1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MONTANA

3             GREAT FALLS DIVISION

4

5   JAY NELSON,                    )
                                   )
6              Plaintiff,          )    Civil Docket
                                   )    No. CV-22-49-GF-BMM
7        vs.                       )
                                   )
8   FOREST RIVER, INC. And DOES    )
    1-25,                          )
9                                  )
               Defendants.         )
10  _____)

11                  Transcript of Motion Hearing

12

13             Missouri River Federal Courthouse
14                 125 Central Avenue West
                    Great Falls, MT 59404
15             Tuesday, February 21, 2023
                  2:40 p.m. to 4:07 p.m.
16

17           BEFORE THE HONORABLE BRIAN MORRIS

18       UNITED STATES CHIEF DISTRICT COURT JUDGE

19

20                Yvette Heinze, RPR, CSR
21              United States Court Reporter
              Missouri River Federal Courthouse
22                 125 Central Avenue West
                    Great Falls, MT 59404
23            yvette_heinze@mtd.uscourts.gov
                    (406) 454-7805
24
             Proceedings recorded by machine shorthand
25   Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2    PRESENT ON BEHALF OF THE PLAINTIFF:

3                        C. Tab Turner (via video)
                         TURNER & ASSOCIATES, P.A.
4                        4705 Somers Avenue, Suite 100
                         North Little Rock, AR 72116
5

6                        Daniel B. Bidegaray (via video)
                         BIDEGARAY LAW FIRM
7                        1700 West Koch, Suite 305
                         Bozeman, MT 59715
8

9                        Keith D. Marr
                         Gregory Pinski
10                       Dennis P. Conner (via video)
                         CONNER & MARR, PLLP
11                       PO Box 3028
                         Great Falls, MT 59403-3028
12

13   PRESENT ON BEHALF OF THE DEFENDANTS:

14
                         Mark Hayden
15                       Spencer Shields Cowan (via video)
                         TAFT STETTINIUS & HOLLISTER LLP
16                       425 Walnut Street
                         Suite 1800
17                       Cincinnati, OH 45202

18                       Maxon R. Davis
                         DAVIS HATLEY HAFFEMAN & TIGHE
19                       PO Box 2103
                         101 River Drive North The Milwaukee Station
20                       Third Floor
                         Great Falls, MT 59401-2103
21

22

23

24

25

```
1                         PROCEEDINGS
2        (Open court.)
3             THE COURT:  Madam Clerk, please call the next case on
4   the Court's calendar.
5             THE CLERK:  This Court will now conduct a motion
6   hearing in Cause Number CV-22-49-GF-BMM, Nelson versus
7   Forest River.
8             THE COURT:  Good afternoon, Mr. Marr.
9             MR. MARR:  Hi, Judge.
10            THE COURT:  Mr. Pinski.  And I have, I think,
11  Mr. Turner on Zoom and Mr. Conner and Mr. Bidegarary.  You're
12  all there?
13            MR. TURNER:  Yes, sir.
14            THE COURT:  Good afternoon, Mr. Davis and Mr. Hayden.
15            MR. HAYDEN:  Yes, sir.
16            THE COURT:  I have on Zoom, Mr. Cowan?
17            MR. COWAN:  Yes, Your Honor.
18            THE COURT:  All right.  Great.
19            So this is a motion to dismiss filed by Defendant
20  Forest River, Document 49, and also Forest River's motion to
21  strike class allegations, Document 51.
22            So who's going to argue for Forest River?
23            MR. HAYDEN:  I am, Your Honor.
24            THE COURT:  All right.  Go ahead, please, Counsel.
25            MR. HAYDEN:  Your Honor, would you like me to argue
```

1 | both motions or argue --

2 | THE COURT:  Yes, please, both of them.

3 | MR. HAYDEN:  Good afternoon, Your Honor.

4 | Defendant Forest River moves to dismiss Plaintiff Jay Nelson's

5 | third amended complaint for lack of jurisdiction under Federal

6 | Rules of Civil Procedure, Rule 12(b)(1) and 12(b)(6).

7 | Alternatively, if this Court exercises jurisdiction,

8 | it should dismiss plaintiff's third amended complaint under

9 | Rule 12(b)(6) because plaintiff has not alleged a viable claim.

10 | Excuse me, I think I said we're moving to dismiss for

11 | lack of jurisdiction under 12(b)(6).  That should be just

12 | 12(b)(1).

13 | The facts of this case, Your Honor, are fairly

14 | straightforward and simple.  Plaintiff alleges that in May of

15 | 2020, while he was towing his 2019 Forest River recreational

16 | vehicle, a wire connected to the RV overheated and started to

17 | smoke.  Fortunately, this incident caused no harm.  Plaintiff

18 | and his family were not harmed.  The smoke did not damage the

19 | RV.  Plaintiff's pickup was not damaged, And none of his other

20 | property was damaged.

21 | And plaintiff paid nothing to fix the RV.  Plaintiff

22 | took the RV to a Forest River dealer here in Montana, which

23 | repaired the RV, and Forest River reimbursed the dealer for

24 | those repairs.

25 | Plaintiff alleges that a design defect caused the

1    wire to overheat.  Plaintiff did not disavow Forest River or
2    its RVs.

3           About a month after the incident with his original
4    RV, plaintiff traded in his original RV and purchased a new
5    2020 Forest River RV.  Plaintiff doesn't complain of any
6    problems with that replacement RV.  Nonetheless, plaintiff
7    hired an attorney, and together plaintiff and his attorney
8    hired an electrician to inspect and modify the replacement RV's
9    wiring.  Plaintiff paid the electrician $300 for these
10   modifications.  Plaintiff's attorney, who hired the electrician
11   as a consultant, paid about $200 for the consulting work.

12          If you look at plaintiff's preliminary pretrial
13   statement at page 37 -- and that's ECF Number 22 -- there, in
14   that statement, the plaintiff states that he hired an
15   electrician at the cost of $300 to make these changes to the
16   replacement RV.

17          It says in paragraph 34, and I quote, "After
18   discovering the cause of his RV fire, Jay hired an electrician,
19   at the cost of $300, to make repairs to the replacement RV to
20   bring it in compliance with NFPA 1192, Article 110, Part A,
21   Items 2, 4, 5, 6, and 8, and ANSI/RVIA LV 3-1, 3-6, and 5-1
22   standards."

23          So in the preliminary pretrial statement, the
24   plaintiffs said very clearly that the cost of making these
25   alleged repairs to the replacement RV cost the plaintiff $300.

Plaintiff now seeks reimbursement for his cost, a cost he voluntarily incurred, to make these changes to the replacement RV, and he alleges a design defect that never manifested itself as a defect in this replacement RV and caused no harm.

First, Your Honor, I'd like to address CAFA jurisdiction.  This Court should dismiss plaintiff's complaint under Rule 12(b)(1) because even after amending his complaint three times, plaintiff has not shown that jurisdiction exists under the Class Action Fairness Act known as CAFA.  To invoke CAFA jurisdiction, a party must show, first, that a hundred or more plaintiffs comprise the putative class; and, second, that the putative class's aggregate damages exceed 5 million.  It's our position, Your Honor, that plaintiffs can't satisfy that second requirement.

Here, plaintiffs claim that 12,662 Forest River RVs have been sold since 2005.  That's paragraph 3 of the third amended complaint, ECF Number 45.  There, the plaintiff alleges 12,662 Puma RVs have been sold by Forest River.

