1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MONTANA

3                GREAT FALLS DIVISION

4

5  JAY NELSON,                )

6           Plaintiff,     )

7      vs.               )  Civil Docket
                        )  No. CV-22-49-GF-BMM

8  FOREST RIVER, INC., and DOES    )
   1-25,                   )

9                     )
          Defendants.    )

10  _____)

11            Transcript of Motion Hearing

12

13

14         Missouri River Federal Courthouse
             125 Central Avenue West
              Great Falls, MT 59404

15           Thursday, October 3, 2024
           11:07 a.m. to 11:46 a.m.

16

17       BEFORE THE HONORABLE BRIAN MORRIS

18   UNITED STATES CHIEF DISTRICT COURT JUDGE

19

20            Yvette Heinze, RPR, CSR

21         United States Court Reporter
        Missouri River Federal Courthouse

22         125 Central Avenue West
          Great Falls, MT 59404

23     yvette_heinze@mtd.uscourts.gov
            (406) 454-7805

24

25    Proceedings recorded by machine shorthand
  Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2   PRESENT ON BEHALF OF THE PLAINTIFF,

3               Daniel B. Bidegaray
                BIDEGARAY LAW FIRM
4               1700 West Koch, Suite 5
                Bozeman, MT 59715

5
                Dennis P. Conner
6               CONNER, MARR & PINSKI, PC
                PO Box 3028
7               Great Falls, MT 59403-3028

8

9   PRESENT ON BEHALF OF THE DEFENDANTS:

10              Mark Hayden
                Spencer Shields Cowan
11              TAFT STETTINIUS & HOLLISTER LLP
                425 Walnut Street, Suite 1800
12              Cincinnati, OH 45202

13              Devon Conroy
                DAVIS HATLEY HAFFEMAN & TIGHE
14              PO Box 2103
                101 River Drive North The Milwaukee Station
15              Third Floor
                Great Falls, MT 59401-2103

16

17

18

19

20

21

22

23

24

25

1                              PROCEEDINGS

2          (Open court.)

3              THE COURT:  Clerk, please call the next case on the

4    Court's calendar.

5              THE CLERK:  This Court will now conduct a motion

6    hearing in Cause Number CV-22-49-GF-BMM, Nelson v Forest River.

7              THE COURT:  Thank you, Mr. Clerk.

8              Good afternoon, Mr. Bidegaray and Mr. Conner.

9              And who is for the defense, please?

10             MR. HAYDEN:  Mark Hayden for the defense, with

11   Spencer Cowan, and Devon Conroy, who is here for Max Davis.

12             THE COURT:  Thank you.

13             This is a hearing on a motion to dismiss filed by

14   defendants.  Who's going to argue, please?

15             MR. COWAN:  I will, Your Honor.

16             THE COURT:  Go ahead.

17             MR. HAYDEN:  Should he argue at the podium?

18             THE COURT:  Whatever you prefer.

19             MR. COWAN:  I'll go to the podium.

20             THE COURT:  All right.

21             MR. COWAN:  Good morning, Your Honor.  Spencer Cowan

22   for defendant Forest River.

23             This lawsuit is about an alleged fire risk caused by

24   the lack of overcurrent protection in certain Forest River Puma

25   5th wheel RVs, and this Court should dismiss this case because

Forest River has initiated a recall with NHTSA that promises to supply overcurrent protection on every Forest River Puma RV ever manufactured.

The recall eliminates the fire risk and moots this case.

I want to recap a few basic facts about this lawsuit. Plaintiff owned a 2019 Puma RV, and he alleges that that RV lacked overcurrent protection on the battery charge wire.  He alleges that the charge wire shorted and caught fire.

Here's exactly how plaintiff describes that incident in paragraph 53 of his third amended complaint:  "Because the battery wire had no overcurrent protection as required by standards defendant certified were met, the short caused the battery wire to heat to an extremely high temperature setting nearby flammable material on fire."

In other words, plaintiff traces the cause of the fire directly to the overcurrent protection.

Now, a Forest River dealership repaired the 2019 Puma free of charge, and plaintiff has since traded that away.  And so that's effectively out of the picture.  But plaintiff bought a 2020 Puma RV that he alleges is substantially identical and has the same alleged defect, no overcurrent protection on the battery charge wire.

Now, the 2020 Puma hasn't caught fire, hasn't smoked, but plaintiff alleges that the lack of overcurrent protection

1  on the battery charge wire presents a serious fire risk, and

2  that gives him standing here.

3          And here's, again, how he describes that fire risk in

4  paragraph 30 of the complaint, quote:  "If there is no fuse,

5  circuit breaker, or overcurrent protection between the junction

6  box and house battery and battery wire, and a short in the

7  battery wire occurs, the unprotected battery wire will

8  dramatically overheat, causing the hazard risk of an RV fire."

