# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| JAY NELSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br>FOREST RIVER, INC.,<br><br>Defendant. | CV-22-49-GF-BMM<br><br>ORDER |

## INTRODUCTION

Plaintiff Jay Nelson ("Nelson") has filed a class action suit against Forest River, Inc. ("Forest River"). (Doc. 1.) Nelson alleges that Forest River manufactures Subject RVs with a wiring system that violates industry safety standards in several ways (the "Defect"). (Doc. 45 at ¶ 5.) Nelson alleges that the Defect caused Nelson's 2019 Puma RV to catch fire, that he had to repair the same Defect in the 2020 Puma RV he purchased, and that the Defect creates a safety hazard and misleads consumers of Subject RVs. (Doc. 45 at ¶¶ 5–10, 66.)

Nelson filed his first Complaint in this Court on May 23, 2022. (Doc. 1.) Nelson has amended his Complaint three times. (Doc. 38); (Doc. 39); (Doc. 45.) Forest River has filed corresponding Motions to Dismiss. (Doc. 26); (Doc. 40); (Doc. 49.) The Court granted Forest River's motion to dismiss Nelson's Consumer

1

Product Safety Act, fraudulent concealment, and declaratory relief claims. (Doc. 67.) Nelson's class allegations and claims for negligence, negligent misrepresentation, and violations of the Montana Consumer Protection Act remain. (*Id.*)

Forest River inspected the 7-way electrical cord in the 2020 Puma RV in April 2024. (Doc. 83 at 6.) Forest River found that the charge line between the trailer battery and the junction box connected to the wrong side of a breaker. (Doc. 83 at 6–7.) The incorrectly wired charge line lacked overcurrent protection that could cause the wire to overheat and catch fire. (Doc. 83 at 7.) Forest River initiated a recall of affected vehicles to fix the wiring problem (the "Recall"). (Doc. 83 at 6–7.)

Forest River now moves to dismiss Nelson's Third Amended Complaint on prudential mootness grounds under Federal Rule of Civil Procedure 12(b)(1). (Doc. 82.) Forest River argues that the Recall supervised by the National Highway Traffic Safety Administration ("NHTSA") provides Nelson and putative class members with all their requested relief and renders Nelson's claims prudentially moot. (Doc. 83 at 3.) Nelson argues that the NHTSA recall fails to cure the Defect and does not compensate Nelson fully for his injuries. (Doc. 90 at 7.)

## BACKGROUND

Nelson alleges that as a condition of its membership in the Recreational Vehicle Industry Association ("RVIA"), Forest River adopted RVIA's safety standards that include those of the National Fire Protection Association ("NFPA") and the American National Standards Institute ("ANSI"). (Doc. 45 at ¶¶ 31–39.) The NFPA requires RV equipment to exhibit mechanical strength, durability, and electrical insulation in order to withstand heating effects under normal and abnormal conditions, arcing effects, and other factors affecting safety. (Doc. 45 at ¶ 41.) The ANSI requires RV wiring to be routed away from sharp edges, moving parts, and heat sources, and to have conductors with overcurrent protection, support and protection against physical damage, and additional material where insulated conductors are clamped to the structure. ANSI further requires fuses and circuit breakers to have protection against the weather and physical damage. (Doc. 45 at ¶ 42.) Nelson alleges that the Defect violates these safety standards, misleads consumers, and creates a fire hazard. (Doc. 45 at ¶¶ 43, 46.)

In April 2019, Nelson bought a new 2019 Forest River Puma RV (the "2019 Puma") from a Montana Forest River dealership for $34,613, financed over 180 months at 4.99% interest. (Doc. 45 at ¶¶ 44, 64.) The 2019 Puma caught on fire while Nelson was driving it during a family trip. (Doc. 45 at ¶¶ 49–51.) Nelson alleges that if the 2019 Puma "had been designed and assembled" in accordance with

the safety standards that Forest River had purportedly adopted, "the fire would never have occurred." (Doc. 45 at ¶ 59.) Nelson alleges that contrary to Forest River's representations about the safety standards it had adopted, the 2019 Puma's wiring had no overcurrent protection, lacked protection against the weather and physical damage, and used "inappropriate metal clamps and grommets to support the electrical wiring exiting it." (Doc. 45 at ¶ 56.) Nelson also alleges that the battery wire lacked adequate jacketing and protection and was routed over sharp edges. (Doc. 45 at ¶ 45.) Nelson contends that these features of the Defect violate NFPA and RVIA/ANSI safety standards. (Doc. 45 at ¶¶ 46, 58.)

