C. Tab Turner
TURNER & ASSOCIATES, PA
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Phone: (501) 791-2277
Fax: (214) 750-9787
tab@tturner.com

Dennis P. Conner/J.R. Conner
CONNER, MARR & PINSKI, PC
P. O. Box 3028
Great Falls, MT 59403-3028
Phone: (406) 727-3550
Fax: (406) 727-1640
dennis@mttrials.com
jr@mttrials.com

Daniel B. Bidegaray
BIDEGARAY LAW FIRM, LLC
1700 W. Koch, Suite 5
Bozeman, MT 59715
Phone: (406) 522-7744
Fax: (406) 534-7629
daniel@bidegaraylawfirm.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT, DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| JAY NELSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FOREST RIVER, INC.,<br><br>Defendant. | Cause No. CV-22-49-GF-BMM<br><br>**PLAINTIFF'S MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT - OPPOSED** |

Plaintiff Jay Nelson, through counsel and pursuant to Rule 15(a)(2) of the

Federal Rules of Civil Procedure, hereby moves this Court for an Order granting

leave to file the attached Fourth Amended Complaint. The purpose of the Fourth

Amended Complaint is to include newly discovered evidence, including a June 4,

2024 partial recall, evidence from a Field Inspection of more than 400 RVs, and recent depositions, that establish Forest River's systemic wiring defects. A copy of the proposed Fourth Amended Complaint is attached as Exhibit A, and a brief in support accompanies this motion. Plaintiff's counsel has conferred with Defendant's counsel, and they oppose this motion.

Respectfully submitted this 15th day of January 2025.

/s/ *Daniel B. Bidegaray*
Daniel B. Bidegaray
*Attorneys for Plaintiff*

# EXHIBIT A

C. Tab Turner
TURNER & ASSOCIATES, PA
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Phone: (501) 791-2277
Fax: (214) 750-9787
tab@tturner.com

Dennis P. Conner/J.R. Conner
CONNER, MARR & PINSKI, PC
P. O. Box 3028
Great Falls, MT 59403-3028
Phone: (406) 727-3550
Fax: (406) 727-1640
dennis@mttrials.com    jr@mttrials.com

Daniel B. Bidegaray
BIDEGARAY LAW FIRM, LLC
1700 W Koch, Suite 5
Bozeman, MT 59715
Phone: (406) 522-7744
Fax: (406) 534-7629
daniel@bidegaraylawfirm.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT, DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| JAY NELSON, individually and on behalf of all others similarly situated, | Cause No. CV-22-49-GF-BMM |
| Plaintiff, | |
| v. | **CLASS ACTION FOURTH AMENDED COMPLAINT** |
| FOREST RIVER, INC., an Indiana corporation, | |
| Defendant. | |

Plaintiff Jay Nelson ("Mr. Nelson") brings this action on behalf of himself and all others similarly situated and alleges:

## NATURE OF THE ACTION

1.      This action arises from Forest River, Inc.'s ("Forest River") systemic violations of recreational vehicle ("RV(s)") low-voltage electrical safety standards, including those set forth by NFPA 1192 and ANSI/RVIA LV and its continued (1) failure to disclose violations of the applicable standards ("applicable standards" more descriptively defined below)[1], (2) active concealment of these violations, and (3) refusal to adequately remedy the resulting wiring defects. Forest River's practices endanger consumers of Forest River products and the public at large. By ignoring these safety standards, Forest River exposes consumers and the public to the risk of fire, property damage, injury, and death associated with latent wiring defects that the ordinary consumer is not able to identify until it is too late.

2.      Forest River has, over many years, failed its customers by not having adequate quality controls in place regarding the manufacture of its towable RVs. It failed them by not having a valid schematic for the electrical wiring of its towable RVs at both the manufacturing and dealership/repair levels. It failed them by representing that it had complied with safety standards when it knew it had not. It failed them by placing them, their families, and their property in danger of fire and other safety hazards from undisclosed and easily preventable defects in the electrical

---

[1] National Fire Protection Association ("NFPA") 1192. NFPA 1192 directly incorporates the ANSI/RVIA LV (Low Voltage) standard.

wiring of the towable RVs. It failed them by refusing to recall the towable RVs and fix the problem. Class members bought a towable RV that promised compliance with applicable standards. Because of a lack of effective quality control, Forest River failed to deliver on this promise and manufactured towable RVs with hidden wiring defects.

## THE PARTIES

3.    Mr. Nelson is and has been a citizen of Montana at all relevant times. When Mr. Nelson purchased a new 2019 Palomino Puma fifth wheel ("2019 Puma") RV for his family, he was unaware of the potentially catastrophic wiring defects involving Forest River's towable RV's electrical system - specifically, the seven-way plug connection and the RV wiring going from the seven-way to the RVs' batteries ("wiring defects," defined more fully below). Soon after first using the trailer, it caught on fire, and his children, one in a car seat, had to be evacuated to safety before disconnecting the tow vehicle from the 2019 Puma. This fire led to the discovery of Forest River's systemic wiring defects. Mr. Nelson files this putative class action against Forest River because of these wiring defects, asserting causes of action for negligence, negligent misrepresentation, violations of the Montana Consumer Protection Act ("MCPA"), breach of implied and express warranty claims under Indiana law, and violations of the Indiana Deceptive Consumer Sales Act

("IDCSA"). He seeks legal and equitable relief for himself and similarly situated persons.

4.     Defendant Forest River is an Indiana corporation with its principal place of business in Elkhart, Indiana. Forest River is a wholly owned subsidiary of Berkshire Hathaway. It has been served and has appeared.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act) because it is a class action in which at least one member of the putative class is a citizen of a state different from the defendant, the proposed class includes more than 100 members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

6.     Venue is proper and has been conceded.

## FACTS RELEVANT TO ALL CLAIMS
### RV Manufacturer Standards & Expectations

7.     Forest River presents itself as one of North America's leading manufacturers in the RV industry, expressly stating that it builds its products according to recognized safety and quality standards established by the RV Industry Association ("RVIA") and the American National Standards Institute ("ANSI").

8.     Forest River represents its towable RVs as complying with industry standards for safety and manufacture. It does this by placing an RVIA Seal on the RVs, as well as through another label on the RVs and through advertising.

9.    Forest River is and at all times relevant has been a member of RVIA and manufactures recreational vehicles, cargo trailers, pontoon boats, buses, vans, and commercial vehicles.

10.    The RVIA was first formed in 1974 and developed RV manufacturing standards.

11.    According to the RVIA, "Every RV and Park Model RV produced by a member manufacturer must display the Association's Seal. The Seal communicates manufacturers' certification that it has complied with the RV standards adopted by the Association and has been subjected to regular, periodic compliance audits by inspectors, who monitor the thousands of requirements impacting electrical, plumbing, heating, fire & life safety systems and construction of RVs."

12.    RVIA also states, "RV dealers and consumers look for the RV Industry Association Seal on their units as a visible indication of the manufacturers' commitment to the industry. Moreover, most public and private campgrounds in the United States require the RVs and Park Model RVs to have an affixed seal to obtain entry to their park."

13.    The RVIA Standards Department Inspection Program's primary goal is to establish standards and to monitor member manufacturers' pledge to build in conformance with RVIA's adopted standards. As a condition of membership,

manufacturers pledge in writing that they will build RVs that conform to the adopted

standards. Failure to adhere to this pledge can result in association membership

being revoked or the manufacturer being subject to disciplinary action.[2]

14.    The RVIA has adopted the following standards for the construction of

RVs at issue:

    a.    NFPA 1192
    b.    ANSI A119.5
    c.    ANSI/RVIA LV (Subtitle: Standard for Low Voltage
          Systems in Conversion and Recreational Vehicles)
    d.    National Electrical Code.

15.    The RVIA is an accredited ANSI standards developer.

16.    ANSI is a non-profit association that establishes procedures and

guidelines to create recognized minimum safety standards for products used by

consumers and industry, including the RVs. ANSI adopts standards created

following accredited procedures that allow all materially interested parties a voice

in their development. Among these standards are:

    a.    ANSI A119.5
    b.    ANSI/RVIA LV
    c.    ANSI TSIC - 1 Recommended Practices
    d.    ANSI/RVIA EGS - 1 Standard
    e.    ANSI/RVIA UPA - 1 Standard
    f.    ANSI/RVIA RVEC - 1 Standard
    g.    EXTLAD-1 Recommended Practice.

---

[2]    https://www.rvia.org/node/association-and-ansi-adopted-standards.

