IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION


JAY NELSON, individually and )
on behalf of all others )
similarly situated, )
)
               Plaintiff, )
) Civil Docket
   vs. ) No. CV-22-49-GF-BMM
)
FOREST RIVER, INC., and DOES )
1-25, )
)
             Defendants. )
_____ )


Transcript of Motion Hearing


Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
Thursday, February 13, 2024
2:25 p.m. to 3:21 p.m.


BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES CHIEF DISTRICT COURT JUDGE


Yvette Heinze, RPR, CSR, CVR-S
United States Court Reporter
Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
yvette_heinze@mtd.uscourts.gov
(406) 454-7805

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2   PRESENT ON BEHALF OF THE PLAINTIFF:

3                     Daniel Bidegaray (via video)
                      BIDEGARAY LAW FIRM, LLC
4                     1700 W Koch, Suite 5
                      Bozeman, MT 59715
5
                      JR Conner (in person)
6                     Dennis Conner(via video)
                      CONNER, MARR & PINSKI, PC
7                     PO Box 3028
                      Great Falls, MT 59403-3028
8

9
    PRESENT ON BEHALF OF THE DEFENDANT:
10
                      Mark Hayden (in person)
11                    Spencer Cowan (via video)
                      TAFT STETTINIUS & HOLLISTER LLP
12                    425 Walnut Street, Suite 1800
                      Cincinnati, OH 45202
13
                      Max Davis (in person)
14                    DAVIS HATLEY HAFFEMAN & TIGHE
                      PO Box 2103
15                    101 River Drive North The Milwaukee Station
                      Third Floor
16                    Great Falls, MT 59401-2103

17
    Also Present:
18
                      John Drics
19

20

21

22

23

24

25

PROCEEDINGS

1

2          (Open court.)

3              THE COURT:  Madam Clerk, please call the next case on

4  the Court's calendar.

5              THE CLERK:  This Court will now conduct a motion

6  hearing in Case Number CV-22-49-GF-BMM, Nelson versus Forest

7  River, Inc.

8              THE COURT:  Good afternoon, Mr. Conner.

9              MR. JR CONNER:  Good afternoon, Your Honor.

10             THE COURT:  Good afternoon, Mr. Bidegaray.  Can you

11  hear me, sir?

12             MR. BIDEGARAY:  I can, Your Honor, thank you.

13             THE COURT:  Good afternoon, Mr. Davis and then

14  Mr. Hayden.

15             MR. HAYDEN:  Yes, sir.

16             THE COURT:  And then Mr. Cowan?

17             MR. DAVIS:  No.  Judge, the fellow two to my right is

18  John Drics, and he is the general counsel of Forest River, and

19  he's here as the client.

20             THE COURT:  All right.  Fine.  Thank you.  He has a

21  right to be here as the client if he wishes.

22             We have a couple of matters to address today.  We

23  have a motion for a protective order filed by Forest River.

24  That's Document 116.  And we have plaintiff's motion for leave

25  to file a fourth amended complaint, Document 121.  Plaintiffs

1  have filed a motion to certify the class.  That's not yet ripe.

2  So we won't take that up today.

3        So let's focus first on -- well, do you want to do

4  the protective order first or the complaint first?

5        MR. DAVIS:  Well, Judge, there's some question, at

6  least in defendants' mind.  If you look at Document

7  Number 117 --

8        THE COURT:  Okay.

9        MR. DAVIS:  -- you addressed the protective order.

10  We're not entirely pleased or totally displeased with that

11  ruling.

12        And then in the order calling for this hearing you

13  said that the protective order, as you just announced, was

14  something to be addressed today.  We certainly recognize that

15  anything you have done before final judgment --

16        THE COURT:  Okay.  So the protective order relates to

17  the discovery request we talked about.  Let's focus first on

18  the amended complaint request.  And then if we need to get into

19  any issues regarding potential discovery or not having

20  discovery, we can do it after that.

21        MR. DAVIS:  That's fine.

22        THE COURT:  Okay.  So who is going to argue on the

23  motion for a new complaint?  Mr. Bidegaray or Mr. Conner?

24        MR. BIDEGARAY:  Yes.  I am, Your Honor.

25        THE COURT:  All right.  Go ahead, Mr. Bidegaray.

1               MR. BIDEGARAY:   Thank you, Your Honor.

2               First of all, sorry.   I'm under the weather here a

3      little bit.   Mr. Turner was going to argue this motion, but

4      he's stuck in a deposition.

5               Obviously, as the Court has pointed out today -- I'll

6      try to talk as loud as I can -- plaintiff is asking that we be

7      allowed to amend the complaint to include newly discovered

8      evidence.   Basically, it's based on new evidence that's been

9      uncovered and solidified.   We didn't dare file an amended

10     complaint before we had that evidence put together.

11              We filed the motion on January 15.   That same day, we

12     got kind of an innocuous email with evidence that had been

13     withheld that is crucial to this.   So the first brief that we

14     filed doesn't talk about that evidence because I hadn't seen

15     it, but the reply does.

16              Quick timeline, lots of motions to compel and

17     whatnot.   This case was filed in May of 2022.   Shortly after it

18     was filed, Forest River did a survey to see if plaintiff's

19     complaint was -- if there was anything to it.   And guess what

20     they found out?   There was a lot to it.   And guess what

21     happened to that survey?   It got buried until January 15, and

22     then it was officially produced on February 4.

23              But it would have been nice to have that evidence

24     early on.   Instead of getting it, what we got was a bunch of

25     motions to dismiss, a bunch of documents, but not key

1  documents.  It's one thing to get buried with a bunch of

2  documents that don't amount to anything --

3          THE COURT:  Mr. Bidegaray, let me interrupt you.

4  What is the relevance of this survey?  Why is this so critical

5  to your case?

