# In the Matter Of:

## JAY NELSON, et al

vs

## FOREST RIVER, INC., and DOES 1-25

# LEO AKINS

February 18, 2025



**BECAUSE TRUST MATTERS**
WWW.MORETTIGROUP.NET | 800.536.0804 | MICHIGAN

Court Reporting · Document Management · Video Conferencing

**Exhibit 3**

```
 1  A    We -- up until recently, we haven't had a legal, quote
 2       unquote, formal department.
 3  Q    And before that, external?
 4  A    External.
 5  Q    And what role or responsibility did your jobs include
 6       that necessitated you communicating with the outside
 7       attorneys?
 8            MR. HAYDEN:  Answer that only if you can answer
 9       it without disclosing any attorney/client privileged
10       communication.
11  A    If you could rephrase the question so I could give as
12       accurate of an answer as possible?
13  Q    (BY MR. TURNER)  Sure.  I'm just trying to determine
14       during what periods of time your job at Forest River
15       necessitated you communicating with outside lawyers --
16       I'm not asking you to tell me the substance of the
17       communications, but just did you have a role or
18       responsibility to do that?
19  A    Yeah -- okay.  Yeah, I -- I would communicate with them.
20       Whenever there was things that were of -- beyond my
21       knowledge or understanding, we would get counsel.
22  Q    Fair enough.  Now, as I understand from reviewing some
23       background information about you off the Internet, you
24       have attended something called Goshen College?
25  A    Yes.
```