So even if there are 12,662 separate plaintiffs, plaintiff has not shown that the putative class's aggregate damages exceed 5 million.  Plaintiff alleges that they spent 300 -- that he spent $300 making these changes to the replacement RV.  And if you take $300 across 12,662 plaintiffs, that produces only $3.8 million in aggregate damages.  So

1  because the aggregate amount in controversy is less than

2  5 million, there is no CAFA jurisdiction.

3          Now, plaintiff alleges here that he can meet the

4  threshold of 5 million by including a $200 consulting fee that

5  his attorney paid to the consulting electrician.  But that

6  makes no sense because those costs are not costs incurred by

7  the plaintiff, and potential class members would only need to

8  spend $300 to make these alleged repairs to their RVs, not

9  $500.

10          Plaintiff also alleges that they can meet the

11  threshold by including punitive damages, but he identifies no

12  authority that permits the recovery of putative damages for any

13  of his claims.  In fact, the Montana Consumer Protection Act,

14  at Section 30-14-133, expressly precludes putative damages.

15          Finally, plaintiffs allege that he can meet the

16  threshold by including attorney fees, and attorney fees can be

17  considered in reaching the CAFA threshold.  But only the party

18  asserting CAFA jurisdiction must prove the amount of attorney

19  fees at stake by a preponderance of the evidence and must make

20  this showing with summary judgment-type evidence.  That's the

21  *Fritsch v Swift Transportation* case.  It's Ninth Circuit

22  decision, in 2018.

23          And even when a party is entitled to attorney fees,

24  it must still provide a reasonably specific showing as to why a

25  certain fee award is appropriate.  That's the *Gaasterland v*

1  *Ameriprise Financial Services* case.  That's a case out of the
2  Northern District of California in 2016.
3          Here, plaintiff has made no effort to specifically
4  show how their attorney fees would get them to $5 million.
5  They haven't made any effort to show specifically how they
6  would get that additional $1.2 million in attorney fees to get
7  to the $5 million threshold.
8          THE COURT:  Mr. Hayden, in the complaint, the third
9  amended complaint, isn't it true that the plaintiff alleges
10  damages of the cost to repair of $825?
11          MR. HAYDEN:  Yes, sir.  Well, that is the -- that's
12  really not the plaintiff's cost of repair.  That's the cost
13  that the plaintiff -- excuse me -- the plaintiff took his
14  original RV to a dealership in Montana, and they did $825's
15  worth of repairs under the warranty.  But then Forest River
16  reimbursed the dealer for that $825.  So the plaintiff didn't
17  incur any of those costs.
18          THE COURT:  They're covered under the warranty for
19  the RV?
20          MR. HAYDEN:  Yes, sir.
21          THE COURT:  Is that warranty something that everyone
22  gets at the time of purchase, or do you pay extra for it?
23          MR. HAYDEN:  I believe everyone gets a warranty,
24  Your Honor.  They get a one-year warranty.
25          Your Honor, moving on from CAFA jurisdiction, we also

1  move to dismiss plaintiff's third amended complaint under

2  Rule 12(b)(6) because plaintiff lacks standing to sue.

3  Article III limits the jurisdiction of federal courts making

4  standing a constitutional prerequisite.  To establish

5  Article III standing, a plaintiff must show that he has

6  suffered an injury in fact.

7          Here, plaintiff has not met his burden to establish

8  jurisdiction because, first, he incurred no direct

9  out-of-pocket cost to repair the original RV.  It was all done

10 under his warranty.

11         Plaintiff cannot represent a class without showing

12 that he has personally suffered an injury.  It makes no

13 difference whether alleged unidentified class members suffer

14 injuries.  The plaintiff has to show that he suffered an

15 injury.

16         Plaintiff has not alleged that the defect reduced the

17 value of his trade-in.  He made a voluntary payment to the

18 electrician to modify his replacement RV, but that doesn't

19 create standing.

20         And in support of that, we cited the *Clapper* case, a

21 US Supreme Court discussion from 2013.  There, the Court held

22 plaintiffs cannot manufacture standing merely by inflicting

23 harm on themselves based on their fears of hypothetical future

24 harm that is not certainly impending.

25         So plaintiff cannot manufacture standing by

1  inflicting harm on himself.  In essence, that's what he did
2  when he made these changes to his replacement RV.  So simply
3  alleging a defect doesn't create standing.  The plaintiff has
4  to show that he suffered an actual injury caused by the defect.

5          THE COURT:  So he would have had to wait until the
6  replacement RV had a fire start in the box?

7          MR. HAYDEN:  Well, that's -- that would have been --
8  that would have been a harm to him.  And then, presumably, that
9  would have cost $300 to fix.

10          THE COURT:  Assuming he put the fire out in time.

11          MR. HAYDEN:  Yeah.  Well, or $825.  That's what the
12  dealer charged.  But, again, it was covered by his warranty.
13  So this plaintiff didn't suffer that.

14          THE COURT:  So I'm assuming the plaintiff is going to
15  argue, "Look, I knew the replacement RV had the same defect as
16  my original RV.  So as a preemptive matter, I had the repair
17  performed to avoid potential damage down the road."

18          That can't be the source of the damages here?

19          MR. HAYDEN:  Well, if it is the source of the
20  damages, first, it's not -- it's not an injury that he actually
21  suffered.

22          THE COURT:  Because of the warranty?

23          MR. HAYDEN:  Yes.  And if it is considered by this
24  Court an injury, it's only $300, and it doesn't get to the CAFA
25  level.  I'm going back to the CAFA argument.  But it's a -- you

1  know, our position is that it doesn't -- it doesn't reach

2  Article III because this particular plaintiff didn't suffer an

3  injury himself.  What he chose to do was make a voluntary

4  improvement to his RV.

5          On our other motion, in addition to our motion to

6  dismiss for lack of jurisdiction, we also made a motion to

7  dismiss for failure to state a claim under Rule 12(b)(6).  If

8  the Court exercises jurisdiction, it should dismiss the third

9  amended complaint under 12(b)(6) for failure to state a claim.

10  All of plaintiff's claims --

11          THE COURT:  Hold on, Counsel.  Let me go back to the

12  damages for a moment.

13          Don't plaintiffs also allege some period of loss of

14  use before they get the RV repaired?

15          MR. HAYDEN:  They make a general allegation about

16  that, but they don't allege any specific amount.  They don't

17  allege any specific damages related to that, just a general

18  statement about lack of use.  But they don't assign any

19  monetary amount to that.

20          They also allege that the RV had a reduction in

21  value, but that's based upon the fact that he traded in an RV

22  that was relatively new.  And you would expect when you trade

23  in an RV that's relatively new, you're going to lose some value

24  on that RV.

25          THE COURT:  All right.  Go ahead.  The next argument

1   is about the failure to state a claim?

2          MR. HAYDEN:  Yeah, but first -- the first claim I'd
3   like to address is the Consumer Product Safety Act.

4          Forest River moves to dismiss the Consumer Product
5   Safety Act for failure to state a claim.  In paragraph 112 of
6   plaintiff's third amended complaint, plaintiff claims that the
7   RV's alleged defective wiring system violates the Consumer
8   Product Safety Act.

9          The Court should dismiss plaintiff's claims under the
10  Consumer Product Safety Act because the CPSA does not apply to
11  RVs.  The Consumer Product Safety Commission has issued an
12  opinion confirming that it does not have jurisdiction over the
13  design and construction of mobile homes or recreational
14  vehicles.  That's an opinion from the office of general counsel
15  of the Consumer Product Safety Commissions.  It's an advisory
16  opinion dated August 31, 1973.  So the plaintiff's claim,
17  therefore, fails because the CPSA does not apply to RVs.