9          The fire risk from the lack of overcurrent protection

10 is what this lawsuit is all about, but the NHTSA recall

11 guarantees the addition of overcurrent protection and,

12 therefore, eliminates that fire risk.

13         Just a few points about the recall itself:  Forest

14 River has recalled more than 40,000 RVs, every Puma and every

15 Cedar Creek RV ever manufactured.  It spent substantial sums of

16 money notifying customers about the recall.

17         THE COURT:  Mr. Cowan, plaintiffs allege that the

18 recall notified some but not all putative class members.  Is

19 that accurate?

20         MR. COWAN:  No.  Your Honor, the recall notifies the

21 Puma owners and the Cedar Creek owners.

22         Now, I believe the plaintiff makes the argument that

23 perhaps the defect exists in other Forest River RVs.  Forest

24 River is only recalling the Puma and the Cedar Creek RVs.  This

25 issue came up in a case that we cite in our motion to dismiss

1 *Chen v BMW*.  It's a case out of the Central District of
2 California.  In there, the plaintiff opposed prudential
3 mootness dismissal in the case of a recall, and his argument
4 was "I believe that this defect exists in other models beyond
5 just what the manufacturer is recalling."

6       The Court rejected that argument and said, "On a
7 motion to dismiss, we're only looking at the allegations of the
8 class representative."

9       The class representative's model is covered by the
10 recall.  And so that's sufficient to dismiss the class on
11 prudential mootness grounds before a decision on class
12 certification.

13       THE COURT:  What about -- okay.  Besides notifying
14 all of the members, including all of the different types of
15 RVs, plaintiffs allege that the recall would correct some of
16 the problems but not all of the problems that they are claiming
17 exist.

18       MR. COWAN:  Sure.  So if you look at the allegation
19 in the complaint, the allegation is that there's a fire risk
20 here, and the cause of that fire risk is the lack of
21 overcurrent protection.

22       Now, plaintiff makes several arguments to try to
23 oppose dismissal and keep the case in court.  One of the
24 arguments that they make is that this Court should continue to
25 exercise jurisdiction because it doesn't affect or doesn't --

1    the recall doesn't address strain relief and crimping.  Those
2    are two words that don't appear in the third amended complaint.
3    And so they're trying to invent a defect that they haven't
4    alleged here.

5            The second argument they make relates to the
6    modifications from the electrician who modified the 2020 Forest
7    River RV.  That electrician modified the junction box, some
8    grommets, some looming, and some sharp edges.  There's two
9    problems with the argument that they are trying to make.  The
10   first argument is that they don't show how the junction box or
11   the grommets or the looming or the sharp edges caused the fire
12   or even caused the short in the 2019 Puma.

13           The second issue with that is that they don't argue
14   that those modifications would reduce the risk of fire after
15   the recall supplies the necessary overcurrent protection.  And
16   so once that overcurrent protection is added, that eliminates
17   the fire risk.

18           THE COURT:  Counsel, isn't there an administrative
19   process available if a party's dissatisfied with the recall
20   action?

21           MR. COWAN:  There is, Your Honor.  And there's a way
22   to just voice complaints with NHTSA.  And this goes back to the
23   *Winzler* decision that we cited in our briefing from
24   Judge Gorsuch.  One of the points that he stressed was
25   reasonable minds can disagree about the best way to execute the

1  recall.  But once NHTSA has stepped in and exercised

2  jurisdiction over the subject matter of the lawsuit, courts

3  should generally dismiss the case and let the coordinate branch

4  exercise jurisdiction and execute the recall as they see fit.

5           I did want to address just a few more points about

6  the recall itself.  So just to be clear, Forest River is making

7  two promises.  And, again, that's backstopped by NHTSA and

8  NHTSA's enforcement powers.  Promise 1 is they will add the

9  overcurrent protection to any RV, any Puma or Cedar Creek RV,

10 that needs that overcurrent protection.  They'd do so free of

11 charge.  The fix takes about six minutes to complete.  Or, B,

12 for plaintiffs like Jay Nelson, who've spent out of pocket to

13 fix the overcurrent issue themselves, Forest River will

14 reimburse those plaintiffs for their out-of-pocket damages.

15          And, again, the prudential mootness doctrine exists

16 for cases just like this, when there's a viable complaint at

17 the outset of the litigation, but a coordinate branch of

18 government has stepped in to guarantee the same relief.

19          Now, I just want to make a couple quick points about

20 that relief.  NHTSA is guaranteeing the relief that plaintiff

21 seeks.  If you look, beginning at page 38 of the third amended

22 complaint, plaintiff identifies the relief that he's requesting

23 from this Court.

24          So, first, plaintiff asks for injunctive relief.  He

25 wants this Court to order Forest River to notify customers of

1   the recall.  Well, Forest River has done just that.  It is

2   required to do just that under the recall.