Nelson brought the 2019 Puma to a dealership for repair, but the repair left the 2019 Puma with the same Defect. (Doc. 45 at ¶ 62.) Nelson lost the use of the 2019 Puma while awaiting repair. (Doc. 45 at ¶ 64.) Even after the repair, Nelson did not feel safe driving the 2019 Puma, and Nelson traded it in for a new 2020 Puma RV (the "2020 Puma"). (Doc. 45 at ¶ 64.) Nelson received a trade-in value of $26,000 for the 2019 Puma, and the 2020 Puma cost $36,648. (Doc. 45 at ¶ 64.)

An electrician inspected the 2020 Puma and discovered that the 2020 Puma suffered from the same Defect:

> the RV had no overcurrent protection between the junction box and house batteries; the wiring in the power cord going through the junction box and into the RV battery compartment did not adequately protect against the weather and physical damage; the junction box was a metal residential junction box not designed for a wet environment that did not protect against the weather and physical damage; the junction box used

4

metal clamps and metal grommets to grasp and support the wires exiting; and the battery wire was not jacketed or protected but exposed at the junction box and routed over sharp edges as it ran through RV framing and into the battery compartment without protection or a loom.

(Doc. 45 at ¶ 70.) Nelson paid the electrician more than $500 to repair the Defect in the 2020 Puma. (Doc. 45 at ¶ 71.) The electrician replaced the power cord, metal residential junction box, metal clamps and grommets with a HOTS 7-Way Trailer Plug Cord Wiring Harness for RVs, a durable plastic waterproof housing junction box, and rubber grommets. (Doc. 45 at ¶ 71.) The electrician filed down the sharp edges between the RV framing and the battery compartment and added a protection for the wire running from the transfer box to the battery compartment. (Doc. 45 at ¶ 71.) Finally, the electrician installed a 30-amp circuit breaker, a $15 item, to provide overcurrent protection on the battery wire. (Doc. 45 at ¶ 71.) Together, these repairs brought the 2020 RV into compliance with industry safety standards. (Doc. 45 at ¶ 71.) Nelson alleges that he would not have purchased either the 2019 Puma or the 2020 Puma if he had known about the Defect. (Doc. 45 at ¶¶ 48, 68.)

In April 2024, Forest River inspected a 2020 Puma RV and audited its assembly facilities. (Doc. 83 at 2, 6–7.) Forest River discovered a "potential assembly error" that could result in the lack of overcurrent protection on the RV (Doc. 83 at 2.) The charge line connected to the wrong side of the breaker ("the Wiring Problem"). (Doc. 83 at 6–7.) As a result, "under certain conditions, the cord may be pulled out of the junction box and cause a short circuit, increasing the risk

of physical damage to surrounding portions of the trailer as well as increasing the risk of a thermal event or fire." (Doc. 83-2 at 2.) Forest River notified NHTSA that it intended to recall "all 2006–24 model-year Puma RVs and 2004–24 model-year Cedar Creek RVs" to fix the Wiring Problem. (Doc. 83 at 7.) Forest River dealers can quickly "move the charge line to the protected side of the breaker" to repair the Wiring Problem and supply overcurrent protection. (Doc. 83 at 8.) Under the Recall, customers of affected RVs may either bring their RV to a Forest River dealer for a free repair or receive a refund for repairs, "provided those repairs fall 'within the scope of this defect [the Wiring Problem] under recall.'" (Doc. 83 at 8.)

## DISCUSSION

### I. Standard of Review

Forest River has moved to dismiss Nelson's claims on prudential mootness grounds under Federal Rule of Civil Procedure 12(b)(1). (Doc. 83.) Unlike Article III mootness, prudential mootness represents an equitable doctrine grounded in the court's exercise of remedial discretion. *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1244 (E.D. Cal. 1999) (citing *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727–28 (10th Cir.1997)). "In some circumstances, a controversy, not [constitutionally] moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Bldg. & Const. Dep't v. Rockwell Int'l*

6

*Corp.*, 7 F.3d 1487, 1491–92 (10th Cir. 1993) (quoting *Chamber of Commerce v. United States Dep't of Energy*, 627 F.2d 289, 291 (D.C.Cir.1980)).  The "central inquiry as to prudential mootness is whether a court should exercise its discretion by finding a case moot because the Court cannot grant meaningful relief."  *Inst. for Wildlife Prot. v. U.S. Fish & Wildlife Serv.*, No. 07-CV-358-PK, 2007 WL 4117978, at *7 (D. Or. Nov. 16, 2007); *Sierra Club*, 69 F. Supp. 2d at 1244.