17. The RVIA Seal that Forest River affixes next to the main entry of every towable RV is more than just a sticker – it is the culmination of a rigorous certification process that manufacturers like Forest River must honor and pay for. Each Seal is purchased directly from the RVIA, reflecting a contractual commitment to purchasers that the RV will conform to the association's adopted safety and quality standards, such as NFPA 1192 and ANSI/RVIA LV.

18. By requiring manufacturers to display this highly visible Seal on every unit, the RVIA creates a powerful incentive for consistent compliance: consumers and campground operators look for the Seal as a mark of reliability and certification.

19. The Seal is a badge of trust, letting buyers know that the RV has met recognized electrical, structural, and fire safety industry benchmarks.

20. This system underpins the RV industry, ensuring members follow carefully crafted codes to keep campers, families, and the public safe, whether parked in a scenic campground or cruising along the highway.

21. Forest River prominently displays this Seal on each towable RV it manufactures immediately adjacent to the door so it is easily visible upon entry. This Seal is highly reflective and draws attention.

22. To operate as an Original Equipment Manufacturer (OEM) of RV products in the United States and Canada, a company such as Forest River is required to comply with all applicable federal and state laws and regulations, including safety

standards established by the National Highway Traffic Safety Administration ("NHTSA").

23.    NHTSA rules and regulations apply to the towable RVs at issue.

**NHTSA Tread Act**

24.    In 2000, pursuant to the Transportation Recall Enhancement, Accountability, and Documentation ("TREAD") Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000), NHTSA established early warning reporting requirements for vehicle manufacturers, 49 U.S.C. § 30166(m); 49 C.F.R. Part 579, Subpart C.

25.    Under the TREAD Act, manufacturers of 100 or more buses and manufacturers of 5,000 or more medium-heavy vehicles are required by law to submit to the U.S. Department of Transportation through NHTSA comprehensive quarterly reports, including production numbers and information on incidents involving death or injury, the number of property damage claims, consumer complaints, warranty claims, and copies of field reports. See 49 C.F.R. § 579.22. Manufacturers of 5,000 or more trailers must also submit comprehensive quarterly reports with this same information. See 49 C.F.R. § 579.24.

26.    Under the National Traffic and Motor Vehicle Safety Act ("Safety Act"), which includes the safety standards applicable to RVs established by the U.S. Department of Transportation through NHTSA, each manufacturer is also required by law to submit to NHTSA copies of all notices, bulletins, and other

communications, including those related to any defect in its vehicles or items of equipment, a customer satisfaction campaign, consumer advisory, recall, or other safety activity involving the repair or replacement of motor vehicles or equipment (collectively, "service bulletins"), sent to other manufacturers, distributors, dealers, owners, or purchasers. See 49 C.F.R. § 579.5.

27.    Forest River has been and continues to be subject to these regulations. At all times relevant to these claims, Forest River represented that its towable RVs complied with applicable standards in all material respects. This material representation is false.

28.    Following Forest River's partial recall on June 4, 2024 - where Forest River refused to accept responsibility for the full extent of the wiring defects - Plaintiff's counsel initiated a comprehensive Field Investigation. Highly trained experts from the Massachusetts Institute of Technology ("MIT"), each holding doctoral degrees in electrical and mechanical engineering, inspected Forest River towable RVs in over seven different cities across the western United States. In total, more than 400 units comprising 86 different models were surveyed, with a primary focus on the seven-way cord and associated wiring to the battery compartment.

29.    This rigorous investigation revealed that 51 of the 86 models inspected (59 percent) were wired in violation of applicable industry standards, confirming serious defects in need of repair. Moreover, the experts determined that Forest River

has continued to manufacture RVs with these same wiring deficiencies even after the June 4, 2024 recall was issued.

## Seven-Way Cord and Associated Wiring

30.    The wiring at issue centers on the seven-way cord and the wiring connecting it to the battery compartment in Forest River towable RVs. This wiring is a small and distinct portion of the overall wiring of a towable RV. Despite minor variations, this wiring, in all legally relevant respects, is the same across all of Forest River's towable RVs.

31.    The seven-way cord is the standard electrical connection between a tow vehicle (like a truck) and a towable RV. It provides power for multiple essential systems: it carries signals for turn indicators, brake lights, and running lights; ensures the trailer's brakes activate when the RV's brakes are applied; powers the RV's auxiliary systems; and can facilitate charging of the towable RV's battery. A breakaway line is also bundled with these seven-way wires as they travel back from the junction box to the battery compartment in numerous models. This breakaway line activates the trailer's emergency braking system if the RV becomes disconnected from the tow vehicle, adding an extra layer of safety.

32.    If the seven-way plug or associated wiring malfunctions because of wiring defects, it carries safety risks. For instance, the trailer's brake system may not deploy properly during an emergency stop, or its exterior lights could fail, reducing

visibility to other drivers. Wiring faults within the plug can cause short circuits that damage electrical components and result in a fire hazard. Because the seven-way and associated wiring handle multiple critical functions and house an important breakaway line, any malfunction can jeopardize RV occupants and other motorists.

33.    Moreover, towable RVs are highly flammable. This is due to the materials used in their construction - wood framing, foam insulation, and other products that can easily catch fire and spread flames rapidly throughout the confined space. A fire in an RV can mean loss of life and property.

34.    Forest River has wired towable RVs with the wiring defects and continues to do so. Forest River refuses to take responsibility for these wiring defects.

35.    The experts found that Forest River's towable RVs were not in compliance with applicable standards. However, the Seal represents that the RVs comply with the applicable standards. Based on the expert investigation, it is evident that the Seal misrepresents the safety of the wiring regarding the seven-way cord and associated wiring in most of the towable RVs Forest River manufactures.

36.    Deposition testimony from Forest River's own management explains why these wiring defects persist: Forest River lacks effective quality controls at the manufacturing level. This means that every towable RV must be inspected because

each towable RV is subject to the defective manufacturing process and lack of adequate quality control utilized by Forest River.

## Forest River's History

37. In January 1996, the assets of Cobra Industries, Inc. were purchased out of bankruptcy, and Forest River was established as the entity that continues to operate as Forest River today.

38. Forest River, headquartered in Elkhart, Indiana, sells the RVs and other products it manufactures in the U.S. and Canada through an independent dealer network, including Montana.

39. Forest River has numerous manufacturing facilities in at least six states, and it manufactures RVs and related products sold under various brand names, including but not limited to Starcraft Bus.

40. Forest River has expanded over the years. In 2002, Forest River purchased two new towable travel trailers and fifth-wheel lines: Puma by Palomino and Sabre by Palomino.

41. In 2004, Forest River began manufacturing Cedar Creek Fifth Wheel RVs ("Cedar Creek RVs").

42. In 2005, Forest River began manufacturing and selling Palomino Puma Fifth Wheel RVs ("Puma RVs").

43.    Despite its expansion and prominence in the RV industry, Forest River has exhibited a troubling history of noncompliance with safety standards, including minimizing known problems while failing to fully disclose issues to NHTSA - a pattern that continues in this case.

44.    This troubling history has been partially documented by NHTSA, starting with the Forest River Starcraft Bus debacle.

**Starcraft Bus Fatality & NHTSA Noncompliance**

45.    In July 2009, a fatal crash of a 42-passenger 2007 Starcraft XLT International 3200 church bus manufactured by Forest River led to an investigation that revealed that Forest River had violated weight limit safety requirements in manufacturing the bus.

46.    A 2013 class action was filed in South Carolina by South Carolina residents who purchased a Starcraft bus. The class alleged that the Forest River bus (a 2005 Starcraft XLT bus (a 34-passenger bus)), with a Gross Vehicle Weight Rating ("GVWR") of 19,500 pounds, violated federal law because the actual weight of the bus, when loaded with passengers and cargo, exceeded the certified GVWR.

47.    On February 26, 2013, Starcraft filed a Part 573 Notice of Safety Defect and Noncompliance. Although each manufacturer is legally required to provide a detailed chronology of how it discovered the defect or noncompliance, Starcraft did not mention the litigation, the crash, the injuries, or the deaths. It stated that "a

warranty claim" prompted it to review XLT units built from 2004 to 2009 manually. Forest River claimed to report the "potential noncompliance," and "following consultation with NHTSA officials, an amended report was submitted."

48.    Meanwhile, two other churches filed cases against Forest River in separate class-action lawsuits. The Church of Christ in Charleston, South Carolina, and the New Mount Zion African Methodist Episcopal Church of Tallahassee, Florida, filed separate class claims, making similar allegations that Forest River had knowingly sold buses at loaded weights that were improperly certified. Forest River settled these lawsuits.