6          MR. BIDEGARAY:  The survey, Your Honor, we served

7  them on June 8th for service.  Forest River did a survey to see

8  if the allegations of our complaint, if there was anything to

9  it.  And guess what they found out?  There was a lot to it.

10 60 percent of their plants were doing what we were saying.  And

11 guess what they said after -- they buried that survey.  They

12 didn't give it to us until --

13         THE COURT:  All right.  So 60 percent of the plants

14 are producing RVs that have wiring problems.  Is that what you

15 are suggesting?

16         MR. BIDEGARAY:  That is not suggesting.  That is just

17 what they were doing.

18         THE COURT:  All right.  Now, as I understand, there

19 has been a nationwide recall by Forest River.  Doesn't that

20 correct the problem?

21         MR. BIDEGARAY:  It does not.  Because, first of all,

22 the nationwide recall, as we put in the affidavit, first, it

23 only addresses two of the models.

24         And, secondly, it doesn't address all of the problems

25 in the 7-way and associated wiring.  So, no, it doesn't come

1   close to addressing the problem.

2          And, third, they continue to make -- we found in the
3   field, in our field -- we didn't dare file an amended complaint
4   because we knew there was going to be a motion to dismiss filed
5   right on the heels of us filing an amended complaint.  So we
6   knew we needed facts.  We thought we were going to get facts
7   through deposition and normal discussions.  Of course, guess
8   what we didn't get?  The stuff we needed so that we could come
9   to you and say, "Judge, here's what's going on.  We got a bunch
10  of left-handed stuff.  We didn't get the truth."

11         And so then we had to spend hundreds of thousands of
12  dollars to do a field investigation.  That was finally compiled
13  sufficient enough.  That's why we waited until we dang sure
14  knew so that when they filed their motion to dismiss, we were
15  going to be able to come to you and say, "Judge, here's the
16  deal.  Here's the truth."  Because we weren't getting it in
17  discovery.

18         In fact, we weren't even getting key depositions.  I
19  don't know if the Court recalls, but we said we need to change
20  the scheduling order; we need to extend it.  And they resisted
21  it.  They wanted us to go forward with no facts.  They didn't
22  want us to know the truth.  And then the Court kind of did a
23  modified -- split-the-difference deal.

24         And they didn't make key witnesses available until
25  January of 2025, and we needed those witnesses.  It was in

1  those depositions that we finally discovered enough facts to
2  find out about this 2022 survey.

3          On January 16th, we took the deposition of a fellow
4  by the name of Matt Gingerich.  During that deposition, he
5  finally disclosed what was going on to a certain extent.  We
6  didn't really know what the documents they innocuously dropped
7  on us the day before, informally.  It was just in an email.
8  "Attached, please find" -- you can see it.  It's an exhibit.
9  We attached it.

10          But, anyway, during the deposition we discovered
11  enough to figure out, holy smokes, there's something there.
12  And then when we finally got it and had our experts analyze it,
13  it was, like, my goodness.  And then we had to do some emails
14  back and forth, "Please read the chain."

15          One of the things, that email chain with Mr. Hayden,
16  he says, "Oh, we just got this survey, these documents, today.
17  So we're quickly giving them to you," un-Bates stamped and what
18  have you.  Well, what the email doesn't say is -- it doesn't
19  say whether their law firm knew about it.

20          The Taft Law Firm, there's an inhouse counsel.  I
21  haven't heard his name before, Mr. Drics.  But Melissa Macchia
22  is a Taft Law Firm attorney.  She attends -- she was on the
23  partial recall that was enacted.  She attends a lot of their
24  meetings.  Mr. Papageorge, I think he's on this Zoom call.
25  He's in the Taft Law Firm.  He attends a weekly meeting with

1    Forest River regarding fire risk.

2           So I don't know.  At this stage we're probably going
3    to have to do more discovery to find out what they knew and
4    when they knew it.  But one thing for sure, Judge, we didn't
5    know it, and that's not right.

6           And if there's anything that justifies a motion to
7    amend is you can't -- first of all, this is a serious problem.
8    Secondly, you can't reward -- it needs to be fixed.  This
9    problem needs to be fixed.  There's no way it can be fixed
10   without a class action.  As Posner, Judge Posner said, "You'd
11   have to be a lunatic to go after someone like Forest River."
12   They even told us yesterday, "If the judge grants the motion to
13   amend, we're going to file another motion to dismiss."

14          THE COURT:  Mr. Bidegaray, why can't you address
15   these discovery issues as part of the class certification
16   process?

17          MR. BIDEGARAY:  I agree with you, Judge.  We probably
18   can.  We're going to have to get into that.  I want to know
19   what they know and when.  I definitely want to know that.

20          THE COURT:  Why do you need to amend the complaint?

21          MR. BIDEGARAY:  What's that?

22          THE COURT:  Why do you need to amend the complaint if
23   you can address these issues as part of the class certification
24   process?

25          MR. BIDEGARAY:  Well, two things:  One, the amended

1  complaint sets forth facts that we weren't able to get timely
2  in discovery.  The deadline to amend was January, I think, of
3  2023.  We hadn't even had rulings yet on the motions to
4  dismiss, the multiple motions to dismiss that they filed at
5  that stage.  And we had done no discovery by that point.
6  That's Point 1.