|   |   |   |
|---|---|---|
| 1 |   | I wanted to know how the charge lines were being wired in |
| 2 |   | fifth wheel facilities. |
| 3 | Q | I got it.  In other words, the Complaint triggered this |
| 4 |   | specific issue about the charge lines? |
| 5 | A | Yes, sir.  Yes, sir. |
| 6 | Q | Okay.  Now, have you reviewed the documents given to us |
| 7 |   | relating to the 2022 inspection? |
| 8 | A | 2022 inspection? |
| 9 | Q | Yeah, this check it out process that Matt was doing. |
| 10 | A | One more time say the whole -- the whole thing. |
| 11 | Q | I'm just wondering if you reviewed before today the |
| 12 |   | documents that were generated at Matt's request as part |
| 13 |   | of the check it out process back in 2022? |
| 14 | A | I believe so.  I -- |
| 15 | Q | Okay. |
| 16 | A | -- believe I have seen those. |
| 17 | Q | Okay.  And do you recall that Matt's work involved over |
| 18 |   | 60 plants? |
| 19 | A | It may have.  I'm not -- |
| 20 | Q | Do you have -- |
| 21 | A | -- I'm not sure. |
| 22 | Q | -- 60 plants that make fifth wheels? |
| 23 | A | No, sir. |
| 24 | Q | Is it possible that you told Matt to include all plants |
| 25 |   | that make travel trailers, both travel and fifth wheel |

```
 1                and --
 2                     MR. HAYDEN:  Objection.
 3     Q     (BY MR. TURNER)  -- bumper --
 4                     MR. HAYDEN:  Objection.  Form to what is
 5           possible.
 6     A     I do not recall.  I don't --
 7     Q     (BY MR. TURNER)  Okay.
 8     A     -- recall telling him to do that or not.  I know I
 9           specifically wanted him to look at fifth wheels.  We may
10           have discussed more than that.
11     Q     Okay.  So you can't exclude the fact that you may have
12           told Matt to include travel trailers as well as fifth
13           wheels?
14                     MR. HAYDEN:  Objection.  Form.  Calls for
15           speculation.
16     A     That's not outside the realm of possibility.
17     Q     (BY MR. TURNER)  Okay.  Now, did you advise, tell or
18           communicate to anyone else that you were having -- anyone
19           else within the company that you were having Matt do this
20           process of checking things out at the plants?
21                     MR. HAYDEN:  Objection.  Form.  Compound.
22     A     I do not recall.
23     Q     (BY MR. TURNER)  Do you recall if you told the president?
24     A     That I was having Matt do it?
25     Q     Yes.
```

```
 1   A    I don't recall telling him that.
 2   Q    Do you recall telling the president that you were going
 3        to check out what was going on at the plants relating to
 4        the Complaint about the charge line?
 5   A    Yes, I -- I told the president that I was going to look
 6        into it.
 7   Q    Okay.  Did you tell anybody outside the company that you
 8        were going to look into this?
 9   A    Outside of Forest River?
10   Q    Yes.
11   A    I do not recall that.
12   Q    For instance, independent monitors, lawyers, anyone else?
13             MR. HAYDEN:  Objection.  Do, do not disclose
14        discussions you had with attorneys.
15             MR. TURNER:  I'm not asking him to disclose
16        discussions.  I'm asking him did you tell anybody outside
17        the company?
18             MR. HAYDEN:  You just asked about lawyers.  Do
19        not disclose any conversations you had with attorneys.
20        Those are attorney/client privileged communications.
21   A    Yeah, just -- I'm trying to remember.  I, I do not
22        remember who I may or may not have spoke to about it.  I
23        -- all I remember -- I clearly remember talking to Matt
24        and my president.
25   Q    (BY MR. TURNER)  Did you order Matt to do this work at
```

```
 1       the various plants after you received the lawsuit papers?
 2   A   Did I order Matt to do this after I -- we got the --
 3       yeah, the, the -- this case is what prompted me to look
 4       at the fifth wheel charge line wiring.
 5   Q   Did you -- had you already passed the lawsuit papers on
 6       to the legal office or the people that handle the legal
 7       process?
 8   A   There was no legal office giving me any of this.  I -- it
 9       showed up on my desk one day, and I talked to the
10       president.
11   Q   And did the president commun -- what did the president
12       tell you when you brought this to him that day?
13   A   He said, go check it out.
14   Q   And did he -- did the president indicate to you you need
15       to get the permission of the lawyers to check it out
16       first?
17              MR. HAYDEN:  Objection.
18   A   I don't recall him ever saying that.
19   Q   (BY MR. TURNER)  Did it ever occur to you that you might
20       need to check in with the lawyers before you did this?
21              MR. HAYDEN:  Objection.  Attorney/client
22       privileged communication.  Don't answer that question.
23              MR. TURNER:  I'm not asking to communicate --
24   Q   I'm saying did it ever occur to you that you needed to
25       communicate with a lawyer, since a lawsuit was filed,
```

```
 1        before you did this check it out process?
 2                  MR. HAYDEN:  And I'm instructing him not to
 3        answer that question.  Attorney/client privilege.
 4   Q    (BY MR. TURNER)  Did you ever talk to the attorneys about
 5        this procedure that you had Matt doing back in 2022?
 6                  MR. HAYDEN:  Objection.  Attorney/client
 7        privilege.  Instruct you not to answer that question.
 8   Q    (BY MR. TURNER)  Now, Mr. Hayden has represented to the
 9        Court that neither he nor your attorneys at the company
10        were aware of this survey that was ongoing in 2022 after
11        this lawsuit was filed.  To the best of your knowledge,
12        is that an accurate statement?
13                  MR. HAYDEN:  Objection.  Instruct the witness
14        not to answer.  Attorney/client privilege.
15   A    Pardon me?
16   Q    (BY MR. TURNER)  Well, let me put it up on the screen for
17        you.  Hold on a second.  Okay.  We are looking at a
18        hearing transcript -- I believe this is page 13.
19                  MR. TURNER:  And, Mr. Hayden, I -- I have
20        highlight it for you.
21   Q    Mr. Akin, Mr. Hayden represented there was a 2022 survey.
22        You see where I got the word survey from now?
23   A    Yes, sir, I see that.
24   Q    Okay.  Is it okay if we call it survey from now on?
25   A    I, I'm okay if you call it survey now that I --
```

1  Q    Okay.
2  A    -- understand that.
3  Q    There was a 2022 survey that was done.  No, we as counsel
4       did not know about.  But it was done internally.  After
5       they received this Complaint, they did they -- what they
6       thought was a competent survey of.  And then the Court
7       says, after Forest River received a complaint?
8       Mr. Hayden said, yes.  And Mr. Hayden continued, not
9       before the Plaintiff's allegations.  It was after his
10      allegations they did this survey.  They thought it was a
11      competent -- I think that's supposed to be confidential
12      business survey.  We didn't know about it.  When it came
13      up in discovery in a deposition of a Forest River witness
14      we turned around and produced it hours after the
15      deposition.  Now, my question to you is, is that an
16      accurate summary to the best of your recollection?
17           MR. HAYDEN:  Objection.  Attorney/client
18      privilege.  Instruct the witness not to answer.
19 Q    (BY MR. TURNER)  Okay.  Let's continue on.  Mr. Hayden
20      represented that it shows that two plants that
21      manufacture fifth wheels, Cedar Creek and Impression, may
22      have had a manufacturing or assembly issue, the same
23      wiring issue that is the subject of the recall.  Is that
24      an accurate statement of what you found?
25 A    Shows the two plants -- when it says it shows, what is it

```
 1         showing?  What is it?
 2   Q     The survey.
 3   A     It shows that the two plants --
 4               THE WITNESS:  I can answer?
 5               MR. HAYDEN:  Yes.
 6   A     Yes, I believe that's accurate.
 7   Q     (BY MR. TURNER)  Okay.  Now, let's continue on down --
 8         couple more questions about this.  Now we are on page 16.
 9         It says -- Mr. Hayden says, we learned about the 2020
10         survey during a deposition of one of the witnesses, Your
11         Honor.  I believe it was Rodney Smith.  Now, do you know
12         Rodney Smith?
13   A     I do.
14   Q     Was -- who was Mr. Smith back in 2022?
15   A     Who was he?
16   Q     Yes.  What did he do for you?
17   A     Oh, he is a standards manager is what we call them today.
18         I think back then they were called quality managers, but
19         a standards manager.
20   Q     Had -- did you have any conversations with Rodney Smith
21         back in 2022 about this survey?
22   A     Not that I recall.
23   Q     Do you recall if he worked for Matt Gingerich?
24   A     Yes, sir.  Yes, sir.
25   Q     He did?
```