18         Additionally, the plaintiff is required to identify a
19  CPSC rule or order that Forest River has allegedly violated.
20  In support of that we cite the *in re Mattel* case, which is a
21  2008 decision out of California.  And there, the Court held
22  "Plaintiffs' failure to identify a consumer product safety rule
23  or order of the CPSC is fatal as there is no private right of
24  action under the CPSA itself absent a specific rule promulgated
25  by the CPSC."

1        Here, the plaintiff has failed to identify how the

2    alleged defective wiring system in the RV violated a specific

3    CPSC rule or order.  So the Court should dismiss plaintiff's

4    CPSC claim because the CPSA does not apply to RVs, and

5    plaintiff has failed to specifically identify a rule or order

6    that Forest River has allegedly violated.

7        Next, plaintiff -- next, Forest River moves to

8    dismiss plaintiff's negligence claim.  Plaintiff's negligence

9    claim should be dismissed because he has, one, not identified

10   an injury or damages; and, therefore, he cannot draw a causal

11   connection between any injury and Forest River.

12       Plaintiff has no specific injury related to the

13   original RV.  He alleges no specific cost related to his loss

14   of use of the original RV.  He does not allege that the wiring

15   defect specifically reduced the market value of his original

16   RV.  He just says, "I traded it in, and I lost money on the

17   trade-in."  But, again, you'd expect that when you trade in a

18   relatively new RV.

19       THE COURT:  What about plaintiff's argument that

20   Forest River owed a duty under the -- let's see.  Where is

21   it? -- the National Highway Transportation Safety Act safety

22   standard?

23       MR. HAYDEN:  Well, in the complaint itself, it

24   alleges an action under the Consumer Products Safety Act.

25       THE COURT:  Well, this is you have a duty to comply

1 with the National Highway Transportation Safety Act safety

2 standard.  So as a matter of law, if you breached that duty,

3 you would be liable?

4          MR. HAYDEN:  I'm not sure how that ties into the

5 Consumer Product Safety Act.

6          THE COURT:  No, this is on the negligence claim, the

7 duty that they owe.

8          MR. HAYDEN:  Oh, okay.

9          THE COURT:  That they allege that you owe arises from

10 the National Highway Transportation Safety Act.

11          MR. HAYDEN:  Well, again, in a negligence case, the

12 plaintiff has to show damages, and our point is he hasn't shown

13 an injury here.  His replacement RV was repaired at no cost to

14 him, and he voluntarily decided to make this change to the

15 replacement RV.  That's a self-inflicted cost that --

16          THE COURT:  Well, Counsel, how would you respond --

17 you have the plaintiff who buys an RV and has this incident

18 with a fire.  We have to take that as true for now.  So if I

19 get a replacement RV with the same kind of electrical box,

20 chances are I might get a fire again.  To avoid that

21 contingency, I'm going to preemptively get the box repaired.

22          You have to wait around for the fire to happen?

23          MR. HAYDEN:  Yeah, he's got to -- that's our view.

24 Our view is that he has to have some actual physical injury or

25 property damage in order to assert, for example, a negligence

1  claim.  He can't just voluntarily make these -- what he

2  considers improvements to his RV.

3           That's our view of the law of negligence, Your Honor.

4           THE COURT:  All right.  What about the negligent

5  misrepresentation claim?

6           MR. HAYDEN:  I'm sorry?

7           THE COURT:  The negligent misrepresentation claim.

8           MR. HAYDEN:  Plaintiff's negligent misrepresentation

9  claim should be dismissed because he's failed to meet the

10  heightened pleading requirements for negligent

11  misrepresentation.  The plaintiff alleges that Forest River

12  certified that plaintiff's RV complied with the National Fire

13  Protection Association's Standard 1192 for RVs, and that Forest

14  River certified that plaintiff's RV complied with certain

15  standards adopted by the Recreational Vehicle Industry

16  Association, and he claims that these certifications were

17  false.

18           In paragraph 74 of his third amended complaint,

19  plaintiff alleges that the replacement RV was stickered with

20  these certifications that it complied with these standards.

21           And then the third amended complaint goes on to make

22  a lot of general statements about these standards.  But

23  plaintiffs have failed to allege that Forest River made a

24  specific representation about the RV's wiring.  And, most

25  importantly, plaintiff has failed to allege that he read these

1  certifications and specifically relied upon them in deciding to
2  purchase his RV.
3        A plaintiff cannot state a claim for
4  misrepresentation by making general claims.  A plaintiff
5  asserting a claim for representation must state the time,
6  place, and specific content of the false representation and,
7  most importantly, here, specific reliance on that false
8  representation.
9        And that's where their claim really falls apart.
10 They don't allege that the plaintiff specifically relied upon
11 these certifications when he made his decision to buy his RV.
12 And that might sound like a technicality.  But when you are
13 dealing with the heightened pleading standards for negligent
14 misrepresentation, he's really got to make a claim specifically
15 that he relied on those certifications in deciding to buy his
16 RV, and they don't make those allegations in their third
17 amended complaint.
18        THE COURT:  It's not enough to argue that, "Well, I
19 bought an RV in part because, unlike a tent, an RV is like a
20 moveable house.  It comes with electricity.  It can have lights
21 running.  It can have a stove operating and a refrigerator"?
22 That's not enough?
23        MR. HAYDEN:  It's not enough to have just -- to say,
24 "I generally relied upon Forest River to manufacture and design
25 a safe RV."  He's got to say that "I specifically relied on a

1  specific representation that was a false representation in
2  deciding to buy my RV."  And that's -- he doesn't -- he doesn't
3  make those specific allegations in the third amended complaint.

4        THE COURT:  Even though the plaintiff argues that the
5  RVs contain this sticker certifying compliance is a NHTSA
6  standard?

7        MR. HAYDEN:  Yeah, but he doesn't say that he
8  specifically relied upon that certification in deciding to buy
9  his RV.

10        There's a very good decision on this, I thought, out
11  of the -- out of California.  I'm trying to find it here,
12  Your Honor.  It's the *Lorenzo Ford v Hyundai* case.  It's a 2021
13  decision out of the Central District of California.  It really
14  deals with a similar issue there, and I'd encourage you to look
15  at that decision.  I think that's --

16        THE COURT:  What's the citation?

17        MR. HAYDEN:  What?

18        THE COURT:  The citation, please.

19        MR. HAYDEN:  *Lorenzo Ford v Hyundai*, 2021,
20  Westlaw 7448507.

21        It's also a good decision that I'm going to just
22  address here in a few minutes on this -- on bringing a class
23  action under Montana Consumer Protection Act.  I think it
24  contains an excellent discussion about that.

25        So, you know, what the court held there is that there

1  just wasn't a specific allegation of reliance in that case and

2  dismissed the negligent misrepresentation claim.

3          Our final argument on this motion to dismiss is the

4  fraudulent concealment and Montana Consumer Protection Act

5  claims.  And really it's the same argument as the negligent

6  misrepresentation argument, Your Honor.  It's our position that

7  they just haven't specifically alleged that the

8  plaintiff relied on a specific alleged false misrepresentation

9  in deciding to buy his RV.

10         THE COURT:  Is it a false concealment or

11  misrepresentation on a standalone claim under Montana law?