3          Second, he seeks actual damages, and he identifies

4   several categories of actual damages.  There's diminution in

5   value, and then he wants to recover the difference between what

6   he paid for the 2020 RV and its actual value, which is less, he

7   argues, because of the defect.  We cited case law in our

8   briefing that once the recall remedies the defect, it restores

9   the value that has been lost.

10          Second, he wants Forest River to set aside a pool of

11   money to pay for repairs.  Well, Forest River is statutorily

12   obligated now to do so under the recall.

13          And, third, he wants Forest River to set aside a pool

14   of money to reimburse owners who have made repairs.  Again,

15   Forest River is statutorily obligated to do just that under the

16   recall.

17          I also want to briefly address --

18          THE COURT:  That pool of money would cover repairs --

19   out-of-pocket expenditures by Mr. Nelson for the first fire?

20          MR. COWAN:  Well, Your Honor, with respect to the

21   first fire, he brought the 2019 Puma to the dealership.  The

22   dealership made the repairs free of charge because it was under

23   warranty.  So there's an allegation in the complaint about

24   $825, but the dealership paid for those repairs.  So plaintiff

25   doesn't have any out of pocket --

1          THE COURT:  Where does the $825 figure come from?

2          MR. COWAN:  I'm sorry?

3          THE COURT:  Where does the $825 figure come from?

4          MR. COWAN:  That was an estimate of the cost of

5   repairs that the dealership incurred and was actually

6   reimbursed by Forest River.  But plaintiff did not pay $825 to

7   the dealership to Forest River.

8          THE COURT:  Forest River paid the dealer that amount

9   to cover its work in repairing the RV?

10          MR. COWAN:  Yes, Your Honor.  The 2019 was under

11  warranty.  Plaintiff took the RV to the dealership.  The

12  dealership authorized the repairs.  I believe it incurred $825

13  in expenses.  And then Forest River reimbursed the dealership

14  for those expenses.

15          So the issues with respect to the 2019 Puma are

16  essentially out of the picture, and then you are left with the

17  modifications that he made to the 2020 Puma.  And Forest River

18  has said that -- and is required under the recall to reimburse

19  owners who've paid out of pocket to make those reimbursements.

20          THE COURT:  How do the facts in *Winzler* compare with

21  here, in terms of the scope of the recall, the parties being

22  notified, and the type of repair at issue?

23          MR. COWAN:  So there are some differences,

24  Your Honor.  One difference I believe is that the recall began

25  while the case was on appeal.  The plaintiff there I think was

only seeking equitable relief, not monetary damages.  We cited,
though, a variety of cases from within the Ninth Circuit,
outside of the Ninth Circuit, where someone who is seeking
monetary damages may seek -- a court may deem a case
prudentially moot when the plaintiff is seeking monetary
damages.

I do want to address one important case which we cite
in our briefing, which is *Sugasawara v Ford Motor Company*.
That's a decision out of the Northern District of California,
and it's from Judge Koh before she was elevated to the Ninth
Circuit.

That case involved a sophisticated seat belt device
called a pretensioner.  And the way that a pretensioner works
is it emits an explosive charge when a car is about to get into
an accident or even when the car is in an accident.  And it
locks the seat belt in place so that the passenger is
restrained.

The allegation in that case was that the pretensioner
was emitting an explosive charge that was too powerful, and it
was setting nearby material on fire.  And so Ford recalled the
cars.  It didn't do anything with the pretensioner.  It didn't
do anything about the explosive charge.  But it removed some of
the flammable material, and it added fire retardant.

The plaintiffs in that case said, "That's not enough.
Ford needs to remove the pretensioner.  Ford needs to do

1  something about the sparks."  And Judge Koh rejected that

2  argument.  And she said, quote, "That the seat belt

3  pretensioner may continue to spark is of no moment if those

4  sparks cannot cause harm."

5        That's very similar to what we have here, where

6  there's a short that has occurred.  The short by itself is

7  harmless if there's overcurrent protection.  The addition of

8  the overcurrent protection ensures that there's no causal

9  connection between the short and the fire.

10        In the Judge Koh decision, *Sugasawara*, she dismissed

11  the case on subject matter jurisdiction grounds.  She doesn't

12  use the words "prudential mootness," but it's nearly identical

13  factually to the case that we have here.

14        And just as Ford eliminated the potential cause of

15  the fire, in that case the flammable materials, Forest River

16  has removed -- or excuse me -- added overcurrent protection and

17  break any kind of causal connection between the short and the

18  fire risk.

19        Finally, I just want to address one final point,

20  which is that once there is a NHTSA recall, the plaintiff must

21  show that there is some cognizable threat that the recall will

22  fail.  And it can't just be speculation.  It can't be the mere

23  possibility of failure.  And, again, that comes from the

24  *Winzler* decision.