A court may "consider evidence outside of the pleadings for the purpose of deciding a jurisdictional issue" in evaluating a motion to dismiss pursuant to Rule 12(b)(1).  *Farr v. United States*, 990 F.2d 451, 454 (9th Cir. 1993).  "[U]nlike a motion under Rule 12(b)(6), the moving party may submit 'affidavits or any other evidence properly before the court . . . It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction.'"  *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 778 (9th Cir. 2000) (citations omitted).  A court may take judicial notice of matters of public record if the facts are not subject to reasonable dispute.  Fed. R. Evid. 201; *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

## II.     Forest River's Motion to Dismiss for Prudential Mootness

The doctrine of prudential mootness most often appears in claims for "prospective equitable relief by declaratory judgment or injunction" when a governmental entity has already changed the policy underlying the suit. *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997); *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1211 (10th Cir. 2012); *Chamber of Com.*, 627 F.2d at 291. Similarly, when NHTSA, a coordinate branch of government, makes "a remedial commitment" to ensure a private defendant issues a safety recall, its assurance that the plaintiff will receive "precisely" the requested relief may render a claim prudentially moot. *Cheng v. BMW of N. Am., LLC*, 2013 WL 3940815, *2 (C.D. Cal. July 26, 2013) (quoting *Winzler*, 681 F.3d at 1211).

"[W]hile equity may not require [courts] to duplicate efforts of the other branches it hardly insists [courts] run the risk of leaving a plaintiff without a remedy she's entitled to." *Winzler*, 681 F.3d at 1212. Though "reasonable minds might well disagree about the ideal method" of noticing, repairing, or replacing a defect, the NHSTA recall must "reach the same result" as the plaintiff's requested relief in order for a defendant to invoke the doctrine of prudential mootness. *Id.* at 1214.

The plaintiff in *Winzler* sought injunctive relief and an equitable fund to repair defective "Engine Control Modules" that caused affected Toyota vehicles to stall. *Id.* at 1209. After the plaintiff filed her claim, Toyota initiated an NHTSA recall

that obligated Toyota "to notify owners of the defect and repair or replace any faulty parts at no cost." *Id.* The plaintiff argued that NHTSA oversight may not be sufficient to ensure Toyota "fulfills its recall duties." *Id.* at 1214. The plaintiff did not "dispute that if the Act works as it is supposed to and NHTSA does its legislatively assigned job, she will achieve a complete remedy." *Id.* at 1215. The Tenth Circuit held that because the NHTSA recall offered the plaintiff "a complete remedy[,]" further judicial involvement would "offer not even a sliver of additional relief for [the plaintiff] and members of the class she seeks to represent." *Id.*

The same principle appears in *Cheng*. *Cheng*, 2013 WL 3940815. BMW issued a recall for "precisely" the relief sought by plaintiffs: BMW would notify all owners about the defect (a software problem that caused vehicles to shift into neutral and roll away) and repair it for free. *Cheng*, 2013 WL 3940815, at *4. Plaintiffs argued that the recall did not encompass all the model years in the putative class. This argument failed because "prior to class certification, courts generally consider only the claims of the named plaintiff." *Id.* Though Cheng attempted to distinguish the case from *Winzler* by arguing that the class sought money damages in addition to injunctive relief, the complaint did not allege money damages. *Id.* For these reasons, "it [was] unclear how Plaintiff [could] demonstrate injury in light of BMW's offer to completely repair the roll away defect." *Id.*

A NHTSA recall may render a case prudentially moot even if plaintiffs "disagree with the approach taken by [the defendant company] to fix the problem." *Pacheco v. Ford Motor Co.*, No. 22-11927, 2023 WL 2603937, at *4 (E.D. Mich. Mar. 22, 2023), *motion for relief from judgment dismissed*, No. 22-11927, 2024 WL 188369 (E.D. Mich. Jan. 17, 2024). In *Pacheco*, engine oil and fuel vapor released during engine failure presented a risk of fire. *Id.* at *1. Ford issued a recall, supervised by NHTSA, that prevented the risk of fire by "improving air flow through the engine compartment" to draw flammable fluid and vapors away in the event of engine failure. *Id.* at 1. The plaintiffs argued that the repair created new problems, including the environmental hazard of leaking fluids and additional drag on the vehicle resulting in decreased fuel efficiency. *Id.* The plaintiffs did not dispute that the recall resolved the fire risk. *Id.* at 4. The plaintiffs also failed to allege that the engines leaked any fluid or that they experienced a reduction in fuel economy. *Id.*

Forest River argues that Nelson's claims are moot because "Forest River has committed to giving Nelson and the putative class members all of their desired relief." (Doc. 83 at 10.) To support this argument, Forest River concedes that "Nelson is entitled to reimbursement—to the extent that the repairs fall under the scope of the recall." (Doc. 83 at 17.) Forest River does not assert, however, that the Recall will reimburse Nelson for the $500 Nelson spent to have an electrician fix the Defect in his 2020 Puma. Forest River distinguishes the numerous modifications

that Nelson's electrician performed (replacing metal clamps and grommets with plastic grommets and a different wiring harness, installing a plastic waterproof housing, adding protection to the wires, and filing down sharp edges) from a compensable repair under the Recall (rerouting the charge line to the correct side of the breaker to provide overcurrent protection). (Doc. 83 at 5 (citing Doc. 45 at ¶¶ 70–71); Doc. 92 at 8–10.)