49.    The July 2014 settlement offered the same remedy extended to Starcraft XLT owners in the recall two years earlier. The settlement also required Forest River to notify the U.S. Department of Justice within 10 days of the final approval of the settlement.

50.    On August 4, 2014, Forest River notified the U.S. District Court in Charleston that it had notified NHTSA, the Department of Justice, and the state Attorneys General.

51.    Forest River never filed a Part 573 Defect Report despite the settlement's constituting an expansion of the 2013 recall. This omission represented a failure to comply with federal safety reporting requirements, hindering regulatory oversight and public awareness of safety issues.

## NHTSA Investigation and Consent Order

52.    On September 30, 2014, two months after Forest River notified the safety agency, NHTSA opened an Audit Query into the company's reporting practices (AQ14-002) to investigate potential violations of the Safety Act.

53.    On October 2, 2014, NHTSA issued a Special Order requiring Forest River to produce documents related to its reporting and to provide missing records to NHTSA. Forest River claimed compliance was impossible, and the agency started fining Forest River $7,000 daily.

54.    In Forest River's report to NHTSA, the company barely mentioned the crashes and damage caused by its Starcraft buses. Buried in a section entitled "Remedying Past Noncompliance" was a requirement that no later than 30 calendar days after execution of the Consent Order, Forest River would submit to NHTSA a Part 573 Report to include all vehicles subject to the settlement agreement in *The Church of Christ at Azalea Drive v. Forest River, Inc., et al*., Case No. 2:11-cv-03371-PMD (D.S.C.) and *New Mount Zion African Methodist Episcopal Church, Tallahassee, Florida v. Forest River, Inc.*, No. 4:12-cv-00221-MW-CAS (N.D. Fla.).

55.    On February 24, 2015, Forest River notified NHTSA that it had determined that a safety defect existed in two 2014 towable RV models - Rockwood and Flagstaff. According to Forest River's Part 573 Report, the defect concerned

loose wiring that could result in a fire. NHTSA designated this recall as Recall No. 15V-080. Forest River had identified the defective condition in a service bulletin published in November 2014 but did not timely notify NHTSA. Forest River was ultimately forced to concede its untimely reporting.

56.    On March 17, 2015, Forest River again notified NHTSA that it had found a safety defect involving Palomino camper trailers manufactured in 2014. According to Forest River's Part 573 Report, the defect was a condition in which the trailers were manufactured without an exhaust/fresh air intake vent, which could lead to carbon monoxide exposure and/or a fire due to the potential lack of furnace ventilation. NHTSA designated this recall as Recall No. 15V-156. Forest River had identified the defective condition in a service bulletin issued on March 3, 2015, but no recall had been ordered.

57.    On July 8, 2015, Forest River agreed to the entry of a Consent Order with NHTSA to resolve the ongoing investigation. In the Consent Order, Forest River admitted it violated the Safety Act by failing to submit accurate early warning reports as required by law, failing to file field communications and reports of safety defects, failing to file quarterly recall response rate reports promptly and with complete information, failing to provide the government with required communications to dealers, owners, and purchasers, and failing to respond fully to NHTSA's special order in 2014.

58.     Due to Forest River's failure to meet federal safety requirements, Forest River paid $5 million in fines upfront, with an additional $30 million deferred, contingent on future compliance.

59.     Besides the monetary penalty, the government required Forest River to retain a consultant with expertise in motor vehicle safety and the Safety Act for the term of the Consent Order to advise and assist Forest River in performing its obligations. These obligations included confirming that Forest River was keeping applicable NHTSA databases in accordance with requirements, developing processes and procedures for compliance, conducting training, leading "Best Practices" meetings with other companies in the RV industry, and interacting with an independent monitor ("the Monitor") to ensure any potential Safety Act or Consent Order violations were appropriately cured within specified timeframes.

60.     In addition to the required consultant, Forest River was compelled to pay for the Monitor, who had the authority to audit Forest River's performance of the Consent Order, adherence to the procedures, efforts to disseminate Best Practices within the RV industry, and to implement its other obligations. The Monitor was required to conduct audits and make findings regarding any violation of the Safety Act or terms of the Consent Order.

61.     Yet the potential of a $35,000,000 fine was insufficient for Forest River to change its conduct.

### Continued Violations and Recall Because of this Litigation

62.    Forest River has continued noncompliance with safety regulations despite this history.

63.    Even though Forest River was notified of Mr. Nelson's RV fire within days of its occurrence, and when this suit was filed on May 23, 2022, Forest River did not notify NHTSA of any defects related to this matter until June 4, 2024.

64.    On June 4, 2024, Forest River finally submitted a Part 573 Safety Recall Report to NHTSA relating to the wiring defects in the Puma RVs. The 573 Safety Defect Report stated that after inspecting Mr. Nelson's 2020 Puma and observing how the RV was designed and manufactured, Forest River "reviewed" its overcurrent protection applications at its Fifth Wheel manufacturing plants (20 plants). This "review" was reportedly conducted from April 8, 2024, to May 24, 2024. This partial recall occurred because of this litigation.

65.    Once again, Forest River's reporting to NHTSA was incorrect. Forest River stated to NHTSA that the wiring defect regarding overcurrent protection was being remedied, "As a precautionary measure, Forest River supplies overcurrent protection from the trailer batteries to the 7-Way connector." Forest River knows or should know that this remedy was a required fix per the applicable standards. The fact that this "precautionary measure" had to be taken demonstrates that Forest River RVs were not compliant with applicable standards.

66.    Overcurrent protection is a safety mechanism designed to safeguard electrical circuits from excessive current flow leading to overheating, equipment damage, electrical fires, or other serious hazards. Typically accomplished through devices such as circuit breakers or fuses, overcurrent protection is intended to detect and interrupt abnormal current levels (shorts) before they can cause catastrophic failures or put individuals at risk. Ensuring the proper installation and maintenance of overcurrent protection is essential to prevent injuries, protect property, and maintain the overall integrity of electrical systems.

67.    Before April 2024, Forest River knew it was manufacturing RVs with wiring defects regarding overcurrent protection. It knew or should have known that when shorts occur, damage would be caused to towable RVs without proper overcurrent protection. Yet, it has not implemented changes in the manufacturing process to address these issues, nor has it notified NHTSA to this day.

68.    After its "review," Forest River reported to the government that "certain plants had not been consistently wiring the overcurrent protection to the correct side of the breaker" and ordered a partial recall. Forest River limited the recall to model years 2004-2024 Cedar Creek Fifth Wheels manufactured between July 22, 2004, and May 6, 2024, and model years 2006-2024 Puma Travel Fifth Wheels manufactured between September 26, 2005, and May 2, 2024.

69.     Forest River estimated the scope of the partial recall to include "100%" of the Puma and Cedar Creek RVs manufactured in this time frame, totaling 41,353 units in the United States and 7,616 units in Canada, for a total of 48,969 units.

70.     Forest River produced Cedar Creek models for about 20 years and Puma models for about 18 years and failed to abide by applicable standards at the time of manufacture for all those models.

71.     Due to Mr. Nelson's case, which started in 2020, Forest River finally initiated the partial recall for those two models.

72.     The company waited four years and did not notify NHTSA of the full range of wiring defects. Simply put, Forest River has not been honest concerning the scope of the wiring defects or the numerous other models of towable RVs affected by these wiring defects.

73.     Forest River only acknowledged the overcurrent protection wiring defect in 2024 and, even then, was not candid.

74.     Forest River's proposed repairs of the Cedar Creek overcurrent protection to NHTSA do not provide adequate instructions to remedy the wiring defect.

75.     Although Mr. Nelson, through counsel, has informed Forest River that similar wiring defects exist in numerous other Forest River towable RV models of fifth-wheel trailers, travel trailers, pop-up trailers, and toy haulers. Forest River has

failed to notify NHTSA of those similar wiring defects in the numerous other models of towable RVs it manufactures.

76.    The scope of the Part 573 June 2024 recall includes both the 2019 and 2020 Puma RVs owned by Mr. Nelson but not the many other RV models manufactured the same way. This partial recall is inadequate and does not provide full relief to Mr. Nelson or the Class Members because it fails to address the full scope of the wiring defects or cover all affected models. Because of this shortfall, members of the class face an ongoing risk of shorts, fires, and other dangers.

77.    Despite Plaintiff's efforts to bring these facts to Forest River's attention, Forest River refuses to fully acknowledge the wiring defects or take appropriate action to remedy them. Forest River and its representatives publicly deny the existence of any wiring "defect" despite conducting a partial recall of a limited family of RVs.