7       Point 2, for class certification, we've added three
8  causes of action.  One of the issues this Court knows well is
9  commonality.  And Forest River in their warranty claims puts
10  that Indiana law applies under the Consumer Protection -- not
11  Consumer Protection Act, but the Warranty Act, and there's case
12  law that dovetails the consumer protection claims as well, that
13  that would --

14       THE COURT:  There's nothing new about Forest River
15  being an Indiana corporation, is there?

16       MR. BIDEGARAY:  No.  It's the warranty claim,
17  Your Honor, that under class certification there would be
18  commonality under that claim.  They are going to come back to
19  you.  They're going to fight every issue that we ever bring up,
20  and they're going to fight it.  And it will be a lot stronger
21  ground if it's based on the commonality of the Indiana claims
22  because it's in the warranty of each -- it's in the warranty of
23  each RV -- towable RV that they sell.

24       THE COURT:  Well, again, I guess, why do we need a
25  fourth amended complaint when we talked about you could get

1  some of this stuff through the discovery during the class

2  certification process?

3          MR. BIDEGARAY:  Well, the main reason for the fourth

4  amended complaint is to flesh out the truth and add those

5  Indiana claims.

6          We can probably get certification on negligence, but

7  they're going to object on commonality with negligence.  We

8  wouldn't have that argument, Your Honor, with regard to the

9  Indiana consumer protection claims and they're not -- the

10  warranty claims.

11          And they're not -- there's nothing new about that.

12  They argue about new discovery.  No.  These are all based on

13  the exact same allegations from the beginning.

14          THE COURT:  Mr. Bidegaray, if Forest River files a

15  motion to dismiss -- if you file a fourth amended complaint and

16  they turn around and file a motion to dismiss, as you claim

17  they will, how would we meet the deadlines that are currently

18  set in the case for motions and trial?

19          MR. BIDEGARAY:  Well, I'll try to brief it as fast as

20  I can, for one.

21          Two, I would suspect Forest River -- they've already

22  asked us.  We need to get a -- they said, "Listen, if he grants

23  this, can we get together and do a new proposed briefing

24  schedule?"  I assume they are going to want a new deadline.  I

25  just assume try it when you have it set.

1      We have one deposition that they didn't make the
2 fellow available, a super key witness.  That's going to be here
3 next week.  We'll take that deposition.  That will be darn
4 interesting.

5          THE COURT:  How much of the discovery do you have?

6          MR. BIDEGARAY:  Well, there's a couple more people,
7 but that's -- to be honest with you, we'd have to brainstorm
8 after we take this next deposition.  It's not a lot more, and
9 there's not a lot more physical document discovery we're going
10 to need.  We need to finish the deposition that we wanted to
11 try to get complete well before this hearing, but the witness
12 wasn't made available.

13          THE COURT:  Who is the witness?

14          MR. BIDEGARAY:  A fellow by the name of Leo Akins,
15 Judge.  He's the guy that ordered this 2022 survey.  He knows
16 all about it.  It will be an interesting deposition to say the
17 least.  But, anyway, that's going to be in a couple of days.
18 And then I think maybe one or two more witnesses, but maybe
19 not.

20          I'd like to keep the trial date.  I'd like to keep
21 the heat on them.  I'd like to have a jury, and I'd like a jury
22 of Montana citizens to decide this case sooner than later.

23          THE COURT:  All right.  Anything else you want to
24 say?

25          MR. BIDEGARAY:  I just think it would be a tragedy to

1    reward these guys for the discovery abuse that's taken place.

2          THE COURT:  All right.  Mr. Hayden, do you want to

3    respond, please?

4          MR. HAYDEN:  Yes, sir.  Thank you.

5          Well, you just heard Mr. Bidegaray say that there's

6    nothing new, and he's right.  There's nothing new in terms of

7    allegations.

8          THE COURT:  Explain to me what this 2022 survey is

9    and Mr. Akins's involvement, please.

10          MR. HAYDEN:  Yeah.  There was a 2022 survey that was

11    done.  No, we, as counsel, didn't know about it.  But it was

12    done internally.  After they received this complaint, they did

13    what they thought was a confident survey of --

14          THE COURT:  After Forest River received the

15    complaint?

16          MR. HAYDEN:  Yes.

17          THE COURT:  Okay.

18          MR. HAYDEN:  Not before the plaintiff's allegations.

19    It was after his allegations that they did this survey.  They

20    thought it was a confident business survey.  We didn't know

21    about it.  When it came up in discovery in a deposition of a

22    Forest River witness, we turned around and produced it hours

23    after the deposition.  So as soon as we knew about it, we

24    produced it.

25          And it doesn't show that 60 percent of the plants

 1  have a problem.  It shows that two plants that manufacture
 2  fifth wheels, Cedar Creek and Impression, may have had a
 3  manufacturing or assembly issue, the same wiring issue that is
 4  the subject of the recall.  And you will remember we've already
 5  recalled Cedar Creek.  So it was only two plants of fifth
 6  wheels.

 7        What Mr. Bidegaray is talking about is he's talking
 8  about all travel trailers.  Well, that survey did not indicate
 9  a problem with travel trailers.  So that 60 percent number is
10  just not true.

11        And Mr. Akins -- Your Honor, Mr. Akins is a witness
12  that they named in their complaint, their original complaint.
13  In paragraph 10, they named Leo Akins.  I encourage you,
14  Your Honor, to go back and look at their original complaint
15  because he's right in there on paragraph 10.  That's how
16  important he was.

17        And Mr. Bidegaray met Mr. Akins in April of 2024
18  during the inspections of the vehicles.

19        They scheduled Mr. Akins's deposition for August 27,
20  2024, and then the plaintiffs unilaterally canceled it.  Then
21  they rescheduled it for January 14, 2025.  And on the morning
22  of Mr. Akins's deposition, they unilaterally canceled the
23  deposition.

24        Now they have scheduled it a third time to start next
25  week.  We'll see if they actually take it or not.  But they

1    have unilaterally canceled his deposition twice.