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Do you know whether Rodney was personally involved in the |
| 3 | | survey? |
| 4 | A | I, I believe so.  I'm not 100 percent sure.  I wasn't in |
| 5 | | the day-to-day on that. |
| 6 | Q | All right.  Now, the Court asked the question -- now we |
| 7 | | are on page 17 -- did the survey cover only fifth wheels? |
| 8 | | And Mr. Hayden said, no, it covered travel trailers and |
| 9 | | actually campers.  Do you see that? |
| 10 | A | I do. |
| 11 | Q | Is that accurate to the best of your recollection? |
| 12 | A | I honestly do not recall.  I know I -- |
| 13 | Q | And -- |
| 14 | A | -- I know it covered fifth wheels. |
| 15 | Q | And if it did cover travel trailers and actual campers, |
| 16 | | why would you have instructed Matt to look at the charge |
| 17 | | lines on those as well? |
| 18 | | MR. HAYDEN:  Objection. Form.  Assumes facts. |
| 19 | A | I don't recall asking Matt to do that. |
| 20 | Q | (BY MR. TURNER)  Well, I understand.  But if Mr. Hayden |
| 21 | | represented accurately that the survey covered travel |
| 22 | | trailers and actual campers as well, is there something |
| 23 | | common about the charge lines that would have told you to |
| 24 | | have Matt do that? |
| 25 | | MR. HAYDEN:  Objection. Form. |

| | | |
|---|---|---|
| 1 | A | No, there -- it's a different -- it's a different system. |
| 2 | | It's -- I don't know why.  Unless he was just looking to |
| 3 | | be thorough.  He is a very thorough guy.  I like him a |
| 4 | | lot. |
| 5 | Q | Okay.  Yeah, I liked him a lot when I met him as well. |
| 6 | | Seemed like a nice guy. |
| 7 | A | Very good guy. |
| 8 | Q | And then the Court asked, and the survey that showed |
| 9 | | problems, were these wiring problems consistent with the |
| 10 | | wiring problems identified in the Plaintiff's Complaints? |
| 11 | | And the response was, yes.  Is that consistent with your |
| 12 | | recollection of the results of the survey? |
| 13 | A | I mean, I wouldn't word it that way, but they are |
| 14 | | consistent, yes. |
| 15 | Q | Okay.  Now, I have to ask you this just from a practical |
| 16 | | standpoint to make sure the record is clear.  This survey |
| 17 | | that we are talking about back in 2022, it was never done |
| 18 | | at the request of counsel, legal counsel, is that |
| 19 | | correct? |
| 20 | | THE WITNESS:  Can I answer? |
| 21 | Q | Yes. |
| 22 | | MR. HAYDEN:  Oh, you are going to instruct the |
| 23 | | witness now?  I think he is asking me that question. |
| 24 | | MR. TURNER:  Well, you didn't object. |
| 25 | Q | So you can answer. |

1                    MR. HAYDEN:  Yeah, no, I -- I object on
2        attorney/client privilege grounds.
3                    MR. TURNER:  Now you can thank me for helping
4        you.
5    Q   Now, what allegations do you recall were made in the
6        Complaint that prompted you to have Matt conduct this
7        survey?  What specific allegation?
8    **A   The allegation that the -- the charge line shorted and**
9    **melted.**
10   Q   Do you recall that the Complaint alleged that the unit
11       lacked over-current protection?
12   **A   I believe I recall that, yes.**
13   Q   Do you -- do you recall that the Complaint alleged
14       missing breakers?
15   **A   No, I don't recall that.**
16   Q   Do you recall that the Complaint alleged lack of wiring
17       protection?
18   **A   Yes, I recall that.**
19   Q   And did you have Matt investigate whether that existed as
20       part of this survey?
21   **A   That's what I wanted to know from the different**
22   **divisions, how they were doing that, how they were**
23   **routing it, how they were protecting it, yes.**
24   Q   And do you recall that the Complaint also alleged a lack
25       of appropriate strain relief?