12         MR. HAYDEN:  We don't believe so, Your Honor.

13         Unless you have any questions, I'll go ahead and

14  address the motion to strike.

15         THE COURT:  Well, what about the Consumer Protection

16  Act claim?

17         MR. HAYDEN:  The Montana Consumer Protection Act

18  claim?

19         THE COURT:  Yes, please.

20         MR. HAYDEN:  Yeah.  Well, our view is it's very

21  similar to the negligent misrepresentation claim.  They just

22  haven't met that heightened pleading standard under the

23  Consumer Protection Act claim because they haven't alleged a

24  specific false representation that the plaintiff relied upon to

25  his detriment.

1      THE COURT:  All right.  Go ahead and talk about the

2  motion to strike.

3      MR. HAYDEN:  Thank you, Your Honor.

4      So Forest River moves to strike plaintiff's class

5  allegations.  If this Court does not dismiss plaintiff's

6  complaint under Rule 12(b)(1) or 12(b)(6), it should strike

7  plaintiff's class allegations under Rule 12(f).

8      Plaintiff, a Montana resident, bought an RV

9  manufactured by Forest River.  Forest River is incorporated in

10  Indiana, and it is headquartered in Indiana.  Plaintiff

11  contends that the RV was defective, and he has sued Forest

12  River on behalf of a putative national -- a nationwide class in

13  a Montana subclass of RV purchasers.  He alleges a mix of

14  statutory negligence and fraud-based claims.

15      Regardless of whether plaintiff's claims are viable,

16  he cannot maintain this action as a class action, and the Court

17  should strike the class allegations at this point in the case

18  rather than put Forest River through extremely expensive

19  discovery before looking again at the class action allegations

20  when they move to certify.

21      Now, we believe there are four independent reasons

22  warranting striking the classes now.  First, this Court lacks

23  personal jurisdiction over Forest River with respect to the

24  nationwide class.  Forest River is not at home in Montana.

25  Forest River is not subject to general jurisdiction in Montana.

1   Therefore, specific jurisdiction is the only viable basis for

2   personal jurisdiction.

3          But plaintiff cannot show that the nonresident

4   plaintiffs' claims arose in Montana.  Plaintiff does not

5   allege, for example, that Forest River designed or manufactured

6   any RVs here in Montana.  And the mere fact that plaintiff sued

7   Forest River in Montana does not create a connection between

8   the nationwide class members and this forum that supports

9   specific jurisdiction.

10          THE COURT:  Well, isn't it true that Forest River

11   sells these products in Montana?

12          MR. HAYDEN:  Yes.  And we -- and we believe there is

13   general jurisdiction; there's just not specific jurisdiction.

14   There's not specific jurisdiction for these nationwide class

15   action allegations against Forest River.

16          I can tell you that, you know, class action

17   complaints have been filed against Forest River in the Northern

18   District of Indiana, and that's where it's headquartered.

19   That's where it manufactures its RVs.  But it's not

20   headquartered in Montana, and it doesn't manufacture RVs here

21   in Montana.

22          In support of this argument, we rely on the

23   US Supreme Court's decision in *Bristol Myers Squibb* and the

24   California District Courts' decision *Carpenter v PetSmart*.  The

25   Court should not exercise personal jurisdiction over

1  nonresidents' claims against a nonresident defendant under the

2  holding in *Bristol Myers*.

3       Now, we've acknowledged that *Bristol Myers Squibb* was

4  a mass tort action and not a class action, but the *Carpenter*

5  *PetSmart* case that we've cited was a class action.  And around

6  the nation, courts have split on whether *Bristol Myers* applies

7  to class actions brought in federal court.

8       It is our view -- and we believe this Court should

9  adopt this view -- that the *Bristol Myers Squibb* case applies

10 to both mass tort actions and class actions.

11      THE COURT:  Well, Counsel, plaintiff cites to

12 decisions from the Seventh Circuit, the Sixth Circuit, the

13 Third Circuit, and the DC Circuit that have rejected the

14 *Bristol Myers* approach.  Why don't those cases provide

15 persuasive authority?

16      MR. HAYDEN:  Well, Your Honor, we've cited quite a

17 few cases from California that reached a different result,

18 quite a few district court discussions from the Ninth Circuit.

19 *Carpenter* is one of the best examples of that.  And we

20 discussed that in detail in our briefs, and we've cited other

21 California decisions in the Ninth Circuit who've reached the

22 same conclusion that the *Bristol Myers Squibb* case applies to

23 both mass tort actions and class actions.  So I guess we think

24 they got it right.

25      THE COURT:  Okay.  You want to finish up with your

1    class action analysis?

2         MR. HAYDEN:  Sure.  Second, we believe the Court

3    should strike plaintiff's class allegations because plaintiff's

4    proposed class definitions are not ascertainable and comprise

5    members who have suffered no actual injury.

6         In support of this argument, we rely on *Hovsepian v*

7    *Apple* decision.  That's a 2009 decision from the Northern

8    District of California, and that's in our brief.  In that

9    decision the court granted a motion to strike the class

10   definition because it included proposed class members who never

11   experienced any defects with their iMac computer.  So there,

12   the plaintiff complained that he had some fuzziness on his

13   screen and sought to bring a class action.  But he sought to

14   include class members who had never experienced any problems

15   with their iMacs.

16        And we believe that case applies here because what

17   the plaintiff seeks to do is include a whole class of buyers

18   who've never suffered any wiring problems with their RVs.

19   They've never had a -- they seek to include class members

20   who've never experienced any damages or had any fires or had

21   any issues related to this wiring problem.  And without an

22   actual damage, then we don't believe that they can be included

23   in the proposed class, but the plaintiff has tried to include

24   them in their proposed class.

25        Third, we believe the plaintiff lacks standing to

represent a nationwide class.  Plaintiffs assert negligence,

negligent misrepresentation, fraudulent concealment claims on

behalf of a nationwide class, but they do not say which state

laws should govern these claims.

And that's a significant problem here given the

conflict between Montana law and the laws of 49 different

states, especially as it relates to the Economic Loss Doctrine.

Montana law cannot govern these claims of nonresident

plaintiffs with no connection to this forum because the Court

would be trying to apply the laws of 49 states to these various

claims of negligent misrepresentation, fraudulent concealment,

and the laws are different from state to state for those

claims.

So if this Court were to take jurisdiction of those

claims, then it would violate, we believe, constitutional due

process and give Montana law extra territorial effect.  The

plaintiff lacks standing to asserted state law claims on behalf

of nonresident plaintiffs, therefore, whose injuries arise

outside of Montana.

We believe the plaintiff's alleged claims arose in

Montana, meaning that the plaintiff can only assert claims

under Montana law.  And there really is no solution to this

problem in our view other than to strike the nationwide class

allegations.  And the decision we rely heavily on for that is

this *Carpenter v PetSmart* case again.  It's that 2020 district

1  court decision from California.

2  Fourth, Forest River believes that the -- or takes

3  the position that the Court should strike plaintiff's Montana

4  subclass allegations under the Montana Consumer Protection Act

5  because the Montana Consumer Protection Act expressly precludes

6  plaintiffs from asserting claims under that statute on behalf

7  of a class.

8  Now, we acknowledge that this Court reached a

9  different conclusion in 2016 in the *Wittman v CB1 case.  In*

10 *Wittman*, this Court declined to follow Justice Stevens'

11 concurrence in *Shady Grove*.  And we acknowledge that this Court

12 reaffirmed that holding in *Hill v LLR*.