25        Here, plaintiff cannot show that a fire risk remains

1  once there's overcurrent protection added to the battery charge
2  line.  The NHTSA recall eliminates that fire risk, and for that
3  reason this Court should dismiss this case.

4  　　　　　THE COURT:  What about the Montana Consumer
5  Protection Act claim that plaintiffs have asserted?

6  　　　　　MR. COWAN:  Sure, Your Honor.  So that claim -- an
7  essential element for that claim is that there is an
8  ascertainable loss.  So that's kind of Step 1.  And, here,
9  there is no ascertainable loss because the recall remedies any
10 damages that plaintiff might have.

11 　　　　　And we cited case law, not on the Montana Consumer
12 Protection Act, but on a similar claim where the plaintiff was
13 seeking actual damages, plus attorneys fees, plus punitive
14 damages.  That's the *Flores* decision, and it's cited in our
15 briefing.

16 　　　　　And the Court said, "Well, first, before you get to
17 attorneys' fees or punitive damages or any kind of special
18 damages, you actually have to have actual damages."  And if the
19 recall remedies those damages, you don't have a claim, you
20 don't have actual damages, and you can't get to attorneys' fees
21 or punitive damages or treble damages, what have you.

22 　　　　　THE COURT:  All right.  Anything else, Mr. Cowan?
23 　　　　　MR. COWAN:  No, Your Honor.  Thank you.
24 　　　　　THE COURT:  I will give you a chance to rebut.
25 　　　　　Mr. Bidegaray.

1    MR. BIDEGARAY:  Yes, Your Honor.  Are you okay with
2  me sitting here?
3          THE COURT:  That's fine.
4          MR. BIDEGARAY:  Okay.  First, the recall does not
5  fully address --
6          THE COURT:  The what?
7          MR. BIDEGARAY:  The recall does not fully address the
8  defects alleged.
9          THE COURT:  Why?
10          MR. BIDEGARAY:  First, they say that adding a
11  circuit -- rewiring it right so that it is actually protected
12  by a circuit breaker resolves all of the issues.  That's not
13  true for lots of reasons.
14          One, there are numerous places -- this starts at the
15  7-way cord, Your Honor, and then it goes all the way to the
16  battery.  So there are numerous places between the 7-way cord
17  and the power that's stored in those two batteries in all RVs
18  where they don't adequately protect the wires.  On both sides
19  of the junction box, they don't adequately protect the wires.
20          The 7-way cord governs the brakes on the trailer.
21  There's a break away wire that is directly wired by design to
22  the two batteries.  It's not protected by a breaker.
23          And if you look at the recall that they actually
24  submitted to NHTSA, it's not even -- it's not even honest.  It
25  doesn't even honestly reflect the breaker issue.  If you read

1  it -- if you owned a Forest River trailer and you read that,

2  you wouldn't have a clue what we're alleging in this lawsuit

3  versus what they're trying to fix, as far as whether or not

4  more work needs to be done.

5      There's lots of -- he used the words "cognizable

6  threats."  Even on the Puma there are numerous remaining

7  cognizable threats.  So that's Point 1.  The recall does not

8  even come close to fixing the problem.

9      THE COURT:  Is that for me to decide?  How do you

10  distinguish the *Winzler* case where you may not like the scope

11  of the recall or the alleged repair, but reasonable minds can

12  differ?

13      MR. BIDEGARAY:  Because of the risks that remain

14  here, Judge, are real.

15      THE COURT:  Is that for me to decide or NHTSA to

16  decide?

17      MR. BIDEGARAY:  NHTSA is not even on notice.  They

18  haven't even put NHTSA on notice of most of the defects that

19  we've alleged.  They haven't even done it.  And with regard to

20  the breaker, they didn't even honestly put them on notice of

21  that.

22      Sure.  We're going to go work with NHTSA.  We haven't

23  yet.  We will.  We've got experts.  We've spent probably close

24  to a couple hundred thousand dollars.  We've got people, live

25  humans with degrees that know about this, with blood flowing

 1   through their veins, that will take the stand and explain all

 2   of this to a jury.  Hopefully, you will let us do that.

 3   There's lots of defects here.  Lots.

 4         And we've alleged them, and what they half-heartedly,

 5   not completely honestly said to NHTSA, doesn't even come close

 6   to addressing them.  That's Point 1.

 7         Point 2, they only recalled the Puma and Cedar River

 8   [sic], and those same people that have blood flowing through

 9   their veins that are going to take the stand will tell you

10   there are many, many more models with the defects alleged in

11   this complaint.  What they've done is fractional -- fractional

12   as to what needs to be done.

13         For example, the Columbus Forest River, a man died in

14   that.  He died.  The fire started in the same place where we're

15   alleging.  We're asking for extra discovery from them because

16   they did an investigation.  They won't give it to us.  It's got

17   similar defects.