Apart from potentially compensating Nelson for the $15 circuit breaker installed by his electrician to supply overcurrent protection, the Recall specifically excludes the costs Nelson that incurred for his repairs that Forest Rivers argues were unnecessary to mitigate any risk of fire. (Doc. 83-2 at 2; Doc. 92 at 9–10; Doc. 45 at ¶ 71.) Nelson alleges that under NFPA and ANSI/RVIA safety standards, a risk of fire still exists, distinct from the Recall repair. (Doc. 45 at ¶¶ 41–59.) Unlike the plaintiffs in *Winzler* and *Cheng*, who agreed that the recall fixed the defect in question, Nelson does not agree that Forest River's Recall "completely repair[s]" the Defect. *Cheng*, 2013 WL 3940815, at *4; *Winzler*, 681 F.3d at 1215.

Even if the Recall had reimbursed Nelson fully for the cost of repairing the 2020 Puma, Nelson also alleges that Forest River falsely represented that it adhered to NFPA and ANSI/RIVA safety standards and that but for these false representations, he would not have purchased the RVs. (Doc. 45 at ¶¶ 48, 68.) Regardless of whether the Recall entirely alleviates the fire risk, Nelson alleges that

11

the wiring system does not conform to NFPA and ANSI/RVIA safety standards in other ways and that these violations constitute a misrepresentation material to his decision to purchase the RVs. (Doc. 45 at ¶¶ 5, 126–30.) Nelson's requested relief includes allowing Nelson and members of the putative class "to rescind their contracts of sale, as appropriate, with [Forest River] and to be made economically whole." (Doc. 45 at p. 39, ¶ 9.) The Recall does not permit Nelson to rescind his contract and receive full reimbursement for the cost of purchasing the 2019 and 2020 Pumas.

Forest River's arguments, that the Recall's repair of the Wiring Problem obviates Nelson's request for both injunctive relief and damages, rely on the assumption that the Recall resolves both the Wiring Problem identified by Forest River and the Defect identified by Nelson. The Defect and the Wiring Problems differ. (*Compare* Doc. 45 at ¶ 71, ¶ 58 ("If Plaintiff's 2019 Puma had been designed and assembled [to conform with safety standards] as Defendant represented, the fire would never have occurred."), *with* Doc. 83 at 6–7 ("[T]he charge line—as it ran from the trailer battery to the junction box—connected to the wrong side of a breaker."); Doc. 83-2 at 2.)

The authorities offered by Forest River depend upon the NHTSA recall providing plaintiffs with "precisely the relief [they] seek[]." *Cheng*, 2013 WL 3940815, at *2 (quoting *Winzler*, 681 F.3d at 1211.) The Recall provides Nelson

with $15 of the relief he seeks, at most. Compared with Nelson's requested relief, including rescission of his sales contract and full reimbursement for his purchase of the Pumas, the Recall does not provide comparable compensation or address the same source of injury: according to the industry safety standards cited by Nelson, the risk of fire arises from other safety violations, not merely the lack of overcurrent protection. Nelson's case differs from *Pacheco* for the same reason. The plaintiffs in *Pacheco* agreed that the recall entirely addressed the fire risk but argued that the recall created other problems (reduced fuel efficiency and a potential environmental hazard) in the process. *Pacheco*, 2023 WL 2603937, at *4. The Recall does not forestall any occasion for meaningful relief and the Court does not risk creating dual tracks for this case under its auspices and those of NHTSA.

## CONCLUSION

Forest River has not shown that the Recall forestalls any occasion for meaningful relief because Nelson alleges a different Defect and different bases of relief from the Wiring Problem repair covered by the Recall. The Court will **DENY** Forest River's Motion to Dismiss Nelson's claims for prudential mootness.

## ORDER

Accordingly, **IT IS HEREBY ORDERED** that Forest River's Motion to Dismiss (Doc. 82) is **DENIED**.

DATED this 23rd day of October, 2024.

_____

Brian Morris, Chief District Judge
United States District Court