78.    Plaintiff's rigorous and thorough Field Investigation by qualified experts found that most of Forest River's towable RV models contain wiring defects beyond the 48,969 that Forest River has partially recalled. The Field Investigation has confirmed that Forest River continues to manufacture towable RVs with these wiring defects even after the partial recall.

79.    The Field Investigation shows that the same or similar wiring defects likely exist in hundreds of thousands of additional units, including the brands and

the following models: Aurora, Avenger (Prime Time), Campsite Reserve, Catalina, Cedar Creek, Cedar Creek Cottage, Cherokee - Alpha Wolf, Cherokee - Grey Wolf, Cherokee - Patriot, Cherokee - Wolf Den, Cherokee - Wolf Pack, Cherokee - Wolf Pup, Clipper (Coachmen), Columbus (Palomino), Crusader (Prime Time), Della Terra (East to West), Evo, Flagstaff, Flagstaff Classic Travel Trailer, Flagstaff Hard side, Lacrosse, Longitude (East to West), Nightfall, Ozark, Palomino, Puma (Palomino), R-Pod, Rainer, Rockwood Freedom, Rockwood Premier, Rockwood - Ultra Lite, Salem Cruise Lite Series, Salem FSX, Shasta, Shockwave, Silver Lake (East to West), Stealth, Tracer, V-Trec, Vengeance, Vibe, Viking, Viking Camping Trailer, Wildcat, Wildcat Travel Trailer, Wildwood, Wildwood FSX Series, Wildwood X-Lite Series, XLR Boost, and XLR Micro Boost.

80.    The expert Field Investigation revealed that Forest River manufactures more than 50 percent of its models with one or more wiring defects that violate applicable standards. The volume of class RVs likely substantially exceeds 800,000 units. Each and every one of these RVs requires a safety inspection of its wiring.

81.    The "overcurrent protection defect" partial recall of the 48,969 RVs does not cover all affected Forest River RV models or address all the wiring defects.

82.    Consumers who own Forest River towable RV models with substantially the same wiring defects need to have these wiring defects remedied. Forest River's lack of proper wiring protocols applies uniformly across all towable

RV models. Although wiring defects are not found in every model unit, any model unit that has not been inspected could have a dangerous wiring defect. Forest River plants' lack of adequate safety and quality controls has created a random component to the frequency of the wiring defects. As a result, all such units must be inspected, and those with wiring defects must be repaired. Ordinarily, this is the type of thing a responsible company would fix via a full and comprehensive recall – indeed, this is what the recall system is for. But instead of instituting such a recall of all its RVs, Forest River abandoned its customers.

83.     The cost of the inspection likely makes individual lawsuits impractical, yet it is critical and is a cost incurred only because of Forest River's failures. Plaintiff expects that inspection will likely cost approximately $100 and repair will cost approximately $400. In addition, towable RV owners will have associated damages such as the costs of getting the RV to a Forest River repair facility, loss of use, and likely a diminishment in value.

84.     This injury is ongoing. Following the June 4, 2024, Part 573 Safety Recall Report, at least ten Forest River plants in over nine different cities continue producing RV units with wiring defects, which can result in the dangers previously explained during everyday use.

85.     Plaintiff's Field Investigation, inspecting over 400 units spanning over 85 models in numerous cities, is not yet complete. Even so, a significant majority of

models have been inspected, and more than 50 percent of the models manufactured by Forest River have been found to have wiring defects.

86.    Evidence obtained by Plaintiff in discovery in this litigation, as well as by the Field Investigation, demonstrates that the wiring defects exist and pose a continuing danger not just in the Puma and Cedar Creek models but in other models as well.

87.    On April 5, 2024, two days after Forest River personnel and counsel inspected the 2019 and 2020 Pumas and discovered that the allegations in Plaintiff's complaint were correct, Forest River submitted a Part 573 Safety Recall report to NHTSA, Recall No. 24V-254, regarding Aurora and Catalina travel trailers. In that recall, Forest River acknowledged it was not utilizing overcurrent protection regarding wiring in violation of ANSI/RVIA LV 3-1 and stated that the last affected unit was manufactured on March 29, 2024. Again, Forest River's statement was not true. One of Plaintiff's Field Investigators in Denton, Texas, revealed that an Aurora manufactured on April 8, 2024, contained the wiring defects at issue in this recall.

88.    On November 1, 2024, one week after this Court denied Forest River's motion to dismiss for mootness, Forest River submitted a Part 573 Safety Recall report to NHTSA, Recall No. 24V-822, regarding the East to West Alta Travel Trailers in which it acknowledged it had manufactured trailers that were not wired with proper overcurrent protection involving the wiring system to the inverter.

Although not the subject of the instant case, it involves a similar fire risk because of a lack of overcurrent protection.

89.     On November 8, 2024, two weeks after this Court denied Forest River's motion to dismiss for mootness, Forest River submitted yet another Part 573 Safety Recall report to NHTSA, Recall No. 24V-847, this time regarding the Impression Fifth Wheel Trailers. It acknowledged it had manufactured trailers that were not wired with proper overcurrent protection.

90.     The history of these many recalls, the results of Plaintiff's Field Investigation, and the deposition testimony all show that Forest River has inadequate quality control processes to ensure that the RVs it manufactures comply with applicable standards. As a result, even after partial recalls, Forest River continues to manufacture trailers with ongoing wiring defects, which pose a continuing danger to customers and the public.

### Mr. Nelson's Purchases and Fire

91.     On December 7, 2018, Forest River processed a production sales order for D&D RV Center ("D&D"), in Helena, MT, for a 2019 model PUF295BHSS Puma Towable with VIN # 4x4FPUF28KP079346 ("2019 Puma"). The unit was placarded with the Seal.

92.     On April 26, 2019, D&D sold Jay and Catherine Nelson the 2019 Puma.

93.    On May 29, 2020, the events giving rise to this case occurred. Mr. Nelson had towed the unit less than 200 miles. As the Nelson family was leaving the Black Sandy Campground, their 2019 Puma caught fire. As an experienced Montana Highway Patrolman, Mr. Nelson's quick thinking helped prevent further disaster.

94.    The 2019 Puma was towed to D&D RV Center ("D&D") in Helena, Montana, and a D&D employee, Chad Wenger, took several photographs of the burned components before any repair work and sent them to Forest River.

95.    On June 2, 2020, Ms. Gretchen Gonzalez (Forest River) emailed John Jones, Becky Aessa, Mark Porter, and Cindy Fox (all of Forest River) regarding photos Wenger had sent concerning the fire damage to the 2019 Puma. Mr. Wenger's email to Ms. Gonzalez stated, "It looks to me as a connector in the junction box was not crimped properly for the charge line, and that caused the short and fire." Forest River authorized the repair even though the 2019 Puma was no longer under warranty.

96.    The Wenger photos show that Forest River manufactured the 2019 Puma in violation of applicable standards with a lack of overcurrent protection. Yet, Forest River did not remedy the wiring defects or notify NHTSA. Instead, it continued manufacturing Pumas and other models with ongoing wiring defects in violation of the applicable standards and continued to paste the Seal on these RVs even though they were not compliant.

97.    Forest River addressed the fire damage by approving 7.5 hours to repair the 2019 Puma and paid D&D, a Forest River-approved repair shop, $825.00.

98.    Due to concerns about the safety and reliability of the 2019 Puma, Mr. Nelson traded the 2019 Puma for a 2020 Puma. This trade resulted in a loss of $8,548 plus other incidental costs. Additionally, Mr. Nelson lost the use of the 2019 Puma for 21 days (from May 29, 2020, until its replacement on June 19, 2020. On June 19, 2020, the dealership accepted the 2019 Puma (the burned model) as a trade-in for a 2020 Puma model PUF295BHSS, VIN #4x4PUF22LP084415 ("2020 Puma").

99.    Forest River did not inform Mr. Nelson that the 2020 Puma contained the same wiring defects as the 2019 Puma despite having the Seal.

100.    The following photos of the wiring defects in the 2019 Puma demonstrate some applicable standards violations, including lack of overcurrent protection, inadequate wire protection, and insufficient strain relief.







101.   The fire would not have occurred had Forest River assembled the 2019 Puma in compliance with the applicable standards it claimed to follow.

102.   The Montana dealership replaced the burnt wires on the 2019 Puma exactly as Forest River had originally wired it. Consequently, the dealership did not remedy any of the wiring defects at issue. Forest River has claimed in discovery responses that it does not provide the dealerships with wiring diagrams, nor does it provide its employees with wiring diagrams on how to wire RVs correctly. As a result, Forest River has been inconsistent about how RVs are supposed to be wired.