2    And his allegation about Leo Akins is just simply

3    false.  They knew about him.  They've taken a long time to take

4    his deposition, and they've canceled his deposition twice.

5    Your Honor, really the key issue here is your

6    decision in *Peterson v State Farm*.  That's the key case.  And

7    in your decision in *Peterson*, what you said is that good cause

8    to excuse noncompliance with the scheduling order exists only

9    if the pretrial schedule cannot reasonably be met despite the

10    diligence of the party seeking the extension.

11    And the party seeking the extension here was not

12    diligent in bringing the amended complaint.  And so the inquiry

13    should end, without even getting to Rule 15, with Rule 16.

14    Because if you go through their complaint, what you will see is

15    allegation after allegation in their original complaint that

16    Forest River had wiring defects in its RVs.  They allege unsafe

17    wiring and wiring defects in paragraphs 38, 58, 87, 95A, and

18    112.  So that's five paragraphs where they allege wiring

19    defects in their original complaint.

20    And then in their original complaint, they allege

21    that Forest River concealed all of these wiring defects.  And

22    in their original complaint, they brought a breach of express

23    warranty and implied warranty in their original complaint, and

24    then they decided to drop those claims when they filed an

25    amended complaint.

1          So Mr. Bidegaray cannot say with a straight face that
2     they need to add these warranty claims now when they had them
3     in the original complaint and for whatever reason decided to
4     drop them.
5          THE COURT:  Mr. Hayden, tell me the origin of the
6     2022 survey, when you became aware of it and when it was
7     produced to plaintiffs and what relevance it has to these
8     claims.
9          MR. HAYDEN:  We learned about the 2022 survey during
10    a deposition of one of the witnesses, Your Honor.  I believe it
11    was Rodney Smith.  And right after that deposition, we asked
12    the client about it.  We obtained it from Matt Gingerich, the
13    day after or the day of Rodney Smith's deposition.
14         THE COURT:  Is Mr. Gingerich a Forest River employee?
15         MR. HAYDEN:  Yes, he is.
16         THE COURT:  Who commissioned the survey?
17         MR. HAYDEN:  Leo Akins asked Mr. Gingerich to check
18    into the allegations in the complaint.  And Mr. Gingerich, a
19    young guy, very serious guy, new to the job, thought the best
20    way to do that would be to send out a written survey.  So he
21    sent out a written survey to the various manufacturing plants
22    of Forest River.
23         THE COURT:  How many are there?
24         MR. HAYDEN:  Your Honor, I think there's -- I think
25    there's about 12 to 15 plants that manufacture fifth wheels

1  spread all over the United States.

2          THE COURT:  So did the survey cover only fifth

3  wheels?

4          MR. HAYDEN:  No, it covered travel trailers and

5  actually campers.  And so when we received that 2022 survey,

6  right after we learned about it, we immediately produced it.

7          And Matt Gingerich, who commissioned the survey, was

8  deposed after we produced it.  So they had it when they deposed

9  Matt Gingerich.

10          And, yeah, as I said, what it shows is it shows

11  problems with two plants manufacturing fifth wheels.

12          THE COURT:  What percentage of fifth wheels produced

13  by Forest River are manufactured at those two plants?

14          MR. HAYDEN:  I don't know precisely, Your Honor, but

15  I would say it's maybe 5 to 10 percent.

16          THE COURT:  Okay.

17          MR. HAYDEN:  Of the fifth wheels.

18          THE COURT:  And the survey that showed problems, were

19  these wiring problems consistent with the wiring problems

20  identified in the plaintiff's complaints.

21          MR. HAYDEN:  Yes.

22          THE COURT:  Okay.

23          MR. HAYDEN:  Yes.

24          THE COURT:  All right.

25          MR. HAYDEN:  And I think that really gets to the

1   heart of this, Your Honor.  They --

2           THE COURT:  When was that disclosed to plaintiffs,

3   the survey, please?

4           MR. HAYDEN:  The survey was disclosed in January of

5   this year.

6           THE COURT:  All right.  So you were critical of

7   plaintiffs for postponing this deposition of Mr. Akins.  Do you

8   think it would be reasonable, when they get the survey in

9   January, to postpone that January deposition until they can

10  find out what the survey says?

11          MR. HAYDEN:  That's not why they postponed it,

12  Your Honor.  They called us before the deposition and said one

13  of the attorneys was ill.  And so that's why it was postponed.

14          But, you know, it's -- I guess really what I'm doing

15  is responding to their allegation that we've somehow delayed in

16  producing Leo Akins.  We've offered him up.  And I think,

17  Your Honor --

18          THE COURT:  You do concede, though, you didn't

19  provide the survey until January '25?

20          MR. HAYDEN:  Yes.  Yes.  But I think, you know, the

21  key issue here, when you look back at the standard, the good

22  cause standard, is that the factual allegations that they are

23  relying upon now were all in the original complaint.  None of

24  this is new.

25          The Indiana Consumer Act that they want to bring a

1   new claim for is very similar to the Montana Consumer Act that

2   they have been litigating for two years.  It's very similar.

3   And they knew when they brought their original complaint that

4   Forest River was an Indiana corporation.  So they could have

5   brought that --

6                THE COURT:  Where are these two plants that are

7   identified in the 2022 survey?  Are they in Indiana?

8                MR. HAYDEN:  Cedar Creek is in Indiana.  I don't know

9   where Impression is.

10               THE COURT:  So assume for a minute that -- you argued

11  previously that plaintiffs filed their initial complaint with a

12  warranty claim and that plaintiffs voluntarily dismissed those

13  warranty claims as part of the amended complaint.  Is that

14  correct?