| | | |
|---|---|---|
| 1 | A | That seems familiar to me. |
| 2 | Q | And is that part of the survey that you wanted Matt |
| 3 | | conducting? |
| 4 | A | The simplest way to put it is I wanted to know how the |
| 5 | | different divisions were doing it. |
| 6 | Q | Now, do you recall, Mr. Akins, approximately when this |
| 7 | | survey was completed back in 2022? |
| 8 | A | I do not recall. |
| 9 | Q | Do you recall whether it took a week, two weeks, two |
| 10 | | months? |
| 11 | A | I do not recall. |
| 12 | Q | And what do you recall Matt coming back and telling you? |
| 13 | A | I recall him talking to me about Cedar Creek and |
| 14 | | Impression, but I don't remember the specifics. |
| 15 | Q | So the only thing as you sit here in 2025 that you can |
| 16 | | recall Mr. Gingerich reporting back to you from the |
| 17 | | survey was something about Cedar Creek and something |
| 18 | | about Impression? |
| 19 | A | Well, how they -- which -- their placement of the wires |
| 20 | | on the over-current protection provided. |
| 21 | Q | And what was it that he described for you? |
| 22 | A | I believe he said that they were switched. |
| 23 | Q | What was switched? |
| 24 | A | The -- there is two lugs on a over-current protection, |
| 25 | | and the -- the battery was on the -- I forget if it was |

```
 1         top or bottom, but they were switched on those.
 2   Q     So there were two plants that were doing it wrong?
 3   A     Doing it different than it should -- than we wanted it to
 4         be.
 5   Q     Was that something different than wrong?
 6   A     That's not how we wanted it to be, I guess is the best
 7         way to say it.
 8   Q     Okay.  Well, did you inform the National Highway Traffic
 9         Safety Administration --
10   A     No, sir.
11   Q     -- of your findings?
12   A     No, sir.
13   Q     Did you make the decision not to?
14   A     I didn't make a decision to or not to.  It was not
15         something that we would normally report.
16   Q     So it just never occurred to you?
17   A     No, it's not that it didn't occur to me.  It's not
18         something that we would report.
19   Q     Did it occur to you that you might need to report that to
20         the Government?
21   A     I'm not -- it's, it's not something that we would report.
22         I mean, I'm not sure how to answer that question.
23   Q     Well, did you immediately take the problem to the office
24         of corporate compliance and identify the problem that you
25         had seen from Cedar Creek and Impression?
```

```
 1                MR. HAYDEN:  Objection.  Form.
 2   A    I don't recall talking to the office of corporate
 3        compliance on that.
 4   Q    (BY MR. TURNER)  What did you do to determine how long
 5        this had been done wrong at the Cedar Creek and
 6        Impression factories?
 7                MR. HAYDEN:  Objection.  Form.
 8   A    I don't understand the question.  Could you please
 9        rephrase it?
10   Q    (BY MR. TURNER)  Sure.  Mr. Gingerich comes back and
11        tells you, hey, the Cedar Creek and the Impression plant
12        are not doing these like they are supposed to, correct?
13   A    Not the way we would like to see it, right.
14   Q    And how long had they not been doing it like they were
15        supposed to?
16   A    I, I don't recall.  I don't remember that.
17   Q    Did you ask Matt how long have they been doing this like
18        this?
19   A    I may have.  I don't recall.
20   Q    Did Matt have an answer?
21   A    I, I -- I don't recall.
22   Q    Did it ever occur to you that it might be important to
23        know how long they have been doing it the wrong way?
24                MR. HAYDEN:  Objection.  Form.
25   A    Not necessarily.
```