13 But, in 2021, there was an important decision from

14 the Central District of California, and that's the case I

15 mentioned earlier, this *Lorenzo Ford v Hyundai* case, 2021

16 Westlaw 7448507.  There, in a case that's very similar to this

17 one, the Court held that Alabama and Colorado prohibitions on

18 class actions for consumer claims were substantive law and not

19 merely procedural.

20 And there, in that *Lorenzo Ford* decision, again, a

21 decision dated in 2021, after your decision in *Wittman* and your

22 decision in *Hill v LLR* -- or this Court's decision -- the

23 *Lorenzo Ford* court followed Justice Stevens' concurrence and

24 struck the class action allegations under those statutes.

25 It's our position that the MCPA prohibition on class

1   action is a substantive and not merely procedural holding in

2   that statute; and, therefore, the Court should apply

3   Justice Stevens' concurrence.  And we urge you to review the

4   *Lorenzo Ford* decision and apply that holding here.

5        Additionally, a recent 2022 decision in *Lee v*

6   *Samsung* -- and that's out of the Southern District of Texas,

7   2022 Westlaw 4663878 -- held that a majority of courts have now

8   concluded that Justice Stephens' concurring opinion in

9   *Shady Grove* is controlling.  So in that *Lee v Samsung* case,

10  they reviewed the holdings on this and concluded that

11  Justice Stephens' concurring opinion is now, according to a

12  majority of the courts, the controlling decision out of

13  *Shady Grove*.

14       So we urge you to apply Justice Stevens' concurring

15  opinion and hold that the plaintiff cannot assert a class

16  action under the Montana Consumer Protection Act.

17       THE COURT:  Anything else, Counsel?

18    (Off-the-record discussion between Mr. Turner and

19    Mr. Davis.)

20       MR. DAVIS:  With all due respect, Judge, we think you

21  erred, and we've given you an opportunity to correct yourself.

22       THE COURT:  All right.  Thank you.

23       For the plaintiffs, Mr. Turner.

24       MR. TURNER:  Yes, Your Honor.  Good afternoon.  This

25  is Tab Turner on behalf of the plaintiffs.

1          I briefly want to begin by going back through some of

2     the factual background in order to make sure the Court is aware

3     of a different -- slightly different set of facts as pled in

4     the third amended or operative complaint.

5          Back in April of 2019, Mr. Nelson purchased a new

6     Puma fifth wheel RV in Montana, contrary to what the defendant

7     has represented today.  The Court can refer to paragraphs 45,

8     46, 65, 67, 137, and 139 for the statement and the pleading

9     that Mr. Nelson, during the course of the purchase,

10    unequivocally -- unequivocally relied on Forest River's

11    certification that the RV met the applicable safety standards

12    on the stickers and that its representations regarding the RV

13    being dependable, safe, conscientiously built, and inspected

14    were in fact true.

15         In May of 2020, Mr. Nelson and his family took the RV

16    out for the first time in 2020 when it caught fire as they were

17    exiting the campground.  Mr. Nelson extinguished the fire

18    rather quickly, and at that point in time it had been towed for

19    less than 250 miles.

20         Following the fire, Mr. Nelson took the RV to the

21    Forest River dealership where service representatives explained

22    to Mr. Nelson that the fire risk was something they already had

23    some familiarity with, and they proceeded to repair it.

24    Unbeknownst to him, however, the dealership repaired the damage

25    to the RV but left in place the same defective wiring system

that existed when it was originally sold, and the dealership
charged Mr. Nelson $825 to repair the burned wires.

Because of the RV fire and Mr. Nelson's family's
concerns, they were obviously fearful at that point in time
about, with less than 250 miles, the thing burning up.  The
family decided to get rid of it in June of 2020.  He originally
paid $34,613 for the RV.  He only received $26,000 in a
trade-in, which resulted in an economic loss of $8,613, as pled
in paragraphs 64 and 71 of the operative complaint.

Mr. Nelson had no RV to use from May 29th to
June 19th of 2020, which was directly attributable to the fire.
Mr. Nelson had paid --

THE COURT:  What is that worth, Mr. Turner?

MR. TURNER:  May 29th through June 29th, 2020?

THE COURT:  Right, and no RV for that period.  Does
Mr. Nelson have a limited number of vacation days per year?
What did he do for a living?

MR. TURNER:  Your Honor, we haven't calculated in
terms of that.  We can certainly put an estimate on it.  We
have not put an estimate on it.  We intended to use an economic
analysis from a retained expert in order to make that
calculation, but we have not made that calculation as of this
date.

Now, Mr. Nelson had to pay $2,500 for a warranty on
the RV, and he had traded in the 2019 model for a 2020 model,

1  which was basically fundamentally the same RV.  Keeping in mind
2  and bearing in mind that at that point in time he did not know
3  the wiring system was defective.

4        Following these transactions, Forest River reimbursed
5  the dealership $825 for its repair of the burnt wires under the
6  warranty policy but then refused to compensate Mr. Nelson for
7  any of his other economic damages, which were in excess of
8  $8,000.

9        Unsatisfied and disturbed, Mr. Nelson turned to the
10 legal system, retained a lawyer who retained a professional
11 electrician in December of 2020, who identified the defective
12 system in the RV.  Following that, the operative complaint
13 was -- the lawsuit was initiated, and the operative complaint
14 ended up being filed.

15       So, in short, that is the difference between the
16 factual scenario that the defendant raised today and that which
17 has been pled in the case.

18       Moving on document number -- Court's
19 Document Number 49 to the CAFA requirements, the operative
20 complaint alleges that $300 was originally what the electrician
21 was paid, but then later he had to do some more work which now
22 totaled $500, and that excluded the cost of the component
23 parts.  And the operative complaint alleges at paragraph 11
24 that the reasonable value -- the reasonable cost of the repair
25 work is $825 in damages, excluding attorney's fees and any

1  putative damages that might be associated with it.

2          With regard to the CAFA requirements, there's no

3  question that Mr. Nelson is diverse.  There's no question that

4  there are over 100 potential class members or class members.

5  And the only dispute is the defendant's claim that the class

6  claims do not aggregate more than 5 million in claims.

7          Do you mind if I share a screen with you for a

8  minute, Your Honor?

9          THE COURT:  Go ahead, please.

10          MR. TURNER:  This is the CAFA jurisdiction elements,

11  and this next slide is the calculation based upon the

12  pleadings -- the operative complaint, the pleading filed in the

13  case.

14          There are actually 10,345 class members.  That figure

15  is different from the 12,000 because the 12,000 figure that the

16  defendant -- that the defense mentioned includes all Puma

17  vehicles, both US and Canada.  The 10,345 are only the

18  US versions, and it is our contention the class members are

19  only US citizens.

20          And then if you take the ten thousand thirty-five,

21  and you multiply that by $825 each, which is what the operative

22  complaint contends the cost to repair the RV is, you get a

23  total of $8,534,625.  And I put corrected damages on this just

24  to reflect that we dropped down from US and Canada RVs to just

25  US RVs.  So that does, in fact, exceed the aggregate amount as

1   pled.

2          Now, the operative standard that the Court -- it's my
3   understanding at least based upon the case law, the operative
4   standard is whether the plaintiff has pled damages in good
5   faith and whether, as a matter of legal certainty, the
6   plaintiffs could not obtain the amount requested.  We don't
7   believe that standard has been met in challenging our damage
8   calculation.