18         This case is far from over.  Far from over.  So it's

19   basically twofold.  There's --

20         THE COURT:  So do we have plaintiffs who own Columbus

21   Forest River products?

22         MR. BIDEGARAY:  It's the same defect.  Our class

23   would encompass the Columbus.

24         And then they also limit it to just fifth wheels.

25   That's not true either.  There are travel -- I call them bumper

1   pulls.  So sometimes I might refer to them as that, but I think
2   the industry calls them travel trailers.  It's when -- a fifth
3   wheel is when you have it, and it hooks in the back of the
4   pickup.  A travel trailer hooks to the bumper, the ball on the
5   bumper at the back.  The defects that we're alleging here
6   affect those too.

7            We have experts with great initials after their names
8   from great schools, MIT, what have you.  They have been
9   scouring the country.  We've spent lots of money.  The
10  allegations that this thing is fixed and that NHTSA has been
11  told the truth is not even close to the truth.  Not even close.

12           And you know.  I have been in your courtroom many
13  times, and I wouldn't make statements like this if I didn't
14  know they were true.  I wouldn't do it.  There's lots of
15  cognizable defects that haven't even come close to being
16  addressed by this NHTSA recall.

17           THE COURT:  How do you respond to Forest River's
18  argument that your client has no ascertainable loss because the
19  recall is going to pay for all of these repairs, and he had no
20  out of pocket on the first RV burned in the fire?

21           MR. BIDEGARAY:  Well, first, he does have
22  ascertainable loss.

23           THE COURT:  What?

24           MR. BIDEGARAY:  Well, he took a $9,000 hit when he
25  traded in his other one because he was afraid to put

 1  his family -- his family was afraid to use it.  Second, he had
 2  loss of use.
 3          THE COURT:  So what do you mean a $9,000 hit?  The
 4  new model was more expensive?
 5          MR. BIDEGARAY:  Well, he bought the 2019 for -- don't
 6  quote me on this to the penny.  This is rough.  He bought the
 7  2019 for 36,000; used it five or six times; traded it back in
 8  because he was afraid of it, thinking the 2020 wouldn't have
 9  all the problems that the 2019 -- erroneously thinking that.
10  It did.  And he got 26,000 I think for that.  So for some
11  reason I think it's around $9,000.  My numbers might be a
12  little off.  I think he got, like, 26,000 on the trade-in after
13  he only used it a few times.  That's real money to him.  He got
14  the next one --
15          THE COURT:  Well, was that $26,000 price on the
16  trade-in because of the defect or because it was a used
17  vehicle?  Anytime you drive a car off a lot it depreciates.
18          MR. BIDEGARAY:  Great question.  Probably a little of
19  both.  Probably a little of both.  Maybe mostly the latter.
20  But the point of the matter is the trailer he got the second
21  time was one year newer, and it had only been used five times
22  less.  He wouldn't have traded that.  To him it's real money.
23          You're probably right.  The vast bulk of that
24  probably was just because it -- like you said, you drive a car
25  off the lot, even if you've only driven it one mile, it's going

1  to lose.

2       But to him, he wouldn't have lost that money had this

3  fire not starred, had this defect that they -- I thought it was

4  interesting.  Mr. Cowan started with "alleged defect."  It's

5  not alleged.  They won't even come straight, look you right in

6  the eye and say, "Listen, we wired these things wrong.  We sold

7  it to Nelson wrong.  Not just the first one, the second one

8  too, and to lots of people."

9       They won't even -- even on the little tiny wiring

10  defect that they kind of want to say it will take six minutes

11  to fix -- which is also not true, no one on this earth can fix

12  that defect in six minutes, and people are going to have to

13  take their trailers there.  There's all sorts of -- there's all

14  sorts of loss to all of these people, even on the Pumas, even

15  on the Pumas and the Cedar Creeks that they're owning up to,

16  kinda.  They have to say it's alleged.  It's not alleged, I

17  mean...

18       THE COURT:  Well, if all of that is true,

19  Mr. Bidegaray, why aren't you pursuing an administrative action

20  in front of NHTSA saying, "This is deficient.  You've got to

21  make them do more"?

22       MR. BIDEGARAY:  Well, first of all, in the -- well,

23  because we have the right to be here, and hopefully you will

24  allow us to continue to be here.  You can look at the *Lockyer v*

25  *Mirant* case that we cited, and that's a case decided by the

1   Ninth Circuit in 2005.  It's binding authority on this Court.

2   The Ninth Circuit certainly allowed it there.  L-O-C-K-Y-E-R,

3   it's 390 F3d 1098.

4              THE COURT:  I've got it.  What were the circumstances

5   in *Lockyer*?