103.    Forest River's lack of effective quality control is the root of the problem. Instead of delivering to consumers what Forest River had promised and what the Seal represented - a compliant, reliable, towable RV - the plaintiff class received a towable RV with hidden wiring defects. These wiring defects are not discernable to the average consumer. Forest River's corporate designee and plant managers could not identify the wiring defects during depositions. These wiring defects can only be discovered through a targeted inspection by a qualified person with sufficient experience in low voltage standards. If these wiring defects are not repaired, it can put consumers, their families, and property in mortal danger.

104.    In this case, Forest River initially took the position that no applicable standards governed the wiring at issue and that everything was wired correctly.

105.    Eventually, after the April 3, 2024, Forest River inspection of the 2019 and 2020 Puma RVs in this case, Forest River conducted a nationwide partial recall on only a portion of the affected models and only a portion of the wiring defects while failing to inform NHTSA adequately of the full extent of the wiring defects.

106.    Because Forest River refused to compensate Mr. Nelson for his losses, he hired an attorney who hired a 30-plus-year licensed electrician with extensive knowledge of both low- and high-voltage wiring to investigate the cause and origin of the fire.

107.    Mr. Nelson learned from the electrician that not only did the 2019 Puma contain the wiring defects that led to the fire, but the 2020 Puma also contained the same wiring defects.

108.    Forest River RV purchasers are not able to recognize the latent wiring defects.

109.    Mr. Nelson had the consulting electrician remedy the wiring defects in the 2020 Puma. This inspection and repair cost was $500 plus the time and expense of towing the 2020 Puma to the electrician so it could be repaired.

110.    Mr. Nelson's counsel sent Forest River notice of the wiring defects. Yet, Forest River refused to acknowledge the wiring defects or take remedial action. Instead, as it had done in the past, it ignored the wiring defects and failed to implement protocols to address the systemic deficiencies in its wiring practices. Forest River continued to manufacture more towable RVs with wiring defects. It continued to paste the Seal on these non-complaint RVs.

111.    After four years of litigation, including multiple motions to dismiss, Forest River finally acknowledged a small part of the wiring defects but refused to acknowledge the full extent of the danger.

112.    To date, it still has not fully informed Plaintiff or NHTSA of the extent of the hidden electrical defects.

113.   Because Forest River continues to refuse to accept responsibility for the true extent of the wiring defects at issue, Plaintiff, in addition to written discovery, took depositions of Forest River's corporate designee and various personnel. Those depositions revealed that Forest River only created certain wiring diagrams for certification submittals rather than for manufacturing guidance. Deposition testimony shows that managers were not properly trained on the applicable standards.

114.   Forest River has conceded that it does not even have a licensed electrician or licensed engineer on staff.

115.   Despite having documented notice of the wiring defects and continuing to receive such notices, Forest River has continued wiring towable RVs with these wiring defects and still has not provided plant managers with applicable wiring schematics or training to ensure compliance with applicable standards.

**Forest River Certification of Compliance with Applicable Standards**

116.   Forest River placards every towable RV with the following certification. It expressly certifies and warrants that every RV it manufactures, assembles, and sells, including the Puma RVs at issue in this litigation, bears the following statement, "THIS VEHICLE CONFORMS TO ALL APPLICABLE US FEDERAL MOTOR VEHICLE SAFETY STANDARDS IN EFFECT ON THE

DATE OF MANUFACTURE SHOWN ABOVE." The following is a picture from the Forest River 2020 Puma data plate:



This statement is false and misleading, given Forest River's systemic failure to comply with the applicable standards.

117.   Forest River also includes the following Seal on every towable RV, which certifies that Forest River manufactures towable RVs in compliance with all codes and applicable standards. Forest River placarded Mr. Nelson's 2019 and 2020 Pumas with the following Seals immediately adjacent to the entry door:



118.   This Seal states that Forest River manufactured its RVs in compliance with National Fire Protection Association ("NFPA") 1192. NFPA 1192 directly

incorporates the ANSI/RVIA LV (Low Voltage) standard previously defined as "applicable standards."

119.   Forest River's placing the Seal on all its towable RVs falsely represents compliance with the applicable standards to the consuming public.

120.   Forest River knows the applicable standards provide minimum safety criteria for RVs to protect consumers from personal injury, death, and property damage.

121.   Forest River has produced two different wiring schematics regarding the RVs' specific, narrow wiring segment. This narrow wiring segment only affects the seven-way cord and associated wiring that runs from the seven-way to the RV batteries. Forest River initially produced documents labeled ForestRiver0000011 and 12 (the same schematic, hereafter "FR11"), depicting this specific area of wiring, which correctly shows how RV trailers should be wired in compliance with applicable standards. Forest River initially claimed that this is how it is wiring towable RVs.

122.   The author of the FR11 drawing, Terry Anderson, conceded during his deposition, "That document is a submittal print that I created to make submittals for Forest River as required by the States, Canada, for certifications approvals." He clarified that FR11 was "not designed as a production print."

123.   Buried in thousands of pages of discovery, Forest River produced a different schematic ("FR20969") that depicts incorrect wiring of the seven-way cord and associated wiring on the towable RVs.

124.   In the FR20969 schematic, Forest River depicts the charge line as wired with no overcurrent protection, violating applicable standards (ANSI/RVIA LV 3-1). This schematic contradicts the initial schematic Forest River provided Plaintiff and regulators.

125.   The FR20969 schematic is consistent with Plaintiff's experts' findings in the Field Investigation.

126.   Per Forest River Inc. corporate designee Mr. Conway, the electrical schematics for the fifth wheels are based on the drawings for the travel trailers. In Mr. Conway's words: "The travel trailer document was used to create this [referring to the electrical wiring schematics for the 5th wheels] document in 2000."

127.   A review of the edit history for schematics FR11 and FR20969 shows that between 2009 and 2016, Forest River employees "WGC" and "TJA" alternately modified both drawings. TJA is Mr. Anderson, and WGC is Mr. Conway, the Forest River corporate designee. In effect, Forest River was updating one schematic that correctly depicted how the overcurrent protection should be wired on towable RVs, while at the same time, the same employees were modifying another schematic that incorrectly depicted the wiring for the overcurrent protection.

## The Wiring Defects

128.   As a condition of membership in the RVIA, Forest River pledged to build RVs in compliance with applicable standards.

129.   Contrary to Forest River's certification of compliance, the Puma and Cedar Creek models and other towable models have defects involving the seven-way plug and associated wiring that runs into the battery compartment. The standards violated include one or more of the following failures in violation of applicable code: overcurrent protection (3-1),  strain relief (5-3.1), wire conductor protection (5-1), proper breaker (3-2), clamps on unprotected wire (5-1), and unprotected wire lengths longer than 18 inches from battery to breaker (3-5).

130.   In summary, these wiring defects violate the applicable standards (earlier referred to as "wiring defects") involving the seven-way plug and associated wiring that runs into the battery compartment:

    a.    Forest River failed to provide overcurrent protection on the charge line (ANSI/RVIA LV 3-1);

    b.    Forest River failed to provide proper conductor protection (ANSI/RVIA LV 5-1);

    c.    Forest River failed to provide proper strain relief and protection (ANSI/RVIA LV 5-3.1 and 5-1);

    d.    Forest River failed to install an overcurrent protective device within 18 inches of where the power source connects to the RVs circuits. (ANSI/RVIA LV 3-5);

e.      Forest River failed to install all breakers of the correct size (ANSI/RVIA LV 3-1 and 3-2);

f.      Forest River failed to properly crimp wire connectors (ANSI/RVIA LV 6-1.2).

131.    The wiring defects create a risk of property damage, injury, death, and fire. Wires that short can ignite flammable materials nearby. Shorts are possible even when the RV is disconnected from the towing vehicle because the RV batteries can charge affected wires. These wires are located directly beneath the bed on many models, creating an elevated risk for occupants. The identified wiring defects demonstrate Forest River's disregard for applicable standards.

132.    In addition to placarding every RV with claims that it manufactured towable RVs in compliance with applicable standards, Forest River has also marketed a commitment to safety, testing, and reliability to consumers. Through promotional advertising and sales brochures, Forest River assures its towable RV consumers that its RVs are dependable, safe, and conscientiously built with a "higher standard of manufacturing."

133.    Forest River's express warranties indicate that they are selling an RV without wiring defects. But in fact, the wiring defects that exist place towable RV owners and the general public who use public roadways and campgrounds at serious risk of property damage, personal injury, and death and continue to do so.