15               MR. HAYDEN:  Yes.

16               THE COURT:  All right.  So assuming they had reason

17  to dismiss -- I'm not sure why.  I'm assuming they had some

18  reason for dismissing the warranty claim voluntarily in the

19  amended complaint -- why shouldn't they be allowed to bring the

20  warranty claim now that they have discovered these problems

21  with these two plants?

22               MR. HAYDEN:  Because all of the facts that provide a

23  basis for the warranty claim they had when they filed their

24  original complaint.

25               THE COURT:  Okay.

1          MR. HAYDEN:  It's all related to their allegation

2    about defective wiring, and they allege concealment of that,

3    and all of that is in the original complaint.  So this is --

4    it's nothing new.  And that's why, you know -- that's why your

5    decision in *Peterson* is so on point because they are two years

6    late in requesting this amendment.

7          And this amendment is going to blow up our schedule.

8    We're going to have to file a motion -- we will file a motion

9    to dismiss.

10         THE COURT:  Well, hold on.  Let me interrupt you.

11   This isn't a new -- this case has been in discovery for a

12   number of years.  Right?

13         MR. HAYDEN:  Yes, sir.

14         THE COURT:  And we've developed a record pretty well

15   so far.  Correct?

16         MR. HAYDEN:  Yes, sir.

17         THE COURT:  All right.  So assume I allowed, for sake

18   of argument, plaintiffs to file an amended complaint, why

19   couldn't you just file a motion for summary judgment instead of

20   a motion to dismiss?  You'd get the same result because you

21   already know what the record is.  And the standard on summary

22   judgment is a little bit lower than on a motion to dismiss.

23         MR. HAYDEN:  Well, I think, Your Honor, we have -- we

24   would first file a motion to dismiss before we would file a

25   motion for summary judgment.

1          THE COURT:  Well, I understand that, but that's a

2    high threshold, you know, no circumstances under which they

3    could prevail, as opposed to summary judgment.  Well, you have

4    the record before us.  Tell me why this warranty claim or

5    whatever is not going to survive to trial?

6          MR. HAYDEN:  Well, we may consider that.  But either

7    way, we're looking at a dispositive motion, Your Honor.

8          THE COURT:  Well, I understand that.  I'm trying to

9    figure out what the delay is, what the delay would be.

10         MR. HAYDEN:  They are also adding a whole bunch of

11   new facts in this amended complaint and three new causes of

12   action.

13         And we want to take the plaintiff's deposition and

14   his wife's deposition over these new causes of action.  We

15   didn't have a chance to conduct discovery on these new causes

16   of action.  So if you amend -- if you allow them to amend, then

17   we're going to want to take some discovery on the new causes of

18   action that they are asserting.

19         THE COURT:  So do you think that would require the

20   need for a new scheduling order?

21         MR. HAYDEN:  Yes, sir.  We would have to adjust our

22   expert reports too because these are new causes of action.

23         THE COURT:  How do you respond to plaintiff's claim

24   that minimal discovery would be left?

25         MR. HAYDEN:  I mean, for Forest River, we would have

1    to take -- we'd have to take new discovery.  We would send out

2    document production requests.  We would send out

3    interrogatories.  We'd need to take the plaintiff's deposition

4    again.

5         So it's hard to -- it's hard to sit here and

6    anticipate exactly how much discovery we would need, but we

7    would need to take discovery on those new claims.

8         THE COURT:  Let me change the subject just a bit

9    here, Mr. Hayden.  There was a disclosure I believe -- I can't

10   remember the date on this, but the schematic of the wiring

11   system.  When did that take place?

12        MR. HAYDEN:  The schematic was disclosed very early

13   in discovery.  It may have been one of the first documents.  I

14   think it's Bates-Stamped Number 12.  So it's very early.

15        THE COURT:  I thought plaintiffs were arguing there

16   was something disclosed more recently on the schematic.  Hold

17   on.

18        Mr. Bidegaray, is that your position?  There was

19   something more recently disclosed on the wiring system?

20        MR. BIDEGARAY:  Yes.

21        THE COURT:  What is that, sir?

22        MR. BIDEGARAY:  On February 4, 2025, there was a

23   schematic disclosed for travel trailers that shows the exact

24   issue that we're talking about.  It isn't just for fifth

25   wheels.  This problem is to all towable RVs.

1          THE COURT:  Thank you.

2          So, Mr. Hayden, what was disclosed on February 4th of

3    2025, regarding the schematic of the wiring system?

4          MR. HAYDEN:  Yeah, the schematic that was disclosed

5    in February was a travel trailer schematic.  And what was

6    originally produced was a schematic on fifth wheels.  The

7    plaintiff owned a fifth wheel.  That's the schematic that we --

8          THE COURT:  Okay.

9          MR. HAYDEN:  -- that we believed applied.

10         THE COURT:  So is the schematic for the travel

11   trailers similar or identical to the schematic for the fifth

12   wheels?

13         MR. HAYDEN:  Very different and different in a very

14   important way.  The standards for RVs do not require

15   overcurrent protection for the 7-way cord and travel trailers.

16   So that schematic does not show overcurrent protection because

17   it's not required under the standards.  And that is the

18   standard in the industry, not to put overcurrent protection on

19   the 7-way cord and travel trailers because -- this is

20   important -- because the 7-way cord never enters the RV.  And

21   under the standards, because it doesn't enter the RV, campers

22   and travel trailers do not require overcurrent protection on

23   the 7-way cord.  It is required on fifth wheels but not on

24   travel trailers or campers.

25         Now, if you notice what the plaintiff has been doing

 1    recently is they like to use the word towables.  And when they

 2    use the word "towable," what they're trying to do is throw

 3    everything into the same basket when these RVs are very

 4    different.  Campers are very different than fifth wheels, and

 5    fifth wheels are very different than travel trailers.