**Exhibit 3**

```
 1   Q      (BY MR. TURNER)  Why?
 2   A      There is -- if there is not a risk to safety, then that
 3          -- just change it the way we want it and move on.
 4   Q      What's the risk of doing it the way they were doing it
 5          wrong?
 6   A      I'm unaware of the risk of that.
 7   Q      Well, what's the whole purpose of doing it the right way?
 8   A      Well, the way that we would like it?  On the -- on the --
 9          for the wiring of the charge line?  Is that if -- the
10          risk would be is if the over-current protection wouldn't
11          properly work.  And there is no evidence that it doesn't
12          properly work the way it was wired.
13   Q      Oh, so even the way it was miswired you thought
14          over-current protection would still be in place?
15   A      Yeah, we have no evidence suggesting otherwise.
16   Q      Is that what Matt told you?
17   A      No, that is not what Matt told me.  I don't remember what
18          Matt told me.  That's what I'm saying.
19   Q      How did you reach that conclusion?
20   A      All of our data that suggests that it doesn't -- it works
21          both ways.
22   Q      What data?
23   A      The data that we have from all the units that we built.
24   Q      When you say data, what are you referring to?
25   A      Warranty data.
```

| | | |
|---|---|---|
| 1 | Q | So you went back and looked at the warranty data? |
| 2 | A | I didn't go back and look at it.  I don't have a trend |
| 3 | | that comes to mind that we have a -- a issue with it. |
| 4 | Q | What's a trend mean? |
| 5 | A | A trend would be a collection of data that would give you |
| 6 | | data points that suggest -- to make a suggestion. |
| 7 | Q | Did you go look to see whether a trend existed in the |
| 8 | | data? |
| 9 | A | I didn't specifically go look. |
| 10 | Q | Did you talk with anybody? |
| 11 | A | I do not recall. |
| 12 | Q | Did you -- did it occur to you that you might want to do |
| 13 | | a data review of that? |
| 14 | | MR. HAYDEN:  Objection.  Form. |
| 15 | A | If I had -- if I had sufficient cause to do that, I would |
| 16 | | do that. |
| 17 | Q | (BY MR. TURNER)  What would be sufficient cause? |
| 18 | A | Enough data points brought up to my attention that would |
| 19 | | say -- that would lead me to that. |
| 20 | Q | What's enough data points?  Two fires, three, five, |
| 21 | | ten -- |
| 22 | A | Any, any -- |
| 23 | Q | -- how many? |
| 24 | A | -- any, any is enough.  Any amount is enough, one -- |
| 25 | Q | Any -- |

| | | |
|---|---|---|
| 1 | A | -- one is enough. |
| 2 | Q | -- any fire -- I'm sorry, go ahead. |
| 3 | A | One would be enough to make me look. |
| 4 | Q | Okay.  So one fire related to lack of over-current |
| 5 | | protection would be sufficient to do a full blown look? |
| 6 | A | No, I -- I never said that.  Would make me look, not a |
| 7 | | full blown look. |
| 8 | Q | What's the difference between look and a full blown look? |
| 9 | A | We have many divisions.  I mean, I'm not going to analyze |
| 10 | | every single division for one division doing a thing.  I |
| 11 | | will look at that division. |
| 12 | | MR. TURNER:  Is everybody getting feedback? |
| 13 | | I'm getting some feedback? |
| 14 | | COURT REPORTER:  Yes. |
| 15 | | THE WITNESS:  Yes, feedback. |
| 16 | | MR. COWAN:  Somebody has got a background sound |
| 17 | | going on or something. |
| 18 | | MR. TURNER:  Yeah, somebody needs to put on |
| 19 | | mute.  Somebody has people in the background it sounds |
| 20 | | like. |
| 21 | | THE VIDEOGRAPHER:  Looks like Papageorge has |
| 22 | | something going on in the background. |
| 23 | | MR. PAPAGEORGE:  I don't have anything going on |
| 24 | | in the background, disagree.  You want to tell me what I |
| 25 | | have going on in the background? |

```
 1              MR. TURNER:  I think he was -- meaning he sees
 2      people walking by.
 3              THE VIDEOGRAPHER:  I can see the microphone has
 4      something going on with it.
 5              MR. TURNER:  Hey, Mr. Akins, why don't we take
 6      a bathroom break while these guys figure this out, okay?
 7              THE WITNESS:  Yes, sir.  Thank you.
 8              MR. TURNER:  All right.  You bet.
 9              THE VIDEOGRAPHER:  We are off the record.  And
10      the time is 12:23 p.m.
11                  (A brief recess was taken).
12              THE VIDEOGRAPHER:  We are back on the record.
13      And the time is 12:33 p.m.
14  Q   (BY MR. TURNER)  Okay, Mr. Akin, we are on our home
15      stretch here.  Let's -- when we broke, we were talking
16      about the number of fires.  And I believe you told me
17      that one fire related claim would be sufficient to
18      warrant action.  Did I understand that correctly?
19  A   In the context that we were talking, you had say -- you
20      said, how many would it take?  And it could be one.  It
21      could be whatever the number is.  It all depends on the
22      circumstances.
23  Q   Okay.  Now, how many Cedar Creek and Impression RVs left
24      the factory with the wiring not as the company intended
25      for it to be?  Were you able to determine that?
```