9          The simplistic calculation shows that the potential
10  damages as calculated pursuant to what has occurred in the past
11  with proven numbers is in excess of $8 million.

12          THE COURT:  Mr. Turner.

13          MR. TURNER:  Yes.

14          THE COURT:  Let me just clarify something.  The $825
15  in damages, that's the $300 in the electrician's original
16  bills; plus $500, the cost of new component parts?

17          MR. TURNER:  Not quite.  What the $825 represents --
18  the $825 was charged, but directly by the dealership to replace
19  the wiring in the 2019 Puma.  So that is some evidence of what
20  the cost to replace the wiring is.  That is without remedying
21  the defect in the wiring.  That's just simply replacing the
22  wiring.

23          The cost to repair the defect, in addition to the
24  cost to repair the wires, was between $850 and $1,000 per RV.
25  That's likewise pled.  And it cost --

1          THE COURT:  Is that amount covered by any warranty?

2          MR. TURNER:  No, sir.  That amount is not covered by

3    any warranty.

4          And it cost, at least according to the calculations

5    that we have pled, it cost an additional $500 to hire an

6    electrician to repair the defective system exclusive of the

7    component parts.

8          So the calculations that we have provided in the

9    operative complaint do not even include the component parts and

10   are a minimum of $825 for simply repairing the defective wires,

11   and then an additional $825, according to what we pled, for

12   actually remedying the defect that exists in all of these RVs.

13         Now, the second issue raised by the defendant is that

14   the complaint does not plausibly set forth claims of wiring

15   defects.  And if the Court will give me permission, I will move

16   to the slide again.

17         THE COURT:  Go ahead, please.

18     (Complying.)

19         MR. TURNER:  This slide excerpts out paragraphs 43,

20   basically, through 88, non-inclusive, to summarize all of the

21   facts giving rise to the claims of defect that exists in this

22   RV's wiring system.

23         And to make a long story short, these stickers that

24   are placed on the individual RVs specifically reference that

25   there was compliance with these standards and that Forest River

1 had certified compliance with these standards.  And it was
2 relied upon, of course, by Mr. Nelson as pled in the complaint.

3           And in addition to that, the standards refer to
4 specific guidelines that are set forth, for instance,
5 NFPA 1192, considerations that must be observed when installing
6 RV equipment.  And it specifically sets forth what the rules --
7 what the safety rules and regulations are pertaining to the
8 wiring system in the RVs.

9           And the long and short of it is, not only have we
10 plausibly pled that the defendants violated these standards,
11 we've very specifically referred to the sections that were
12 violated, what was violated, when it was violated, how it was
13 violated, who violated it, and in the manner in which it was
14 violated.

15           So we believe that we have not only very clearly set
16 forth in the complaint our allegations, but they are not only
17 plausible, they are matched up with the respective standards
18 that were violated.

19           Now, with respect to proof of manifestation of a
20 defect, the defendant, as I understand it, argues that proof of
21 the manifestation of the defect is not a -- is a prerequisite.
22 However, we cited the Ninth Circuit case of *Blackie v Barrack,*
23 which was a decision that held that the proof of manifestation
24 of the defect is not a prerequisite to class certification.

25           And as a consequence, we don't believe the

1    defendant's argument that simply because somebody else's RV has
2    not burned up yet, that that somehow precludes this claim.  We
3    disagree respectively with the defendant's arguments.
4            Now, with respect to the individual claims, the
5    violation of the Consumer Products Safety Act, there is an
6    exception as we noted in our briefing, and I won't go through
7    all of the respective details.
8            But to make a long story short, the CPSC will refuse
9    jurisdiction over component parts that are exclusively
10   designed, manufactured, and sold as a component part for RVs.
11   However, they have concurrent jurisdiction, which they've made
12   crystal clear, when an RV manufacturer, like Forest River,
13   incorporates component parts that are not exclusively designed
14   to manufacture and built into RVs.
15           In this specific instance, Forest River used
16   residential components in an RV, which means that they are not
17   exclusively manufactured for RVs, which means that the CPSC
18   does in fact have concurrent jurisdiction over that claim.
19           We don't believe that a motion to dismiss in light of
20   the concurrent jurisdiction of the CPSC is the appropriate
21   result at this stage.  Maybe a summary judgment later, if they
22   believe they're entitled to summary judgment, but certainly not
23   in the context of a motion to dismiss.
24           And we cited the Court to the rulings from the CPSC
25   over the years that have come out referencing this concurrent

jurisdiction and the validity of the concurrent jurisdiction.

Now, moving to the negligence claim, the defendant argued that, at least as I understood it today, which was slightly different than I understood the papers, that somehow you cannot voluntarily make an improvement to a product like this RV, and that somehow excludes the negligence claim.

I, quite frankly, am confused by that.  This was not an improvement.  This was repairing a defective condition in the product, a defective condition that existed, we contend and the operative complaint contends, directly as a result of Forest River's negligence in violating its duty to follow the rules, its duty to use a wiring system that complied with the standards, and follow a duty that it had also acquired -- it had voluntarily acquired as a result of the National Highway Traffic Safety Administration investigations.

Now, with respect to the damage part, the damage part of any negligence claim, of course, includes being able to trace back the damages to the negligent conduct, herein, being the use of a defective wiring system.  We specifically allege in the complaint that Nelson alleged out-of-pocket repair expenses, loss of use damages, diminution in value damages, and we also allege a causal connection between Forest River's conduct, the defects, and the plaintiff's damages.

And our contention is that Forest River could and should have reasonably foreseen that manufacturing and selling

RVs in violation of the safety standards that it had agreed to comply with would likely result in property damage and the risk of serious injury or death in a given circumstance.

Now, moving to the negligent misrepresentation claim, we respectfully disagree with Forest River.  We think we have met any heightened pleading standard under Rule 9(b), with respect to the negligent misrepresentation and the fraud claim, in that not only have we provided who, what, when, where, and how, we have actually provided examples of the misrepresentations and the fraud that took place.  We have shown the stickers.  We have quoted from the standards.  We have given very specific detail about the fraud and negligent misrepresentations that have taken place.

And with respect to damages, the same argument about precluding an award of damages based on consequential damages has specifically been rejected by the Montana courts under *Bokma Farms v the State*.  That's 302 Montana 321, a 2000 decision that references a Restatement (Second) of Torts, Section 552B, which sets forth the appropriate measure of damages for negligent misrepresentation.

And it specifically says that for the recovery of consequential damages sustained as a result of a plaintiff's justifiable reliance on a negligent misrepresentation, that the damages can be either contractual in nature or tortious in nature; and that the consequential damages can be recovered

either scenario; and that the consequential damages under a
contract scenario are limited to those within the contemplation
of the parties but, in the tort context, do not have to be
within the contemplation of the parties to begin with, but
rather are any damages reasonably associated with and related
to the negligent misrepresentation.

And with respect to the kinds of damages that one can
receive in Montana for negligent misrepresentation, there are
some examples set forth in a case referred to as *Montana
Petroleum Tank Release Compensation Board v Crumbleys,*
341 Montana 33, a 2008 decision which goes through and
categorizes the kinds of consequential damages permissible for
negligent misrepresentation in Montana, including lost profits,
including administrative costs, including cleanup costs, and
including any reasonably foreseeable expenses that might have
been incurred by the injured party.