6              MR. BIDEGARAY:  You can do it, especially in a

7   situation like this where you don't have -- where there's still

8   ongoing issues that need to be addressed, and we have lots of

9   them, lots.

10             THE COURT:  What ongoing issues were there in *Lockyer*

11  that --

12             MR. BIDEGARAY:  What's that?

13             THE COURT:  What were the ongoing issues in *Lockyer*

14  that led the Ninth Circuit to conclude the case could proceed

15  on two tracks?

16             MR. BIDEGARAY:  Well, I can't tell you the exact

17  defects, but there were additional issues that still needed to

18  be litigated, and they said that wasn't going to create a

19  mootness issue, as long as there was more that needed to be

20  litigated, much like here.  There's a lot more that needs to be

21  litigated.  They said the case moves on to address the

22  unresolved defects.

23             THE COURT:  Anything else?

24             MR. BIDEGARAY:  Any questions you've got, I can

25  answer them.

1          THE COURT:  Well, I mean, we seem to have some
2    disputes about whether the proposed fix is sufficient, whether
3    it covers all of the alleged defects, to what extent it will
4    fix the problems you addressed in your complaint.

5          Do you have any -- well, tell me what out-of-pocket
6    expenses you have besides the trade-in that would warrant
7    keeping the case alive.

8          MR. BIDEGARAY:  Well, you know, his time and energy
9    and running around and loss of use.  Those are real.  He does
10   have emotional distress.  I don't know, honestly, if we pled
11   that.

12         THE COURT:  A standalone claim of emotional distress?

13         MR. BIDEGARAY:  I don't think we probably pled it,
14   Judge.  But he would.  He did.  It seriously bothered his
15   family and children.  But mainly loss of use.

16         And then we had to do more repairs than just -- that
17   is another thing.  The 2019 repairs, I'd love to take you to
18   show you -- I was -- I did the little tour in Montana when
19   Forest River flew their group of people in to do inspections of
20   the various trailers and the pickup that was towing it at the
21   time.

22         I hadn't seen the 2019 repaired in person until that
23   day.  The repairs aren't even consistent with what Forest River
24   would have wanted even had they done it wrong sending it out
25   of -- it still needs more repairs.  The 2019 still needs more

1  repairs.  That's one point.

2        But the 2020 did substantially more repairs than just

3  rewiring the breaker, substantially more.  We addressed all of

4  the issues.

5        THE COURT:  You mean the --

6        MR. BIDEGARAY:  In the 2020.

7        THE COURT:  -- repairs done to the Nelson's

8  equipment?

9        MR. BIDEGARAY:  I apologize.

10        THE COURT:  The repairs done to Nelson's equipment?

11        MR. BIDEGARAY:  Was substantially more than --

12        THE COURT:  Different than what they're proposing

13  now?

14        MR. BIDEGARAY:  Yes.

15        THE COURT:  Okay.

16        MR. BIDEGARAY:  It was substantially more.

17        THE COURT:  All right.

18        MR. BIDEGARAY:  And the 2019 that they claim was

19  fixed, still needs a lot of work.

20        And, certainly, you look at the bed, the bed in the

21  fifth wheels is right above.  It's right above where this fire

22  hazard is.

23        And the fire hazard is only one thing.  There's still

24  an ongoing fire hazard based on the allegations that we've

25  alleged.  Because there's what they call -- there's a breakaway

wire, Your Honor, on all RVs, towable RVs.  And what happens is
you have to hook up a cable to the towing vehicle.  And if for
whatever reason the trailer comes undone, that cable jerks out
and closes the circuit to lock the brakes up so the trailer
doesn't run wild.

By design, Forest River doesn't breaker that wire.
It's charged directly to the battery, but it's run through the
same group of cables from the 7-way to the battery.  And all of
these defects that we've alleged continue to affect a short
that will cause fires on that wire as well.  There's not one
peep from Forest River about that.

And I honestly don't know -- because I've tried.  I
was at the inspection, and my esteemed colleague, Mr. Davis, I
say to him -- I said -- I was watching them inspect.  You know
I grew up on a farmer ranch.  I know a fair bit about wiring.
I know a lot more about wiring an RV today than I did a year
and a half or two or three years ago.

But I was watching them, and I could tell they
weren't -- they had their group of Forest River people here,
and I was watching them do the inspection.  And, finally, we
were all done, and I could see they weren't looking at hardly
anything right.  And I said, "I'll show you what the problem
is.  I'll show you, Max."

And he says, "Dan, they manufacture these."

And I said, "All right.  We'll have to agree to

1  disagree."

2        Then they took a little sidebar.  They looked at some
3  pictures, and they came back.  They were all done.  We've
4  closed the hatch.  Mr. Hayden was there.  We closed the hatch.
5  And then they said, "Hey, can we go back and look?"