134.   Forest River's Seals and other express warranties of compliance with applicable standards on RVs are material terms to purchasers and are relied upon by all reasonable consumers of RVs. Forest River's failure to manufacture the towable RVs in compliance with the applicable standards directly caused Mr. Nelson and other class members damages.

135.   Plaintiff's experts, through the Field Investigations, have confirmed that at least one or more wiring defects are present on all towable RVs referenced herein.

136.   Based on information acquired during the Field Investigation, the affected RVs include hundreds of thousands of towable RVs, if not more, spanning over 50 models manufactured by Forest River. This includes the following Forest River divisions: Coachmen, East to West, Palomino, Prime Time, and Shasta. The number of affected RVs vastly exceeds the 48,969 partially recalled so far.

137.   Forest River's certifications and representations were a material part of what it was selling, yet they were false. Mr. Nelson and other consumers reasonably expected that Forest River was selling an RV manufactured consistent with its express warranties and that applicable standards were being met. Mr. Nelson and other consumers had the right to expect that Forest River was telling the truth when it warranted that towable RVs were manufactured in accordance with applicable standards. Mr. Nelson was not purchasing an RV from someone who had built it in

their backyard; he was buying an RV from Forest River, one of the largest RV manufacturers in the country, that had warranted that the RVs complied with applicable standards.

138.   Safety standards are essential to reasonable consumers like Mr. Nelson. Forest River knows that safety sells. The Seal tells consumers that Forest River has complied with safety standards. Forest River places this shiny, conspicuous Seal directly to the left of the door, where consumers must walk through to enter its RVs. The Seal is easily noticeable when entering each towable RV. It reads, "MANUFACTURER CERTIFIES COMPLIANCE WITH STANDARD FOR RECREATIONAL VEHICLES NFPA 1192".

139.   Simply put, part of what Forest River was selling through its express warranty was that it manufactured its towable RVs in accordance with applicable standards. As a result, it was a reasonable part of what Forest River sold Mr. Nelson and others who purchased Forest River towable RVs.

140.   Forest River actively concealed from Mr. Nelson and the public that it was manufacturing RVs with dangerous wiring defects, including hiding information from NHTSA, the safety agency, violating its disclosure obligations.

141.   Because of this deceptive practice, when Mr. Nelson traded the 2019 Puma in for the 2020 Puma, he had no idea that the 2020 Puma contained the same wiring defects.

142.    Forest River continued to placard its RVs with Seals, certifying that they met applicable standards, materially misleading consumers, and putting the public at risk even after years of being on notice of these wiring defects.

143.    Forest River has committed and continues to commit actual malice, subjecting it to punitive damages. (See § 27-1-221(2), MCA). Forest River has deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiff and others; or has deliberately proceeded to act with indifference to the high probability of injury to the Plaintiff.

144.    Forest River has committed and continues to commit actual fraud, subjecting it to punitive damages. (See § 27-1-221(3), MCA). Forest River has made a representation with knowledge of its falsity; or has concealed a material fact with the purpose of depriving the Plaintiff and others of property or legal rights or otherwise causing injury.

## CLASS ALLEGATIONS

145.    Mr. Nelson brings this action as a putative class action under Federal Rule of Civil Procedure 23 on behalf of a class and subclass.

> **Class**: All persons in the United States who own a Forest River towable RV other than for resale or distribution.
>
> **Montana Subclass**: All persons in Montana who own a Forest River towable RV other than for resale or distribution.

Plaintiff reserves the right to refine the class definition at the completion of discovery to ensure it accurately reflects the scope of RVs and the claims presented.

146.    Every owner of a Forest River RV has incurred damages because Forest River manufactured their towable RV without adequate quality controls. All of these RVs need to be inspected and, if they have defective wiring, require repair of that wiring.

147.    The core common contention of the Class is that Forest River sold RVs that were not manufactured with adequate quality control. Such quality control problems were consistent across all Forest River towable RVs. Therefore, all class members have incurred damages in the form of costs of inspection and potential repair of their RVs to get what Forest River promised to deliver: a towable RV manufactured according to the certifications Forest River represented.

148.    Mr. Nelson's claims are typical of all class members because all of them, like Mr. Nelson, purchased a towable RV manufactured with the same lack of adequate quality control in violation of the same representations.

149.    Mr. Nelson is an adequate class representative because he is committed to pursuing this class action to protect other RV owners from experiencing the fear of an electrical fire in their towable RV. He seeks to obtain the compensation that the entire class deserves and to prevent what happened to him from happening to

anyone else. His interests are consistent with those of the class: to receive compensation, an inspection, and/or repair of the class RVs.

150. Mr. Nelson is representative of the proposed Class and Subclass because he is a citizen and resident of Montana; his two RVs contain the same or similar wiring defects as the other towable RVs; and he has no interest that is antagonistic to or conflicts with unnamed members of the Class. Mr. Nelson's interest is to protect RV owners and obtain for the entire class the compensation and safety they deserve.

151. Mr. Nelson's claims are also typical of the claims of the Class in that other members have suffered precisely the same or nearly identical injuries from conduct that is not unique to Nelson but is similarly common to all.

152. Each Class Member owns a Forest River towable RV manufactured with insufficient quality control to ensure that it complies with applicable standards and now requires inspection and possibly repair.

153. Excluded from the Class and Subclass are Forest River, any affiliate, parent, or subsidiary of Forest River; any entity in which Forest River has a controlling interest; any officer, director, or employee of Forest River; any successor or assign of Forest River; any Judge to whom this action is assigned; and any owners of Class RVs not distributed for sale in the United States.

154.   Excluded from the Class and Subclass are individuals with claims for personal injury resulting from the wiring defects, except when they only seek economic damages for repairs or diminished value.

155.   Excluded from the Class and Subclass are individuals with claims unrelated to the wiring defects associated with the seven-way cord and wires that run to the battery compartment.

156.   The proposed Class and Subclass satisfy the requirements of Federal Rule of Civil Procedure 23.

157.   The potential Class and Subclass include hundreds of thousands of consumers. The Class is so numerous that joinder of all members is impracticable, satisfying the numerosity requirement.

158.   Questions of law and fact are common to the class, including whether Forest River violated applicable standards, satisfying the commonality requirement. These issues will generate common answers that will drive the resolution of this litigation. The claims of the representative, Mr. Nelson, are typical of the claims of the class, as his claims arise from the same or similar wiring defects that exist on the other Forest River models at issue and are based on the same legal theories. He will fairly and adequately protect the interests of the Class, as he has no conflicts of interest with other Class members and is represented by competent counsel capable of handling this class action litigation, satisfying the adequacy requirement.

159.   Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Additionally, the class action mechanism will allow for the efficient management of this case, avoiding inconsistent or varying adjudications. A class action will provide a fair and efficient method for adjudicating the controversy, satisfying the predominance and superiority requirements of Rule 23(b)(3). The issues of liability for the systemic wiring defects, as well as Forest River's misrepresentations and failure to disclose safety violations, are common to all class members and predominate over any individual issues. The resolution of these common questions will drive the outcome of the litigation.

160.   This case, ultimately, is about Forest River's conduct. Did Forest River manufacture towable RVs that it guaranteed to adhere to applicable standards, without adequate quality control?

161.   In addition, the proposed Class and Subclass are identifiable in that, upon information and belief, the names and addresses of all members of the proposed Class and Subclass can be obtained from business records maintained by Forest River and its dealerships. Notification to Class members can be achieved through direct mail, email, and publication, ensuring due process and adequate notice of this action.

162.    A class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. Plaintiffs should not have to wait until these latent wiring defects damage their RVs or cause injury.