 6              So the standards are different.  The requirements are

 7    different.

 8              THE COURT:  Remind me again of the scope of the

 9    recall.  What vehicles were included?

10              MR. HAYDEN:  The scope of the recall was Puma fifth

11    wheels, which is what the plaintiff owned, and Cedar Creek

12    fifth wheels going all the way back to their original

13    production date.

14              THE COURT:  What about any travel trailers or

15    campers?

16              MR. HAYDEN:  No, none of those have been recalled.

17              THE COURT:  So what relevance, if any, does the

18    schematic you disclosed in February of 2025 have the plaintiffs

19    claimed regarding the fifth wheels?

20              MR. HAYDEN:  We don't believe it has any relevance to

21    their claim.  But they were asking questions in the deposition

22    about the schematic for travel trailers.  We let witnesses

23    answer.  So we decided to go ahead and voluntarily produce that

24    schematic.

25              THE COURT:  Okay.  Anything else?  Take a minute if

1   you like.

2           MR. HAYDEN:  Well, Your Honor, in their reply brief

3   the plaintiff alleges that good cause exists under Rule 16

4   because there's a serious ongoing safety concern.  And, again,

5   Forest River disputes that there's a serious ongoing safety

6   concern.

7           Despite extensive discovery, there's been no evidence

8   that the alleged wiring defects in the 7-way cord have caused

9   any injuries or deaths.  Zero injuries or deaths in the

10  mountain of discovery that has been produced.

11          But even if you accept that there is a safety

12  concern, they alleged safety concerns in their original

13  complaint.  In paragraph 95, plaintiff alleged that these

14  wiring defects could cause serious injuries, deaths, and fires.

15  So the safety concerns did not prevent plaintiff from bringing

16  these claims two years ago and within the Court's deadline.

17          And, again, we really -- really, that gets back to

18  the heart of this motion.  If you look at that original

19  complaint, the wiring defects are all in the original

20  complaint.  The alleged concealment is in the original

21  complaint.  These alleged safety concerns are in the original

22  complaint.  Nothing stopped them from bringing these warranty

23  claims and this Indiana consumer claim in their original

24  complaint.

25          And they shouldn't be bailed out now because they

1    think that this might help their class action.  The Court

2    shouldn't bail them out because they should have brought that

3    in their original complaint.  And all of the facts that they

4    needed are set forth in their original complaint.

5              THE COURT:  All right.  Anything else, Mr. Hayden?

6              MR. HAYDEN:  No, sir.

7              THE COURT:  Mr. Davis?

8              MR. DAVIS:  Yes.  One thing my cocounsel missed, and

9    certainly Dan can -- Mr. Bidegaray can respond about how

10   crucial this lately discovered survey from 2022 is.  In their

11   reply brief -- and Mr. Bidegaray has made a point previously of

12   saying they've spent hundreds of thousands of dollars

13   investigating these claims.  And we see now for the first time

14   in the reply brief, Document 129.  They identify two experts

15   that they've paid hundreds of thousands of dollars to look at

16   scores of travel trailers.  It's a footnote on page 2 of the

17   reply brief.  These are their experts they've paid hundreds of

18   thousands of dollars to, to see how pervasive the problem is.

19              The idea that they got something from a survey that

20   Mr. Akins commissioned in 2022 has got nothing to do with their

21   claimed knowledge of what they allege to be the extent of the

22   problem.  You can't have it both ways.  You can't pay hundreds

23   of thousands of dollars to hire experts to go out and look at

24   God knows how many travel trailers or fifth wheels, and then

25   say, "Oh, we didn't know that we had this information till we

1  got the survey that Mr. Akins commissioned several years ago."

2  So there's an inconsistency there with what plaintiff is

3  representing.

4          THE COURT:  All right.  Anything else, Mr. Davis?

5          MR. DAVIS:  Well, you asked about if this case can

6  stay on track, and as you noted -- well, first of all, those

7  experts are going to be deposed by Forest River.  And I don't

8  know if they'll want to depose our experts.  We have some.

9  They haven't been disclosed yet.

10          Number 2, when we go down the class action

11  certification -- I was going to say "rabbit hole," perhaps

12  that's not the correct characterization.  But the idea that

13  this case can stay on track at that point seems at best to me

14  extremely remote.

15          THE COURT:  All right.  Thank you.

16          Mr. Bidegaray, what's a "towable"?

17          MR. BIDEGARAY:  Your Honor --

18          THE COURT:  Pardon?

19          MR. BIDEGARAY:  Yes.  I apologize, Your Honor.  Can

20  you hear me?

21          THE COURT:  Yes.  What's a towable?

22          MR. BIDEGARAY:  A towable RV is a fifth wheel, a

23  travel trailer -- which is, a travel trailer, some people,

24  including me, reference it to a bumper, where instead of

25  hooking it up with a fifth wheel on the back of your pickup, it

1 hooks onto your bumper -- and then a tent pop-up trailer.

2 Those are the three types of towables.  They all have this

3 issue.

4          And our experts will absolutely unequivocally be able

5 to explain to you why what Mr. Hayden represented to you that

6 that overcurrent protection doesn't apply to travel trailers or

7 pop-ups is dead wrong.  And they will also be able to explain

8 to you what they saw in the field.

9          What we needed to do -- first of all, we shouldn't

10 have to spend hundreds of thousands of dollars, like Mr. Davis

11 keeps talking about that there's an inconsistency.  No.  We

12 shouldn't have to spend hundreds and hundreds of thousands of

13 dollars trying to figure out the truth.  We should be able to

14 do that through Rule 1, normal discovery.  I mean, that's

15 ridiculous.  That is straight up ridiculous.