In addition to that, there's another case called
*Wittman*, W-I-T-T-M-A-N, *v City of Billings,* 2022 Montana 129,
that refers to the fact that even additional construction and
costs to remedy a problem or defect and the just compensation
for actually depriving the party of the property for a
specified period of time are both recoverable damages in the
context of a negligent misrepresentation claim.

Now, moving to number D, the fraudulent concealment
claim, there's been some discussion in the -- at least the

1   pleadings, I didn't hear it today as much -- but in the

2   pleadings about fraudulent concealment being limited to the

3   context of statute of limitations.

4           I would simply say this:  It's a question of

5   semantics.  Because when you read the operative complaint,

6   it's quite -- and you read Montana law, it's quite clear that

7   Montana does recognize that fraud can result from one's failure

8   to disclose material facts to another, which is the equivalent

9   of concealing facts.  And so it's just a matter of semantics

10   whether you call that fraudulent concealment or fraud.

11           But when you look at the gist, when you look at the

12   gravamen of the count for fraudulent concealment, the issue is

13   not what we're calling it, but rather what is a factual claim

14   being made.  Here, we are claiming the fraud was the

15   intentional choice that Forest River made, the intentional

16   decision they made to not disclose the truth about their lack

17   of compliance with the safety requirements or, stated

18   differently, concealing the truth about the lack of compliance.

19           And, of course, all of the damages we've already

20   covered in the context of negligent misrepresentation because

21   those same damage elements, the same measure of recovery

22   applies in the fraud context as it does in the negligent

23   misrepresentation.

24           And, lastly, with respect to the MCPA claim, the

25   criticism that I read in the briefing I didn't quite hear

1   today, but I want to address what was put in the briefing.

2   They claim that we did not identify any deceptive or unfair

3   acts or practices by Forest River that would give rise to a

4   MCPA claim under Montana law.  We very much disagree with that.

5         If you look at *Rohrer*, R-O-H-R-E-R, v *Knudson*,

6   K-N-U-D-S-O-N, 349 Montana 197, a 2009 decision under Montana,

7   the Court held that the MCPA does not have to -- have a proven

8   unlawful act, but any act that offends public policy, that

9   offends a statute, or even offends common law, such as a common

10  law fraud or a negligence claim, or otherwise, is considered in

11  Montana to be unfair and deceptive when it causes injuries to

12  consumers.  So we would respectfully disagree that we have not

13  stated a claim under the MCPA in Montana.

14        There was no discussion about the declaratory relief

15  part of it.  We did brief that.  If you would like for me to

16  discuss that, I'd be glad to because we do believe the

17  declaratory relief does have a role in this scenario.  Because

18  the key allegation made in the operative complaint is that this

19  product, this RV, including potentially other models made by

20  Puma, have an allegation of an imminent threat of future injury

21  due to the fire risk involved in these products.  And as a

22  consequence, there is an element of declaring future rights at

23  issue in this particular case.  It's not simply limited to

24  damages as has been in some other cases.

25        Now moving -- unless the Court has a question, I'm

1   moving to Document 51, which is a motion to strike.

2          THE COURT:  Go ahead, please.

3          MR. TURNER:  With respect to the first issue,

4   personal jurisdiction, this is a relatively straightforward

5   issue.  I'll address it very briefly.

6          This relates to the *Bristol Myers* issue of how do you

7   interpret the *Bristol Myers* decision from the Supreme Court

8   given that *Bristol Myers* was a mass tort case, not a class

9   action?  And the *Carpenter* decision very specifically, which

10  preceded the decisions by the Sixth, Third, and Ninth Circuit

11  in *Lyngaas*, *L-Y-N-G-A-A-S, Kelly*, and *Moser*.

12         *Mosure* was a Ninth Circuit case.  Unfortunately, the

13  Ninth Circuit did not have a -- did not take the opportunity to

14  reach the issue, as the Court probably knows, due to the waiver

15  argument that was made in that case.  They never did

16  specifically directly address head-on the rulings of the Sixth

17  and Third Circuit.

18         But the language from the *Mussat*, M-U-S-S-A-T case, a

19  Seventh Circuit case, that the Sixth and Third Circuit

20  followed, and I'll quote for the Court, "Once certified, the

21  class as a whole is the litigating entity, and its affiliation

22  with a forum depends only on the named plaintiffs."

23         The Supreme Court has regularly entertained cases

24  involving nationwide classes where the plaintiff relied on

25  specific rather than general personal jurisdiction in the trial

1  court without any comment about the supposed jurisdictional

2  problem that the defendant raises.

3          In short, we don't think there's any merit to

4  following the *Carpenter* decision in light of the decisions from

5  the Seventh, Sixth, and Third Circuits, and in light of also

6  the fact that the Ninth Circuit, although they did not address

7  the issue of waiver, they did refer to two of those other

8  decisions.

9          Now, with respect to the ascertainability argument,

10 the complaint -- the operative complaint that we're dealing

11 here, this is sort of either a misunderstanding of the

12 operative complaint's allegations or it's just an ignorance of

13 what the operative complaint says.  Because the operative

14 complaint very clearly alleges with striking detail that the RV

15 wiring system defects violate safety standards in the following

16 ways:  There's no over-current protection.  There's inadequate

17 protection against weather and physical damage.  There's

18 inadequate junction boxes.  There's inappropriate metal clamps

19 and grommet fuse.  There's total lack of wire protection, all

20 of which are required by the very standard organizations that

21 Forest River said they complied with and put stickers on the RV

22 when, in fact, they're in clear violation of those standards.

23         And the complaint makes it very clear that the class

24 includes both himself, Mr. Nelson, and others like him.

25         And just to make crystal clear, there are two groups

1  that the plaintiffs contend should be part of this class.  One
2  are those people with fires, and one are those people who have
3  not yet had a fire.  Because, here, Mr. Nelson has suffered
4  from both.  He had a Puma that caught on fire, and he also had
5  one that did not catch on fire, and that is the one that
6  identified the defects in the vehicle.  And there is economic
7  loss associated with the first one, as we know, as well as the
8  second.

9          We've already touched on the damage provisions of the
10 operative complaint as set forth.  And paragraph 5 and also
11 paragraph 89 of the operative complaint defines the classes to
12 include those who purchased an RV in the United States with the
13 specifically defined defects that are set forth with
14 particularity in the operative complaint.  And we allege that
15 all of these class members include those with the defect, that
16 all suffered harm, and that an injury in fact occurred because
17 they have taken the class member's money through the use of
18 deceptive conduct and misrepresentations about the existence of
19 compliance with the safety standards associated with this
20 particular RV.

21         The next issue is standing.  Forest River makes three
22 arguments under the umbrella of its standing argument:
23 Number 1, state laws vary, and the Court cannot apply the law
24 of another jurisdiction absent a putative class representative
25 from that jurisdiction; Number 2, that the Court cannot apply

1  Montana law to resolve all the nationwide class claims; and,

2  Number 3, that Mr. Nelson has standing to assert claims under

3  Montana law only.

4         Article III standing, as the Court is well aware, is

5  satisfied if one named plaintiff meets the requirements, and

6  here we have that.  That's the *Bates* case.  If one named

7  plaintiff meets the requirements, standing has been complied

8  with in the context of Article III.  It means he suffered an

9  injury.  The injury is traceable to the conduct.  And the

10 injury is likely to be redressed by the action, all of which

11 exist here.