6        They were looking at pictures that we had sent them.
7  And they went back, and they looked, and they compared the
8  pictures.  And that's when they discovered just part -- just
9  part.

10       They inspected the 2019, the 2020, and they were
11  done.  They went back, and they looked.  After they looked at
12  pictures, one guy says -- and we deposed this guy.  He says to
13  the skinnier guy, "Did we do it right?"

14       He says, "No."

15       And, "What's wrong?"

16       "The breaker."

17       And then they went back, and they looked at pictures
18  again, and then they went and had a little sidebar.

19       It's only a fraction of the problem.  And I think
20  part of the thing is they really truly had no clue before this
21  lawsuit, and I don't know if they fully understand the ongoing
22  other issues.  So I don't think they are being dishonest with
23  the Court.  They just won't listen to us.  It's the worst case
24  of cognitive dissonance I've ever seen.  We've laid it out for
25  them.  We've told them.  I've explained it to them.  I've made

1  myself available as a person that would go walk them through

2  it, but they manufacture these things.  They don't want to

3  listen.

4          There's more that needs to be done in this case.

5  People are at risk of death.  People are at risk of fires.

6  This thing is far from over.

7          THE COURT:  All right.  Thank you, Mr. Bidegaray.

8          Any rebuttal, Mr. Cowan?

9          MR. COWAN:  Thank you.

10         I want to address just a few points in response.

11  Mr. Bidegaray referenced something called a breakaway cord.

12  That's not an issue in the third amended complaint.  And I just

13  go back to the allegations in the third amended complaint.  In

14  paragraph 53, this involves the battery charge wire.  It's one

15  of several wires in the unit.  But this case is about the

16  battery charge wire, the lack of overcurrent protection on the

17  battery charge wire.

18         So what we heard a lot of just now and in the

19  response in opposition were alleged defects that aren't

20  referenced in the complaint and, therefore, outside of this

21  Court's jurisdiction.

22         The second point that I want to address is the

23  out-of-pocket expenses.  So there's -- I just want to clarify.

24  Mr. Nelson bought the 2019 Puma RV in April of 2019.  He sold

25  it in June in 2020.  So he had it for about 14 months.  He had

1  the use and enjoyment of that RV for 14 months.

2          Counsel referenced the fact that once you drive the
3  RV off the lot, it's going to depreciate.  Plus, there's just
4  the value of having an asset for 14 months.  It's not in Forest
5  River's possession.  So the allegation that there's a $9,000
6  loss there I don't think holds up.

7          There's also no allegation in the complaint that the
8  RV lost value because of the defect.  So there's case law that
9  is out there that we cite in our briefing to distinguish where
10  plaintiff has alleged -- this defect got a lot of notoriety.
11  The public learned about the defect.  The public places less
12  confidence in the vehicle, and that market value decline has
13  caused me an injury that's distinct from just the defect
14  itself.

15          There's no allegation of that nature here.  So the
16  $9,000 loss isn't attributable to the defect.  It's essentially
17  a self-inflicted injury that doesn't confer standing on a
18  plaintiff.

19          The second point relates to the loss of use.  So
20  there's no real allegation in the third amended complaint about
21  loss of use.  It appears just once in a lengthy paragraph, in
22  paragraph 64.  At the very bottom plaintiff says he lost the
23  use of a 2019 Puma.  Now, there's no allegation, for example,
24  that the plaintiff had to cancel any trips, forwent any plans,
25  had to rent a replacement RV.

1          THE COURT:  Well, to be fair, Counsel, if you had a

2    fire in your existing trailer, are you going to take it back

3    out again?

4          MR. COWAN:  But, Your Honor, my understanding is that

5    the plaintiff took the RV to the dealership.  The dealership

6    made a repair.  There needs to be something more there as far

7    as an injury than just a conclusory "I lost the use of the RV."

8          And in the -- another case that we cite in our

9    briefing is a Sixth Circuit case, a Chrysler -- *Hadley v*

10   *Chrysler,* where this loss of use issue comes up.  And the Sixth

11   Circuit said it's not enough to make that allegation without

12   any facts to back that up.  And so at oral argument the

13   attorney couldn't identify any canceled plans, couldn't --

14   didn't argue that they had gone out and rented a replacement

15   RV.  So there's just not enough factual predicate there to

16   suggest that there's an injury from the loss of use.

17         Finally, I do want to address the scope of the

18   recall, and there were some comments that were made by counsel

19   about other models of RVs.  I just want to kind of bring back

20   the decision that we cite, *Chen v BMW of North America*, where

21   the court emphasizes, and I quote, "Courts generally consider

22   only claims of named plaintiffs in ruling on a motion to

23   dismiss prior to class certification."  And, here, plaintiff's

24   vehicle is encompassed within the recall.