163.    As evidenced by its violations of applicable standards, the systemic wiring defects in Forest River's manufacturing processes uniformly affect the identified models and likely other RVs manufactured during the relevant period, creating a common injury across the Class. Among the issues of law and fact common to the Class and Subclass:

a.    Whether Forest River promised consumers that its towable RVs would comply with applicable standards;

b.    Whether Forest River's towable RVs violate applicable standards;

c.    Whether Forest River's quality control processes failed to guarantee its towable RVs comply with applicable standards;

d.    Whether Forest River towable RV units need to be inspected due to insufficient quality controls;

e.    Whether Forest River towable RV units that violate applicable standards must be fixed;

f.    Whether Forest River's conduct constitutes negligence;

g.    Whether Forest River made negligent misrepresentations;

h.    Whether Forest River violated the MCPA;

i.    Whether Forest River violated the IDCSA;

j.    Whether Forest River is in breach of its implied and express warranties;

k.    Whether Forest River's conduct warrants punitive damages;

l.    Whether the Plaintiff, Class, and Subclass are entitled to a declaration that Forest River's conduct constitutes a violation of the laws alleged herein;

m.    Whether the Plaintiff, Class, and Subclass are entitled to be notified and warned about the wiring defects and are entitled to the entry of final injunctive relief compelling Forest River to issue a notification or warning to all Class members of such wiring defects;

n.    Whether the Plaintiff, Class, and Subclass are entitled to actual damages, including:

(i)    Sufficient funds to inspect each towable RV and to bring those with wiring defects into full compliance with applicable standards;

(ii)    Sufficient funds to compensate the Plaintiff, Class, and Subclass members for losses associated with inspection and repair, including but not limited to the time and expense associated with bringing the towable RVs to a satisfactory repair facility and the loss of use while each affected RV is being repaired, and associated diminishment in value; and

(iii)    The Plaintiff will present a damages model that uniformly calculates the cost associated with the inspection, associated damages including time and cost associated with the inspection process, repairs, and loss of use across all class members using standardized data from Forest River's records and other reliable methods.

o.   Whether the Plaintiff and members of the Class and Subclass are entitled to equitable relief, including but not limited to restitution or preliminary and permanent injunction; and

p.   Whether the Plaintiff and members of the Class and Subclass are entitled to attorney fees and costs.

## CAUSES OF ACTION
### COUNT I
### Negligence
### (On behalf of Plaintiff and all Classes)

164.   Plaintiff incorporates by reference each paragraph of this Complaint as if more fully set forth herein.

165.   Forest River owed Plaintiff, Class, and Subclass a duty to exercise reasonable care in designing, manufacturing, testing, inspecting, labeling, and certifying the RVs it sold and continues to sell, as well as a duty to warn purchasers about the associated wiring defects that exist in the RVs at issue.

166.   Forest River failed to exercise ordinary care in designing, manufacturing, testing, inspecting, labeling, and certifying the RVs Plaintiff, Class, and Subclass purchased. It also failed to warn about safety hazards associated with their use.

167.   Forest River knew or should have known that the Class RVs are not reasonably safe because of the wiring defects.

168.   Forest River failed to inform Plaintiff, Class, or Subclass about the wiring defects or associated dangers.

169. Forest River knew, or in the exercise of reasonable care, should have known that because of the wiring defects, the Class RVs are inherently at risk of fire and other dangers capable of causing significant property damage, personal injury, and death.

170. Forest River was negligent in the training, supervision, designing, manufacturing, testing, promoting, advertising, warning, marketing, inspecting, labeling, certifying, and selling of the defective RVs to the Plaintiff, Class, or Subclass because it:

a. Failed to create consistent reference materials (electrical wiring diagrams) that would provide consistent guidance to personnel so that RVs were manufactured in compliance with applicable standards;

b. Failed to provide adequate training and supervision to personnel so that RVs were manufactured in compliance with applicable standards;

c. Failed to ensure its RVs were manufactured in compliance with applicable standards;

d. Failed to use reasonable care in promoting, advertising, marketing, inspecting, labeling, certifying, and selling RVs with wiring defects;

e. Failed to conduct sufficient quality control in manufacturing, inspection, and post-marketing monitoring to determine the safety of the RVs and ensure their wiring system met applicable standards, resulting in the above-described wiring defects;

f. Failed to accompany the Class RVs with proper warnings about the wiring defects;

g.    Failed to act upon a system-wide failure regarding compliance with applicable standards;

h.    Failed to warn about the magnitude and scope of the wiring defects once it became evident the wiring defects resulted from a systemwide failure;

i.    Acted otherwise negligent in its conduct.

171.    Even though Forest River knew or should have known about the significant danger associated with the wiring defects, Forest River kept Plaintiff, Class, and Subclass members unaware of the full extent of the wiring defects and continues to do so.

172.    As a direct and proximate result of Forest River's negligent conduct, Plaintiff, Class, and Subclass have suffered damages.

## COUNT II
### Negligent Misrepresentation
### (On behalf of Plaintiff and all Classes)

173.    Plaintiff incorporates by reference each paragraph of this Complaint as set forth herein.

174.    Forest River misrepresented material facts about the quality and safety of its RVs to Plaintiff, Class, and Subclass and falsely certified that applicable standards were met. Forest River's misrepresentations regarding compliance with applicable standards were especially egregious, given its longstanding membership in RVIA and the certifications displayed on its products.

175.    Forest River knew, or by exercising reasonable care, should have known that its certifications and representations made to Plaintiff, Class, and Subclass were false because the RVs contained one or more of the wiring defects and failed to meet the applicable standards contrary to Forest River's certifications.

176.    Forest River's certifications and representations that it manufactured its towable RVs in compliance with applicable standards were part of what Forest River was offering to consumers.

177.    These express warranties were made to induce Plaintiff, Class, and Subclass to purchase its RVs.

178.    Plaintiff, Class, and Subclass justifiably relied upon Forest River's statements about its RVs' quality, safety, and certification.

179.    As a direct and proximate result of Forest River's negligent misrepresentation and omissions of material fact, the Plaintiff, Class, and Subclass have suffered damages.

## COUNT III
**Montana Consumer Protection Act ("MCPA")**
**(MCA § 30-14-101, *et seq*.) (On behalf of Plaintiff and Montana Subclass)**

180.    Plaintiff incorporates by reference each paragraph of this Complaint as set forth herein.

181.   Plaintiff and the Montana Subclass members are "consumers" as defined under the Montana Consumer Protection Act ("MCPA") in MCA § 30-14-102(1).

182.   Forest River is a "person" as defined in MCA § 30-14-102(6).

183.   Forest River is engaged in "trade" and "commerce" as defined in MCA § 30-14-102(8).

184.   Under MCA § 30-14-103, it is unlawful for Forest River to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce.

185.   Forest River engaged in deceptive or unfair acts and practices that offend established Montana public policy because they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Despite explicitly certifying compliance, Forest River's noncompliance with applicable standards constitutes a deceptive act under the MCPA.

186.   As a direct and proximate result of Forest River's unlawful conduct and violation of the MCPA, the Plaintiff and Montana Subclass are entitled to actual damages, statutory damages, treble damages, and an award of reasonable attorney's fees and costs under MCA §§ 30-14-133, et seq.

187.   Forest River's deceptive acts and practices have occurred in the conduct of trade or commerce and have directly and proximately caused harm to consumers in Montana. These practices have a substantial impact on the public interest, as they

affect the purchasing decisions of a significant number of consumers and involve matters of safety and reliability.

## COUNT IV
### Breach of Express Warranty
**(Ind. Code § 26-1-2-313) (On Behalf of Plaintiff and All Classes)**

188.    Plaintiff incorporates by reference each and every foregoing paragraph of this Complaint as though fully set forth herein.

189.    Forest River has taken the judicial position before this Court that Indiana law governs certain warranty claims. By virtue of the limited warranty's choice-of-law provision, Plaintiff's breach of express warranty claim arises under Ind. Code § 26-1-2-313, on behalf of Mr. Nelson and all Class Members subject to Indiana law.

190.    The limited warranty language regarding the choice of law as Indiana accompanied the sale of each affected towable RV.

191.    An express warranty is created under Ind. Code § 26-1-2-313 when a seller makes any affirmation of fact or promise to a buyer that relates to the goods and becomes part of the basis of the bargain, or when the seller provides a description of the goods that are made part of the basis of the bargain.

192.    Forest River made express warranties and representations to Plaintiff and Class Members concerning its towable RVs' safety, reliability, and compliance with applicable standards. These express warranties included, but were not limited

to, the Seals and other statements on its towable RVs, representing that Forest River manufactured the RVs in compliance with applicable standards.

193.   Forest River's express warranties became part of the basis of the bargain when Plaintiff and Class Members purchased Forest River RVs with expectations that the RVs were manufactured in compliance with applicable standards.

194.   Forest River breached its express warranties by selling RVs with systemic wiring defects that failed to comply with applicable standards. As a result, the RVs did not conform to the affirmations of fact and descriptions provided at the time of sale.

195.   Forest River's breach of express warranty proximately caused Plaintiff and Class Members to suffer damages, including but not limited to diminished value of the RVs, out-of-pocket costs for necessary repairs, loss of use, and incidental and consequential damages.

196.   Under Ind. Code § 26-1-2-313, 26-1-2-714, and 26-1-2-715, Plaintiff and Class Members are entitled to recover all remedies provided by law, including compensatory damages specified herein, as well as incidental and consequential damages.

197.   Plaintiff and Class Members, therefore, seek all available remedies for breach of express warranty under Indiana law, including but not limited to

compensatory damages, incidental and consequential damages, attorneys' fees where permitted, and any other relief the Court deems just and proper.