16          They should produce the documents.  They shouldn't be

17 denying allegations.  They shouldn't be filing motions to

18 dismiss and making representations to you.  If you go back and

19 look in their representations that they made to you, including

20 representations today, they're straight up wrong.

21          THE COURT:  Like what?

22          MR. BIDEGARAY:  First of all, that overcurrent

23 protection doesn't apply in travel trailers.  Give me a break.

24 Or a pop-up?  That is just straight up wrong.  Those things

25 will start fires and burn people up in those just as fast as

1  they will in a fifth wheel.

2          And then they say, "Oh, there's no proof."  First of
3  all, when these things burn, you know what's left?  A pile of
4  molten metal.  I can show you plenty of pictures.

5          Their system doesn't even allow them to enter deaths.
6  It doesn't even allow them to enter a death.  There is a death
7  claim.  They tried to enter it.  And guess where it started?
8  Right in the front, right where this problem is.  But guess
9  what they wanted to do?  They wanted to fight the claim.  They
10  didn't want to give the guy --

11          THE COURT:  I don't like guessing.  So why don't you
12  just tell me.  Okay, Mr. Bidegaray?

13          MR. BIDEGARAY:  What?

14          THE COURT:  I said I don't like guessing.  So why
15  don't you tell me.

16          MR. BIDEGARAY:  Well, I'm telling you, there's at
17  least one death claim, probably two, that we know of, just from
18  our own independent investigations.

19          And they don't investigate these.  They don't do root
20  cause analysis.  They don't do anything to get to the bottom of
21  the truth, and they darn sure don't do anything to fix the
22  problem.  We need your help for that.  So that's where we're
23  at.

24          MR. DAVIS:  Your Honor --

25          THE COURT:  Hold on.  We'll get to you.

1        Go ahead, Mr. Bidegaray.

2        MR. BIDEGARAY:  Anyway, so this problem is way

3  broader than fifth wheels.  Yeah, they want to pigeonhole it

4  to --

5        THE COURT:  Does your complaint target just fifth

6  wheels, or does it target all towables, as you define them?

7        MR. BIDEGARAY:  It targets everything.  It targets

8  everything.

9        But we didn't get discovery on anything other than

10  fifth wheels.  That's part of the problem.

11        THE COURT:  Did you ask for discovery beyond fifth

12  wheels?

13        MR. BIDEGARAY:  Yes.  So we ended up having to do our

14  own investigation, and it wasn't sufficiently complete.

15        If we would have amended the complaint, Judge,

16  without having people raise their right hand, blood flowing

17  through their veins, and look you right in the eye and explain

18  to you what the problem was and why, and they saw it with their

19  own eyes, we would have been faced with another motion to

20  dismiss, and you would have been faced with "I don't like

21  guessing."  And I don't blame you for not liking to guess.  You

22  can't.

23        But guess what?  Okay.  I used it again.  Sorry.  But

24  now that we've sufficiently spent the money, gathered the

25  evidence, we can come to you with proof, and we have.  Read the

1  affidavit of Dr. Rojas and Dr. Angle.  Read them.

2          This is a problem.  It needs fixed.  And no -- a

3  lunatic would take these guys on for, you know, $1,000, $12-,

4  $1,300 of damage per trailer, a lunatic.

5          THE COURT:  Mr. Bidegaray, how do you respond to the

6  argument that the Court's decision in *Peterson v State Farm*

7  precludes granting a motion to file your fourth amended

8  complaint here?

9          MR. BIDEGARAY:  First of all, in *Peterson*, there was

10  no newly discovered evidence like there is here.  There was

11  nothing like that in *Peterson*.

12          They actively concealed and tried to get this case

13  dismissed using up your time, our time, give me a -- you know,

14  *Peterson* is completely distinguishable.

15          THE COURT:  So let's go back, again, to the newly

16  discovered evidence, the survey.  Does it cover fifth wheels or

17  all towables?

18          MR. BIDEGARAY:  It covers all towables, and the --

19  there's another misrepresentation.  He says, "Only two."  No.

20  I will bring witnesses in, experts that actually know what they

21  are talking about.  60 percent of their plants are doing it

22  wrong, and they didn't -- and he said 12 plants or something.

23  They have over 64 plants.  They surveyed 64 plants, but there's

24  more than 64 plants.  They surveyed the Indiana plants.  There

25  are plants outside of Indiana, Judge.  They didn't survey

1  those.

2         The field investigation, we're still trying to get to

3  the bottom of exactly where everything was produced, which

4  plants.  We've got most of that, on our own, not through

5  discovery, because we're not getting straight answers on some

6  of that.  But the problem is way bigger.  Come on.  That is

7  completely unfair to you.  "Oh, two plants, 10 percent of the

8  models."  That is not true.

9         THE COURT:  Anything else, Mr. Bidegaray?

10         MR. BIDEGARAY:  No, Your Honor.

11         THE COURT:  Mr. Hayden, you wanted to respond to

12  something?

13         MR. HAYDEN:  Yes.  Thank you, Your Honor.

14         So if Mr. Bidegaray has some proof of a death or an

15  injury caused by a 7-way cord, he ought to produce it in

16  discovery.  I'm not aware of that, and they haven't produced

17  anything to support those statements.  If that's discovery they

18  have, they ought to produce it to us.  They haven't produced

19  anything like that.

20         We have -- and getting to the issue of whether the

21  7-way cord and a travel trailer requires overcurrent

22  protection, we have the premier expert in the industry.  He

23  literally ran the organization that sets the standards for RVs,

24  and he will testify that travel trailers do not require

25  overcurrent protection.

1          Mr. Bidegaray sits there and acts like, no.  You

2  know, we're making some misrepresentation.  We have an expert

3  who will say that.