12        And in the *Langan* case, L-A-N-G-A-N, cited in our

13 brief, the court -- the Second Circuit addressed this very

14 issue of standing and rejected the argument that Forest River

15 makes today noting that class actions under Rule 23 are an

16 exception to the rule; that one person cannot litigate injuries

17 on behalf of others.

18        The Rule 23, the Second Circuit noted, Congress has

19 authorized plaintiffs to bring a suit in federal court on

20 behalf of, not just themselves, but others from different

21 states, and that such suits result in efficiencies of cost,

22 time, and judicial resources and permit a collective recovery

23 where obtaining the individual judgments might not be

24 economically feasible.

25        And we would argue, Your Honor, that this is the

1   classic case of when a class action, especially a nationwide

2   class action, is warranted because the damages are too small

3   for each of these individual plaintiffs that receive these

4   defective RVs to pursue.  And the risk, however, is great in

5   that somebody could die in a fire very easily if they haven't

6   already died in a fire in one of these RVs.

7            The analysis should occur, according to the Second

8   Circuit, under Rule 23 and not just standing arguments made by

9   Forest River in this case.

10           Now, there are a number of Ninth Circuit cases that

11  come out of the district courts, that some go one way and some

12  go another.  We could cite just as many as Forest River could

13  cite that say the opposite of Forest River's position.  The

14  Second Circuit is the only circuit that we've been able to

15  identify that has very clearly and straightforwardly addressed

16  this issue that the defense barring class action cases have

17  been raising that specifically says that Rule 23 is the

18  appropriate analysis to follow, not an Article III standing

19  analysis.

20           And, lastly, with respect to the choice of law

21  issues, the courts have routinely, as we pointed out in our

22  brief, pointed out that choice of law issues are for the class

23  certification stage, not a motion to dismiss stage, under

24  Rule 23.  And the standing analysis does not apply at this

25  stage to that part of the issue, the choice of law.

1          And lastly, Your Honor, the Montana Consumer
2    Protection Act claim, I won't spend too much time with this
3    one.  It doesn't take long for somebody to note your experience
4    with it.

5          But, in short, Forest River contends that the cases
6    outside of Montana since *Wittman* show that *Wittman* is no longer
7    good law.  That's their precise words.  However, in *Hill v LLR,*
8    *Inc.*, this Court reviewed *Wittman*, reaffirmed its holding, and
9    rejected the exact arguments Forest River is now recycling.

10          For the same reasons as were explained in *Wittman* and
11   *Hill*, the plaintiff believes that the MCPA's purported class
12   action prohibition does not apply to this case, and Forest
13   River's argument is without merit.

14          And unless the Court has any additional questions for
15   me, that's all I've got, Your Honor.

16          THE COURT:  All right.  Thank you, Counsel.

17          Mr. Hayden, I'll give you a brief rebuttal.

18          MR. HAYDEN:  Yes, sir.

19          The claims against Forest River just keep moving, and
20   today is further evidence of that.  The plaintiff is now
21   claiming that the cost of repair is $825.  Well, that's
22   actually the cost that the dealer incurred to replace the
23   damaged wiring.  That's not the cost that a person would incur
24   to make these changes to their RV absent any kind of damaged
25   wiring.

1   THE COURT:  Well, Counsel, let's clarify something.
2   You say, "damaged wire."  Are you talking about wire damaged
3   during the trial fire on the first RV?
4   MR. HAYDEN:  Yes, yes.
5   THE COURT:  All right.  So if I just wanted to go in
6   and upgrade or replace wiring on a recently sold RV, how much
7   would that cost?
8   MR. HAYDEN:  Well, according to the plaintiff, it
9   cost $300.  That's specifically what they said in their
10  preliminary pretrial statement.  On page 37, they said that it
11  would cost $300 to make these changes to reach compliance with
12  the NFPA and ANSI.  So that's their position that they have
13  filed in the pretrial statement with this Court that it would
14  cost $300.  And they said in earlier complaints that the
15  plaintiff incurred a cost of $300 to make these changes.  So I
16  feel like they're comparing apples to oranges.
17  And I think it's also significant that in their third
18  amended complaint they allege that there were 12,662 Puma fifth
19  wheel RVs sold.  And then you hear today the plaintiffs were
20  saying, no, it's 10,345.  So if you take 10,345 times 300,
21  you're even further below the $5 million CAFA threshold.
22  Your Honor asked me if a person pays for their
23  warranty, and I said, "I'm not sure."  I am not sure.  And I
24  see now that the plaintiff alleges in his complaint that he
25  paid 2,500 for a one-year warranty.  I am just not sure whether

1    or not customers pay for that warranty or not.  So I just want
2    to make that clear that I'm not sure on that.
3            One other very quick point, on the application of
4    *Bristol Myers* decision, there's one other important case out of
5    Arizona, and that's *Wenokur* -- and I might be mispronouncing
6    that.  It's W-E-N-O-K-U-R -- *v AXA*.  It's a 2017 decision out
7    of Arizona.  The cite is 2017 Westlaw 4357916, and there the
8    Court held that the analysis in *Bristol Myers* should apply to
9    class actions.
10           The argument about the Consumer Protection Act, they
11   seem to be arguing that a metal junction box isn't appropriate
12   for RVs.  But this metal junction box that they are talking
13   about is inside the RV.  It's not something that is exposed to
14   rain or weather.  It's inside the RV itself.  And what they are
15   saying is that instead of having a metal junction box, you
16   should have a plastic junction box.  And they even take a
17   picture of it, and show you that you can buy this on Amazon.
18           Well, that is just an upgrade.  It's not a -- it's --
19   not getting into the substance of the case, we don't believe
20   it's necessary for inside of an RV to have a plastic junction
21   box.  A metal junction box is fine inside of an RV.
22           And, again, going back to our argument, it just --
23   the Consumer Protection Act is very clear that it doesn't apply
24   to RVs.  And so to take component parts and pull them out of a
25   product that the consumer Protection Act doesn't apply to and

1  start pulling those parts out and saying the Consumer

2  Protection Act should apply to this specific component part,

3  that seems to me to be an abuse of the Consumer Protection Act

4  and not what it's intended to cover.

5           THE COURT:  All right.  Anything else?

6           MR. HAYDEN:  No, sir.

7           THE COURT:  Thank you, Counsel.  This matter is

8  submitted.  I will have an order out as soon as possible.

9           Anything else to address today, Mr. Turner?  Are you

10  still around?

11           MR. MARR:  No, Your Honor.

12           MR. TURNER:  Yes, I'm still here.  Nothing for the

13  plaintiff, Your Honor.

14           THE COURT:  All right.  Well, thank you for your

15  time, Counsel.  We'll be in recess.

16      (The proceedings concluded at 4:06 p.m.)

17

18                        --o0o--

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1                      REPORTER'S CERTIFICATE

2          I, Yvette Heinze, a Registered Professional

3    Reporter and Certified Shorthand Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore mentioned;

6    that the proceedings were reported by me in machine shorthand

7    and thereafter reduced to typewriting using computer-assisted

8    transcription; that after being reduced to typewriting, a

9    certified copy of this transcript will be filed electronically

10   with the Court.

11         I further certify that I am not attorney for, nor employed

12   by, nor related to any of the parties or attorneys to this

13   action, nor financially interested in this action.

14         IN WITNESS WHEREOF, I have set my hand at Great Falls,

15   Montana, this 5th day of March, 2023.

16

17                          /s/ Yvette Heinze
                          _____
18                          Yvette Heinze
                            United States Court Reporter
19

20

21

22

23

24

25