25         So that was a similar argument about the scope of the

1  recall versus perhaps the scope of the alleged issue.  And the
2  Court said, "Before certification, I'm only concerned with the
3  named plaintiff's claim."

4        And, here, we have an extremely broad class
5  definition, and we identified this issue in our discovery
6  briefing.  But there's no time limitation with respect to the
7  class definition.  There's not even any kind of reference in
8  the class definition that you have to be a current owner of the
9  Puma RV.

10        And so just looking at the class definition as
11  alleged in the complaint, in theory, if Puma RVs existed in
12  1905, you could still be a class member.  Obviously, that's not
13  the case.

14        THE COURT:  Mr. Cowan, let me focus on the third
15  amended complaint.  Which claims are you alleging that are
16  asserted by plaintiffs that the recall addresses?

17        MR. COWAN:  So after this Court's decision on our
18  previous motion to dismiss, the three surviving claims are
19  negligence, negligent misrepresentation, and the Montana
20  Consumer Protection Act claim.  So all three claims are mooted
21  by the recall.  Because when you look at the requested relief,
22  and cross reference that with the relief that the recall
23  provides, the damages just whittle away.

24        THE COURT:  What about -- we talked earlier about the
25  $825 reimbursement of the repair shop by Forest River.  Was

1  that the 2019 trailer or 2020?

2          MR. COWAN:  Yes, Your Honor.  That was the 2019.

3          THE COURT:  Okay.  What about does Mr. Nelson have

4  any out-of-pocket expenses for the 2020 repair?

5          MR. COWAN:  So just based on the allegation in the

6  complaint, he hired the consulting electrician to make some

7  modifications to the RV.  The allegation in the complaint is

8  that he paid the consulting electrician $500.  And so that, in

9  fairness, would be his out of pocket.

10         And under the recall, Forest River is statutorily

11 obligated to reimburse owners who've paid out of pocket to

12 repair this defect.  So under the recall, Forest River would

13 owe Mr. Nelson that $500, provided that he submits a claim

14 through the recall process.

15         THE COURT:  Anything else, Mr. Cowan?

16         MR. COWAN:  No, Your Honor.

17         THE COURT:  All right.  Thank you.

18         MR. COWAN:  Thank you.

19         THE COURT:  All right.  This matter is submitted.

20 I'll get an order out as soon as I can.

21         Before we break, Counsel, is there any interest in a

22 settlement conference with the magistrate?  Is that premature,

23 or would it be productive?

24         MR. BIDEGARAY:  I think it's premature.  We had one

25 scheduled, but we got into discovery issues and arguments

1    about -- you heard today, I think 500 bucks would square things

2    up for Mr. Nelson.  I think we need some rulings from the

3    Court.

4           MR. HAYDEN:  We had a mediation scheduled for

5    November 4th, and we were trying to reach an agreement with the

6    other side to stop discovery, and we wouldn't file any more

7    motions.  Instead, they charged ahead with doing discovery, and

8    we filed this motion.

9           So we were hopeful to go to mediation on

10   November 4th, but the plaintiffs have decided to cancel that

11   mediation.

12          THE COURT:  All right.  Well, I will consider that

13   option as well.

14          MR. BIDEGARAY:  We did get an excellent mediator out

15   of California that we agreed to that does class action

16   mediations, and we are open to --

17          THE COURT:  All right.  So you are not interested in

18   the magistrate?

19          MR. BIDEGARAY:  -- reconvene with that mediator.

20          THE COURT:  Then that's up to you.  If you're going

21   through mediation with a private mediator, that's your issue,

22   not the Court's.

23          MR. BIDEGARAY:  Sounds good.  Thank you, Your Honor.

24          MR. HAYDEN:  We're fine either way, Your Honor.

25          THE COURT:  I was just offering the magistrate as we

1   do in every single case.

2          All right.  Thank you.

3       (The proceedings concluded at 11:46 a.m.)

4

5                          --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

# REPORTER'S CERTIFICATE

1

2        I, Yvette Heinze, a Registered Professional

3   Reporter and Certified Shorthand Reporter, certify that the

4   foregoing transcript is a true and correct record of the

5   proceedings given at the time and place hereinbefore mentioned;

6   that the proceedings were reported by me in machine shorthand

7   and thereafter reduced to typewriting using computer-assisted

8   transcription; that after being reduced to typewriting, a

9   certified copy of this transcript will be filed electronically

10   with the Court.

11        I further certify that I am not attorney for, nor employed

12   by, nor related to any of the parties or attorneys to this

13   action, nor financially interested in this action.

14        IN WITNESS WHEREOF, I have set my hand at Great Falls,

15   Montana, this 14th day of October, 2024.

16

17                              /s/ *Yvette Heinze*

18                              _____
                                 Yvette Heinze
19                               United States Court Reporter

20

21

22

23

24

25