## COUNT V
### Breach of the Implied Warranty of Merchantability
### (Ind. Code § 26-1-2-314) (On Behalf of Plaintiff and All Classes)

198.   Plaintiff incorporates by reference each and every foregoing paragraph of this Complaint as though fully set forth herein.

199.   Forest River has taken the judicial position before this Court that Indiana law governs certain warranty claims. By virtue of the limited warranty's choice-of-law provision, Plaintiff's breach of implied warranty of merchantability claim arises under Ind. Code § 26-1-2-314, on behalf of himself and all Class Members subject to Indiana law.

200.   Forest River is a "merchant," as the term is used in Ind. Code § 26-1-2-314(1) because it regularly engages in the business of manufacturing, distributing, and selling towable RVs.

201.   Under Ind. Code § 26-1-2-314, unless excluded or modified, a warranty that goods shall be merchantable is implied in a contract for the sale of goods if the seller is a merchant with respect to goods of that kind.

202.   At the time of sale, Forest River impliedly warranted that each RV was merchantable - i.e., fit for the ordinary purposes for which RVs are used, of fair or

average quality, and in conformance with any affirmations of fact on the RV itself or in related marketing materials.

203.    Under Ind. Code § 26-1-2-314(2)(e), for "goods to be merchantable must at least be as such as: … are adequately contained, packaged, and labeled as the agreement may require; and conform to the promises or affirmations of fact made on the container or label if any." Forest River packaged and labeled the affected RVs as manufactured in compliance with applicable standards when, in fact, they were not.

204.    For the reasons alleged throughout this Complaint - including Forest River's systemic manufacturing wiring defects and concealment of latent wiring defects - Forest River breached the implied warranty of merchantability.

205.    Specifically, the RVs at issue were not fit for the ordinary purposes for which they are used because they contained (and continue to contain) wiring defects that can result in fire hazards, safety risks, and other substantial nonconformities.

206.    As a direct and proximate result of Forest River's breach of the implied warranty of merchantability, Plaintiff and Class Members have incurred damages, including but not limited to out-of-pocket costs of inspection or repair; diminished value of the RVs; loss of use, incidental and consequential damages; and any other losses allowed by law.

207.   Under Ind. Code § 26-1-2-714 and § 26-1-2-715, Plaintiff and Class Members are entitled to recover compensatory damages, as well as incidental and consequential damages.

208.   Plaintiff and Class Members, therefore, seek all available remedies for breach of the implied warranty of merchantability under Indiana law, including but not limited to compensatory damages, incidental and consequential damages, attorneys' fees where permitted, and any other relief the Court deems just and proper.

## COUNT VI
### Violation of the Indiana Deceptive Consumer Sales Act
### (Ind. Code § 24-5-0.5-1, *et seq.*) (On Behalf of Plaintiff and All Classes)

209.   Plaintiff incorporates by reference each and every foregoing paragraph of this Complaint as though fully set forth herein.

210.   Forest River has taken the judicial position before this Court that its limited warranty is governed by Indiana law. Forest River alleged that its warranty expressly states: "The terms, conditions, rights and responsibilities of this warranty shall be governed by the laws of the State of Indiana notwithstanding any other state laws." Because Plaintiff's IDCSA claim arises from the same obligations and responsibilities set forth in the warranty and from the same facts that trigger warranty coverage, Forest River's unlawful conduct falls within the scope of this Indiana choice-of-law provision.

211. The IDCSA, Ind. Code § 24-5-0.5-1, et seq., prohibits "suppliers" from committing deceptive or unconscionable acts in connection with consumer transactions.

212. At all relevant times, Plaintiff and the proposed Class Members were "consumers" who purchased towable RVs for personal, family, or household use. See Ind. Code § 24-5-0.5-2(a).

213. Defendant Forest River is a "supplier," as defined by Ind. Code § 24-5-0.5-2(a)(3) because it engages in consumer transactions, offering goods or services for sale, lease, or distribution to the public.

214. Forest River engaged in "uncured deceptive acts" within the meaning of Ind. Code § 24-5-0.5-2 because the acts of Forest River damaged Plaintiff and the proposed Class Members, and Forest River has not timely offered to cure. In addition, Forest River's conduct qualifies as "deceptive acts" under Ind. Code § 24-5-0.5-3 insofar as it knew or reasonably should have known that its express and implied warranties were false, that its towable RVs were not of the standard, quality, and grade as advertised or certified, or did not perform or possess the characteristics, uses, or benefits as stated or implied in its advertisements or certifications.

215. Forest River's deceptive conduct includes, but is not limited to: (a) affirmatively misrepresenting that the RVs were in compliance with applicable standards as described herein; (b) withholding the full extent of the electrical wiring

defects from Plaintiff and Class Members; (c) failing to disclose risks associated with manufacturing towable RVs with the wiring defects; and (d) continuing to expressly warrant and claim the RVs as compliant with applicable standards despite knowledge to the contrary.

216.   Forest River's deceptive conduct occurred in connection with consumer transactions under the IDCSA, namely the sale and warranty of the towable RVs.

217.   Because the same operative facts - i.e., Forest River's warranty misrepresentations and failures to disclose - give rise to both the warranty claims and the related consumer-protection violations, Plaintiff's and Class Members' IDCSA claims arise from and relate to the "terms, conditions, rights, and responsibilities" under the warranty, thereby falling within Indiana law.

218.   As a direct and proximate result of Forest River's deceptive acts and practices, Plaintiff and Class Members have suffered ascertainable losses, including but not limited to those described herein.

219.   Plaintiff, on behalf of Mr. Nelson and all Class Members subject to Indiana law, seeks to recover actual damages, statutory damages where applicable, costs, attorneys' fees, treble damages, and all other relief allowed under Ind. Code § 24-5-0.5-4, including an order enjoining Forest River from continuing its wrongful conduct.

220.   By reason of the foregoing, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests relief as set forth in the "Relief Requested" section below (or as otherwise permitted by law) to remedy Forest River's violations of the IDCSA.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff, Class, and Subclass request this case proceed to judgment against Forest River as follows:

1.   Certify the classes as defined above under Fed. R. Civ. P. 23, or with such qualifications, descriptions, limitations, or enlargements as may later be determined to be in the best interest of fair and efficient adjudication of the claims brought on behalf of the Plaintiff, Class, and Subclass, and the public in general;

2.   Appoint Plaintiff as the representative of the Class and Subclass;

3.   Appoint Plaintiff's counsel as counsel for the Class and Subclass;

4.   Enter judgment for the Plaintiff, Class, and Subclass and against Forest River;

5.   Afford the Plaintiff, Class, and Subclass injunctive relief compelling Forest River to notify members of the Class and Subclass about the wiring defects complained of;

6.   Award the Plaintiff, Class, and Subclass actual damages, representing:

a.  Sufficient funds to cover inspection costs of each towable RV and sufficient funds to bring each noncompliant RV into compliance with applicable standards;

b.  Sufficient funds to compensate for the diminishment of the value of the RV;

c.  Sufficient funds to compensate for any loss of use while the RV is being repaired;

d.  Sufficient funds to compensate consumers who incurred repair or inspection costs related to the wiring defects;

e.  Pre-judgment and post-judgment interest and costs of suit as provided by law;

f.  Assess punitive damages on applicable Counts against Forest River in an amount sufficient to punish Forest River and discourage it and others from engaging in like conduct in the future;

g.  Compensatory damages in all amounts provided by law and as supported by the evidence at trial;

h.  An order requiring Forest River to implement independent third-party audits of its manufacturing and certification processes to ensure compliance with ANSI/RVIA and federal safety standards and to provide annual reports to NHTSA for oversight; and

i.  Costs and reasonable attorney's fees.

7.  Award Plaintiff and the Montana Subclass treble damages, attorneys' fees, and any other damages recoverable under the Montana Consumer Protection Act;

8.    Award Plaintiff and the Class treble damages, attorneys' fees, and any other damages recoverable under the IDCSA;

9.    Order that Forest River comply with NHTSA reporting requirements;

10.    Grant injunctive relief to prevent a continuation or reoccurrence of Forest River's wrongful conduct typified by its treatment of the Plaintiff, Class, and Subclass; and

11.    Grant Plaintiff, the Class, and Subclass such other and further relief as this Court deems equitable, just, and proper.

12.    Plaintiff maintains his request for a jury trial on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 15, 2025.

BIDEGARAY LAW FIRM, LLC

By: /s/ Daniel B. Bidegaray
Daniel B. Bidegaray
*Attorneys for Plaintiff*