4          And then, finally, our survey wasn't of just Indiana

5  plants.  We surveyed plants all over the country in 2022 to see

6  if there was an issue.

7          THE COURT:  How many plants do you have?

8          MR. HAYDEN:  Again, Your Honor, I -- I think you

9  asked me earlier.

10          THE COURT:  Mr. Bidegaray -- you said 12 or something

11  like that.  Mr. Bidegaray suggests there's over 60.

12          MR. HAYDEN:  I can't -- I don't want to -- I don't

13  want to misrepresent anything to you, Your Honor, and I can't

14  remember the exact number of plants.  I think you asked me

15  earlier about fifth wheel plants, and I believe that's a much

16  smaller number.  But in terms of how many plants that make all

17  towables, I can't give you that answer right now.

18          THE COURT:  Let me just ask:  Does Forest River track

19  incidents with their RV?  If someone reports, "I was at the

20  campground.  My towable started on fire."  Does that go into a

21  database somewhere?

22          MR. HAYDEN:  Absolutely.  We have warranty records

23  that go back -- that go back to 2015, and we're now working on

24  producing those through 2013.  And we've produced all of that

25  to the plaintiffs.

1          THE COURT:  Mr. Bidegaray alluded to the fact that

2     there's an inability of Forest River to track deaths from these

3     products.  What is he talking about there?

4          MR. HAYDEN:  No.  We have a way of tracking deaths

5     and injuries, Your Honor, and we do track deaths and injuries.

6          THE COURT:  Have you provided that information to the

7     plaintiff?

8          MR. HAYDEN:  Yes.  Yes.

9          And the warranty information on fires related to

10    7-way cords, we've produced that for all towables, not just

11    fifth wheels, all towables.

12         THE COURT:  The warranty information.

13         MR. HAYDEN:  Yes.

14         THE COURT:  Do you have any idea how many claims have

15    been filed on the warranties for your towables based on the

16    7-way wiring defects?

17         MR. HAYDEN:  That is -- that is in the range of 70 to

18    80 claims.

19         THE COURT:  How many towables have you produced?

20         MR. HAYDEN:  Tens of thousands.

21         THE COURT:  And those 70 to 80 claims, have those

22    been resolved already?

23         MR. HAYDEN:  Yes.

24         THE COURT:  Okay.

25         MR. HAYDEN:  Yes.  And we have a method for tracking

 1  fires, for injuries, and deaths.  And that information has been

 2  produced to the plaintiffs.

 3          THE COURT:  So I asked Mr. Bidegaray about, instead

 4  of filing an amended complaint, pursuing some of this discovery

 5  as part of the class certification process.  And his concern

 6  was that Forest River is going to challenge plaintiffs on the

 7  commonality factor; there's not enough similarity between the

 8  circumstances of the individual class members and the defects

 9  they are alleging.  How do you respond to that?

10          MR. HAYDEN:  We are going to do that, and we're going

11  to do that regardless of whether he files an amended complaint

12  or not.  An amended complaint isn't necessary to -- you know,

13  if you read their amended complaint, it's like they want to

14  summarize all of the facts they've discovered, and that's not

15  the -- you don't need to do that in a complaint.  Rule 8 is

16  just a --

17          THE COURT:  If you want to avoid a motion to dismiss,

18  it's one of the preferred tactics, I think.

19          MR. HAYDEN:  But all of the allegations that provide

20  a basis for their claims are contained in their original

21  complaint.

22          THE COURT:  All right.  Anything else?

23          MR. HAYDEN:  Just a sec.

24          THE COURT:  Go ahead.

25      (Off-the-record discussion between Mr. Hayden and

1    Mr. Drics.)

2            MR. HAYDEN:  We have an obligation, Your Honor,

3    through -- to NHTSA to report any injuries and deaths.

4            THE COURT:  Tell me for the record, the National

5    Highway Transportation Safety Administration?

6            MR. HAYDEN:  Yes, sir.

7            THE COURT:  Okay.  To report injuries or deaths?

8            MR. HAYDEN:  Yes.

9            THE COURT:  Okay.  And those records are available

10   and have been produced?

11           MR. HAYDEN:  Yes.

12           THE COURT:  All right.  Anything else, Mr. Bidegaray?

13           MR. BIDEGARAY:  No, Your Honor.

14           THE COURT:  All right.  Then, what is our current

15   trial date?

16           MR. HAYDEN:  September of 2025.

17           THE COURT:  All right.  Well, I see no reason why we

18   can't keep that schedule one way or another.  So I will get an

19   order out on this as soon as I can.  Try to keep this case

20   moving.  In the meantime, continue your discovery efforts, and

21   I'll have an order out as soon as possible.

22           Thank you for your time, Counsel.

23       (The proceedings concluded at 3:21 p.m.)

24

25                           --o0o--

REPORTER'S CERTIFICATE

REPORTER'S CERTIFICATE

1

2     I, Yvette Heinze, a Registered Professional

3  Reporter, Certified Shorthand Reporter, Certified Verbatim

4  Reporter-Steno, certify that the foregoing transcript is a true

5  and correct record of the proceedings given at the time and

6  place hereinbefore mentioned; that the proceedings were

7  reported by me in machine shorthand and thereafter reduced to

8  typewriting using computer-assisted transcription; that after

9  being reduced to typewriting, a certified copy of this

10  transcript will be filed electronically with the Court.

11     I further certify that I am not attorney for, nor employed

12  by, nor related to any of the parties or attorneys to this

13  action, nor financially interested in this action.

14     IN WITNESS WHEREOF, I have set my hand at Great Falls,

15  Montana, this 14th day of February, 2025.

16

17                    /s/ *Yvette Heinze*

18     _____
                      Yvette Heinze
19                    United States Court Reporter

20

21

22

23

24

25